RECEIVED
FEB 2 3 2016
TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

| | |
|---|---|
| PEGGY MAYS, ET AL. | CIVIL ACTION NO. 14-3098 |
| VERSUS | JUDGE DOHERTY |
| CHEVRON PIPE LINE CO., ET AL. | MAGISTRATE JUDGE WHITEHURST |

**MEMORANDUM RULING**

Currently pending before the Court is a motion for summary judgment [Doc. 29], filed by defendants Chevron Pipe Line Company ("Chevron Pipe Line") and Chevron Midstream Pipelines, LLC ("Midstream"), whereby defendants seek dismissal of all claims brought against them by plaintiffs on the grounds that the claims are barred by the Louisiana Workers' Compensation Act ("LWCA"), La. R.S. 23:1061(A). Additionally pending is plaintiffs' motion to strike certain affidavits filed by defendants in connection with their motion for summary judgment. [Doc. 50] For the following reasons, the motion for summary judgment is GRANTED IN PART and DENIED IN PART, and the motion to strike is GRANTED.

## I. Factual Background

Peggy Mays (individually and as personal representative of the Estate of James Mays), Daphne Lanclos, Brent Mays and Jared Mays (collectively, "plaintiffs") have sued defendants in tort for damages arising out of a workplace accident that resulted in the death of James Mays. [Doc. 1-1] Jurisdiction in this matter is based upon diversity of citizenship, 28 U.S.C. § 1332. [Doc. 1-1,

p.2; Doc. 12, p.2] The following facts are not in dispute:

On January 30, 2014, Chevron Pipe Line and Furmanite America, Inc., Mays' employer, entered into a Master Services Contract, whereby Furmanite agreed to provide valve maintenance services for Chevron Pipe Line at its onshore and offshore facilities. [Doc. 29-6, p. 1; Doc. 39-3, p. 1] On September 9, 2014, Mr. Mays was sent by Furmanite to the Lighthouse Point platform to perform valve maintenance services. [Id.] The platform was owned by Midstream and operated by Chevron Pipe Line. [Doc. 63-7, p.1; Doc. 67, pp. 1-2; Doc. 70, p.2] The platform was located 2.9 miles off the coast of Louisiana, and, thus, was in state territorial waters.[1] [Doc. 29-6, p. 1; Doc. 39-3, p. 1] While Mr. Mays and others were attempting to manually close a valve, a gear operator broke. [Doc. 63-7, p. 1; Doc. 67-9, p. 1] Mr. Mays returned to the Lighthouse Point platform on September 13, 2014 to remove the broken gear operator. [Doc. 29-6, p. 2; Doc. 39-3, p. 1; Doc. 63-7, p. 2; Doc. 67-9, p.1] After removing the gear operator, the crew began removing the operator cap/bonnet cover plate from the valve. [Id.] While removing the last bolt, the pressure barrier was breached causing the operator cap/bonnet cover plate and valve stem to be expelled. [Doc. 63-7, p. 2; Doc. 67-9, p. 2] Mr. Mays was struck in the head and killed. [Doc. 1-1, p. 2]

---

[1]Notwithstanding plaintiffs' *argument* in their opposition to defendants' motion for summary judgment that the Lighthouse platform *might* be located on the outer continental shelf, there is no genuine issue of material fact that the platform is located in state waters. In their complaint, plaintiffs allege the Lighthouse platform was located "approximately 2.9 miles offshore." [Doc. 1-1, p. 2] During discovery, plaintiffs issued a request for admission to defendants, instructing them to "admit or deny that the incident that made the basis for this claim occurred within the state waters of Louisiana"; defendants responded to this request in the affirmative. [Doc. 47-5, p. 1] Additionally, in defendants' statement of uncontested material facts filed in connection with this motion, defendants state "[t]he platform was located 2.9 miles off the coast of Louisiana"; plaintiffs "admitted" this fact in their response. [Doc. 29-6, p. 1; Doc. 39-3, p. 1] Thus, the fact that the Lighthouse platform is located in state waters is conclusively established. Fed. R. Civ. P. 36(b)(A matter admitted pursuant to a request for admission "is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended."); *see also* LR 56.2 (unless controverted, statements of material fact are deemed admitted).

## II. Summary Judgment Standard

"A party may move for summary judgment, identifying each claim or defense - or the part of each claim or defense - on which summary judgment is sought." Fed.R.Civ.P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

*Id.* at § (c)(1).

As summarized by the Fifth Circuit:

> When seeking summary judgment, the movant bears the initial responsibility of demonstrating the absence of an issue of material fact with respect to those issues on which the movant bears the burden of proof at trial. However, where the nonmovant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial. Only when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" is a full trial on the merits warranted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

*Lindsey v. Sears Roebuck and Co.*, 16 F.3d 616, 618 (5th Cir.1994)(internal citations omitted).

Finally, in evaluating evidence to determine whether a factual dispute exists, "credibility determinations are not part of the summary judgment analysis." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994). To the contrary, "[i]n reviewing all the evidence, the court must

disregard all evidence favorable to the moving party that the jury is not required to believe, and should give credence to the evidence favoring the nonmoving party as well as that evidence supporting the moving party that is uncontradicted and unimpeached." *Roberts v. Cardinal Servs.*, 266 F.3d 368, 373 (5th Cir.2001).

## III. Analysis

### A. Whether Midstream and Chevron Pipe Line were Mr. Mays' statutory employers and thus entitled to tort immunity under Louisiana law.

Both Midstream and Chevron Pipe Line contend they were Mays' "statutory employers" under the Louisiana Workers' Compensation Act ("LWCA")[2], by virtue of the Master Services Contract between Chevron Pipe Line and Furmanite, and thus, they argue they are each entitled to tort immunity pursuant to the LWCA. [Doc. 29-3, pp. 4-6] The Master Services Contract in effect on the date of Mays' accident provides in pertinent part:

> **12.7 Louisiana Statutory Employer Coverage.** In all cases where Contractor's employees . . . are covered by the Louisiana Worker's Compensation Act, La. Rev. Stat. Ann. 23:1021 et seq., Company and Contractor agree that pursuant to Section 23:1061(A)(1) all Work performed by Contractor and its employees under the terms and conditions of this Contract is an integral part of Company's operations and is essential to Company's ability to generate its goods, products, and services. Additionally, Company and Contractor agree that for purposes of Section 23:1061(A)(3) Company is the principal or statutory employer or special employer of Contractor's employees.

[Doc. 29-4, p. 28]

Under the LWCA, an employer is liable for compensation benefits to an employee who is injured as a result of an accident arising out of and in the course of employment. La. R.S. 23:1031(A). Generally, the recovery of workers' compensation is the employee's exclusive

[2] *See* La. R.S. 23:1020, et seq.

remedy against the employer for such injury. La. R.S. 23:1032(A)(1)(a); *see also Wright v. Excel Paralubes*, 807 F.3d 730, 732 (5th Cir. 2015). The LWCA applies to both direct employer/employee relationships, as well as to statutory employer/employee relationships. La. R.S. 23:1061; *Wright* at 732.

With regard to "statutory employers," the LWCA provides:

> [W]hen any "principal" . . . undertakes to execute any work, which is a part of his trade, business, or occupation and contracts with any . . . "contractor", for the execution . . . of the whole or any part of the work undertaken by the principal, the principal, as a statutory employer, shall be granted the exclusive remedy protections of R.S. 23:1032 and shall be liable to pay to any employee employed in the execution of the work or to his dependent, any compensation under this Chapter which he would have been liable to pay if the employee had been immediately employed by him. . . .

La. R.S. 23:1061(A)(1).[3] "Simply put, a statutory employer/employee relationship can arise when, in conformance with La.Rev.Stat. § 23:1061, a principal hires a contractor to perform services that are part of the principal's business; in this situation, the principal can become the statutory employer of the contractor's employees." *Nielsen v. Graphic Packaging Intern., Inc.*, 469 Fed.Appx. 305, 307 (5th Cir. 2012).

When the principal enters into a written contract recognizing it as the statutory employer of the other party's employees, "there shall be a rebuttable presumption of a statutory employer relationship between the principal and the contractor's employees. . . ." La. R.S. 23:1061(A)(3). "This presumption may be overcome only by showing that the work is not an integral part of or essential to the ability of the principal to generate that individual principal's goods, products, or

[3]Under the LWCA, a "principal" is defined as "any person who undertakes to execute any work which is a part of his trade, business, or occupation in which he was engaged at the time of the injury." La. R.S. 23:1032(A)(2).

services." *Id.*

**2. Whether Midstream can be Mr. Mays' statutory employer**

Again, the Master Services Contract was between Chevron Pipe Line (the operator of the Lighthouse platform) and Furmanite (Mr. May's employer); the Master Services Contract does not mention Midstream (the owner of the platform). In a footnote in plaintiffs' memorandum in opposition to defendants' motion for summary judgment, plaintiffs assert that because the Master Services Contract is between Chevron Pipe Line and Furmanite only, Midstream cannot be deemed Mays' statutory employer under the LWCA, because it is not identified as a statutory employer in the Master Services Contract. [Doc. 39, p. 5, n. 8] In defendants' reply memorandum, they assert Midstream is a wholly owned subsidiary of Chevron Pipe Line, and thus, an "Affiliate" of Chevron Pipe Line as defined in the Master Services Contract, and therefore Midstream is "entitled to the same statutory employer protection as [Chevron Pipeline]." [Doc. 47-4, pp. 9-10] In support of this argument, defendants submit the affidavit of Frank Soler, which states as follows:

> 1. I am an authorized representative of Chevron Pipe Line Company and is [sic] authorized to make this affidavit;
>
> 2. I am familiar with the corporate relationship between Chevron Pipe Line Company and Chevron Midstream Pipelines, LLC; and
>
> 3. Chevron Midstream Pipelines, LLC is a wholly owned subsidiary of Chevron Pipe Line Company.

[Doc. 47-5, pp. 9-10]

Plaintiffs have filed a motion to strike this affidavit arguing that Mr. Soler was not identified in defendants' Rule 26 initial disclosures. [Doc. 50, p. 2] Plaintiffs contend because defendants failed to disclose Mr. Soler, defendants are "prohibited from using the undisclosed evidence 'at

trial, at a hearing, or on a motion,' unless the failure is harmless." [Id. (quoting Fed.R.Civ.P. 37(c)(1))] Plaintiffs further contend the failure to disclose Mr. Soler was not harmless, because plaintiffs did not have the opportunity to depose him before the close of discovery, and "[i]t would be extremely prejudicial to Plaintiffs for the Court to now grant a dispositive Motion for Summary Judgment on the testimony of witnesses who have never been disclosed to Plaintiffs." [Id. at 2-3]

The Court need not determine whether defendants' failure to disclose Mr. Soler as a possible witness was harmless, as the affidavit itself in no way comports with the requirements of Fed.R.Civ.P. 56(c)(4). An affidavit used to support a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and *show that the affiant or declarant is competent to testify on the matters stated.*" *Id.* (emphasis added). Mr. Soler's affidavit in no way shows he is competent to testify on the matters stated. Further, the affidavit is potentially in conflict with defendants' Corporate Disclosure Statement [Doc. 8] which states, "Chevron Midstream Pipelines, LLC is a wholly-owned subsidiary of Chevron Corporation," but is silent as to whether Midstream is wholly owned by Chevron Pipe Line.[4] Accordingly, the Court declines to consider the affidavit of Mr. Soler, and thus, must find defendant has submitted no competent evidence in support of its argument that Midstream is an "Affiliate" of Chevron Pipe Line as defined in the Master Services Contract.

The Court further notes even if Midstream were an affiliate of Chevron Pipe Line, the statutory employer provision of the Master Services Contract would not, on its face, appear to apply

[4]Fed. R. Civ. P. 7.1 requires a corporate party to identify "any parent corporation and any publicly held corporation owning 10% or more of its stock. . . ." *Id.* at (a)(1); *see also* LR 5.6. The rule additionally requires the corporate party to "promptly file a supplemental statement if any required information changes." *Id.* at (b)(2); *see also* LR 5.6 and Rec. Doc. 7. Until this affidavit, defendants have never identified Chevron Pipe Line as a parent corporation of Midstream.

to Midstream. The statutory employer provision applies to "Company" (which is identified as "Chevron Pipe Line Company"), and makes no reference to its application to "affiliates." The definition of "Company" in the Master Services Contract is "the Person defined as 'Company' in the introductory paragraph of this Contract [i.e. Chevron Pipe Line]." Only when "referring to a Service Order" is the definition of "Company" broadened to include "Company or its Affiliate that is named as 'Company' in such Service Order." [Doc. 29-4, pp. 6-7] While the Court has not been provided with any service order and is, therefore, unaware of whether Midstream is named as "Company" in any service order, the language of the statutory employer provision found in the Master Services Contract on its face would seem to apply only to Chevron Pipe Line. Thus, nothing *provided to this Court* extends the statutory employer provision to any entity other than Chevron Pipe Line, and therefore, the cases cited by defendants in support of their argument that Midstream is entitled to avail itself of the statutory employer defense by virtue of its status as an "affiliate" appear legally and factually distinguishable. *See e.g. Johnson v. Motiva Enterprises LLC*, 128 So.3d 483 (La.App. 5 Cir. 2013)(statutory employer provision applies to "BUYER or any of its subsidiaries or affiliates," and affiliates were specifically identified by name in the contract); *Berthelot v. Murphy Oil, Inc.*, 2010 WL 103871 (E.D.La.)(applying the "two-contract" defense, not the "statutory employer" defense).[5] In light of the foregoing, the Court finds Midstream has

---

[5]Other cases independently reviewed by this Court likewise support the conclusion the statutory employer defense is unavailable under the facts of this matter. *See e.g. Wright v. Excel Paralubes*, 807 F.3d 730, 733 (5th Cir. 2015)(MSA provision extended all exclusions of liability and indemnities to "affiliates"); *Loque v. Scott Equipment Co., L.L.C.*, 170 So.3d 335, 340 (La.App. 2015)(statutory employer provision in procurement agreement did not apply to owner of accident site where accident site owner was not listed in the agreement as an affiliate or subsidiary, but instead was listed as merely a location for services); *St. Angelo v. United Scaffolding, Inc.*, 40 So.3d 365, 372 (La.App. 2010)(non-signing party which was granted statutory employer status was explicitly referenced in the contract).

not carried its burden to show it is due the relief requested.

**1. Whether Chevron Pipe Line can be Mr. Mays' statutory employer**

Plaintiffs contend because Peggy Mays' is receiving benefits under the Longshore and Harbor Workers' Compensation Act ("LHWCA"), the LWCA does not apply in this case, and consequently, Chevron Pipe Line is not protected from tort liability, regardless of the statutory employer provision in the Master Services Contract.[6] [Doc. 39, p. 5] In support of their argument, plaintiffs cite to *Brown v. Avondale Industries*, 617 So.2d 482 (La. 1993), wherein the Louisiana Supreme Court, in a two paragraph per curiam opinion, held that an alleged statutory employer under the LWCA could not claim the tort immunity provided to principals under that act, where the injured employee elected benefits under the LHWCA. The Court stated in pertinent part:

> Because the employee elected benefits under the federal Act, the state Act was not implicated. Defendant, even if it would be a statutory employer under the state Act, cannot claim the tort immunity provided to principals by that Act, because the conflicting provisions of the federal Act selected by the employee control.

*Id.* at 482.[7]

However, as discussed in the cases following *Brown*, the *Brown* rule applies where it is clear the injured plaintiff was entitled to benefits under the LHWCA. Where the facts show an injured employee was not covered by the LHWCA, "Louisiana's Worker's Compensation Law,

[6]Although plaintiffs make the same argument with regard to Midstream (and both Midstream and Chevron Pipe Line collectively respond), as the Court has determined Midstream has not shown it is immune from tort pursuant to the statutory employer provision of the LWCA and the master services agreement, the Court addresses this argument solely with regard to Chevron Pipe Line.

[7]During the relevant time period in *Brown*, there was concurrent jurisdiction under the LWCA and LHWCA. *Brown*, 617 So.2d at 482. However, pursuant to state law, if the employee chose compensation under the federal Act, he could not also receive state worker's compensation benefits. *Baudoin v. McDermott, Inc.*, 644 So.2d 799, 802 (La.App. 1994).

including its statutory employer defenses, is implicated." *Kerr v. Smith Petroleum Co.*, 909 F.Supp. 421, 424-25 (E.D.La. 1995); *see also Baudoin v. McDermott, Inc.*, 644 So.2d 799, 803 (La.App. 1994)(Questions of material fact existed as to whether plaintiff, who was receiving LHWCA benefits, was entitled to same; if plaintiff was not covered by the LHWCA, the LWCA could still be implicated); *English v. Apache Corp.*, 2011 WL 3352011, *5-*6 (E.D.La.)(plaintiff, who was receiving LHWCA benefits, was not covered under the LHWCA, and thus, state law regarding the statutory employer immunity under the LWCA applied). Accordingly, this Court must determine whether Mr. Mays was covered by the LHWCA at the time of his death.

Plaintiffs assert they are entitled to coverage under the LHWCA by virtue of the provision of the Outer Continental Shelf Lands Act ("OCSLA"), which extends LHWCA coverage to injuries "occurring as the result of operations conducted on the outer Continental Shelf" for the purpose of extracting natural resources from the shelf. 43 U.S.C. § 1333(b). In *Pacific Operators Offshore, LLP v. Valladolid*, 132 S.Ct. 680 (2012), the Supreme Court ended a split of authority among the Circuits and held "OCSLA extends coverage to an employee who can establish a substantial nexus between his injury and his employer's extractive operations on the Outer Continental Shelf." *Id.* at 684.

At issue in *Valladolid* was the workplace death of an offshore drilling platform employee that occurred in an onshore facility. The employee's widow sought LHWCA benefits, but his former employer argued OCSLA's extension of the LHWCA was inapplicable because the death occurred onshore. The Ninth Circuit found § 1333(b) neither contains a "situs-of-injury" requirement, as the Fifth Circuit held in *Mills v. Director, Office of Workers' Compensation*

*Programs, U.S. Dept. of Labor*, 877 F.2d 356 (5th Cir. 1989)(en banc)[8], nor imposes a "but for" causation requirement, as the Third Circuit held in *Curtis v. Schlumberger Offshore Service, Inc.*, 849 F.2d 805 (3rd Cir. 1988). *Id.* at 685 (citing *Valladolid v. Pacific Operations Offshore, LLP* ("*Valladolid I*"), 604 F.3d 1126, 1130-40 (9th Cir. 2010)). Rather, the Ninth Circuit fashioned a new test (the "substantial nexus" test) and held "§ 1333(b) may apply to injuries occurring outside the situs of the outer continental shelf, so long as they occur 'as the result of operations conducted on the outer continental shelf.'" *Valladolid I* at 1139 (quoting § 1333(b)). As set forth by the Ninth Circuit, to satisfy this test, "the claimant must establish a substantial nexus between the injury and extractive operations on the shelf." *Id.* "To meet the standard, the claimant must show that the work performed directly furthers outer continental shelf operations and is in the regular course of such operations." *Id.*

The United States Supreme Court affirmed, thereby abrogating *Mills* and *Curtis.* As stated by the Supreme Court, the substantial nexus test requires "the injured employee to establish a significant causal link between the injury that he suffered and his employer's on-OCS operations conducted for the purpose of extracting natural resources from the OCS." *Valladolid* at 691. Thus, the substantial nexus test is a causation-based test, as opposed to a status-based test. *Id.* at 690. With regard to *Mills*, the Supreme Court noted, "Contrary to the view of . . . the Fifth Circuit, nothing in that language [of § 1333(b)] suggests that the injury to the employee must occur on the OCS." *Valladolid* at 687. With regard to *Curtis*, the Supreme Court stated as follows:

---

[8]In *Mills*, the Fifth Circuit held the OCSLA extends LHWCA coverage only to employees engaged in OCS extractive activities who "suffer injury or death on an OCS platform or the waters above the OCS." *Mills* at 362.

> The Third Circuit's "but for" test is nominally based on causation, but it is also incompatible with § 1333(b). Taken to its logical conclusion, the "but for" test would extend workers' compensation coverage to all employees of a business engaged in the extraction of natural resources from the OCS, no matter where those employees work or what they are doing when they are injured. This test could reasonably be interpreted to cover land-based office employees whose jobs have virtually nothing to do with extractive operations on the OCS. Because Congress extended LHWCA coverage only to injuries "occurring as the result of operations conducted on the outer Continental Shelf," we think that § 1333(b) should be interpreted in a manner that focuses on injuries that result from those "operations."

*Id.* at 690.

Plaintiffs assert Mays satisfies the "substantial nexus" test, because "[a]t the time of his death, James Mays was working on a Chevron valve that was part of the Chevron pipeline transporting natural gas from at least two Chevron natural gas extraction wells located on the outer Continental Shelf directly to the subject valve and then on to an onshore facility." [Doc. 39, p. 8] According to plaintiffs, because "transportation by pipeline of OCS natural resources is one of the operations covered by the OCSLA," Mr. Mays meets the substantial nexus test.[9] [Doc. 56-1, p. 4]

Chevron Pipe Line argues Mays does not meet the substantial nexus test under the facts of this case, because: (1) plaintiffs have put forth no evidence that Mays' direct employer, Furmanite, had any extractive operations on the OCS at the time of his death; or (2) in the alternative, plaintiffs have failed to show a substantial nexus between Mr. Mays' death and Chevron Pipe Line's Outer Continental Shelf operations. [Doc. 47-4, pp. 8, 11] With regard to the first argument, Chevron Pipe Line asserts without any supporting authority that to meet the substantial nexus test, one must

[9]*See* 43 U.S.C. § 1333(b) ("With respect to disability or death of an employee resulting from any injury occurring as the result of operations conducted on the outer Continental Shelf for the purpose of . . . transporting by pipeline the natural resources . . . of the subsoil and seabed of the outer Continental Shelf, compensation shall be payable under the provisions of the Longshore and Harbor Workers' Compensation Act [33 U.S.C.A. § 901 et seq.]").

look solely to the direct employer. [Id. at 8] Presumably, Chevron Pipe Line is inferentially relying upon the statement in *Valladolid* that "OCSLA extends coverage to an employee who can establish a substantial nexus between his injury and his employer's extractive operations on the Outer Continental Shelf." *Id.* at 684. However, there were no statutory employers involved in *Valladolid.* Thus, Chevron Pipe Line's framing of the issue is likely fatally narrow as it, without jurisprudential support, excludes consideration of a statutory employer's OCS extractive operations, when the issue at hand is that very statutory employer's possible liability.

Nevertheless, the Court need not make that legal determination, as the Court finds under the facts of this matter, plaintiffs have not established a substantial nexus between Mr. Mays' death and Chevron Pipe Lines' extractive operations on the Outer Continental Shelf. In order to meet the substantial nexus test, plaintiffs must establish "a significant causal link" between Mays' death and "his employer's on-OCS operations conducted for the purpose of extracting natural resources from the OCS." *Id.* at 691. In *Valladolid I*, in explaining what is required to meet the substantial nexus test, the Ninth Circuit adopted language from the Fifth Circuit's pre-*Mills* jurisprudence, which required the claimant to show "the work performed directly furthers outer continental shelf operations and is in the regular course of such operations." *Id.* (citing *Herb's Welding v. Gray*, 766 F.2d 898, 900 (5th Cir. 1985)("In each case we found that the decedent's work had furthered the operations of a fixed rig on the shelf and was in the regular course of extractive operations on the shelf."). As noted by the Ninth Circuit, prior to the adoption of a situs-based test in *Mills*, "the Fifth Circuit had long held that § 1333(b) applied to injuries occurring outside the outer continental shelf," but it also "required a more direct connection than simple 'but for' causation." *Id.* (citing *Nations v. Morris*, 483 F.2d 577 (5th Cir. 1973), *Herb's Welding v. Gray*, 766 F.2d 898 (5th Cir.

1985)).

In *Herb's Welding*, the Fifth Circuit denied OCSLA benefits to a welder injured while bracing a gas line on a platform in state waters, even though the platform was connected by pipeline to platforms on the outer continental shelf. *Herb's Welding* at 899-900. The Fifth Circuit reasoned regardless of whether the employer "had confined its operations solely to the Louisiana part of the oil field, the accident still would have happened." *Id.* at 900. "The fact that the platform where Gray was injured might have been indirectly connected to a platform on the shelf by a network of pipelines is unrelated to the accident's causation." *Id.* The Court contrasted helicopter crash cases where it had found "the decedent's work had furthered the operation of a fixed rig on the shelf and was in the regular course of extractive operations on the shelf." *Id.*

The accident in this matter occurred *on a platform in state waters* due to the failure to release pressure from an operator cap on a valve prior to removal of the operator cap. As in *Herb's Welding*, the fact that the platform in state waters might have been connected to a platform on the shelf is unrelated to the accident's causation. To adopt plaintiffs' argument in this case would essentially be to adopt the Third Circuit's "but for" test, which the Supreme Court has rejected as overly broad. The arguments made by each party using the facts at hand would seem to place this occurrence neither firmly within the "but for" analysis, nor the "substantial nexus" analysis. However, such a characterization would be overly simplistic. The Supreme Court instructs that the inquiry is causal in nature and is between "*the injury* that [Mr. Mays] suffered and his employer's [or here, statutory employer's] on-OCS operations." *Valladolid* at 691. As noted, Mr. Mays' *injury* occurred when attempting to remove an operator cap on a valve on a platform in state waters. Plaintiffs' only allegation of any OCS connectivity is that the operator cap Mr. Mays was

attempting to remove was on a valve which was "part of the Chevron pipeline" that transported natural gas from the Outer Continental Shelf in addition to transporting natural gas from state waters. To accept plaintiff's argument would come perilously close to the "but for" analysis rejected by the Supreme Court, and allow a random mechanic who might be repairing a third party transport truck on land, used to transport product originating from an OCS platform, to claim longshoreman status - clearly not the intention of the Supreme Court. Accordingly, this Court finds plaintiffs have not established a significant causal link between "the injury," here Mr. Mays' death, and Chevron Pipe Line's extractive operations on the Outer Continental Shelf, and therefore finds Mr. Mays was not covered by the LHWCA at the time of his death. Because the Court finds Mr. Mays was not covered by the LHWCA at the time of his death, "Louisiana Worker's Compensation Law, including its statutory employer defenses, is implicated." *Kerr* at 424-25; *see also Baudoin* at 803; *English* at *5-6.

**IV. Motion to Strike**

For the reasons previously stated, the motion to strike is granted to the extent it seeks exclusion of the affidavit of Frank Soler from consideration by the Court in connection with defendants' motion for summary judgment. Plaintiffs additionally move this Court to strike the affidavits of Marion Cooper East, Jr. and David Lute. As the Court did not find the latter affidavits relevant to the issues at hand, it did not consider those affidavits in connection with defendants' motion for summary judgment. Accordingly, while technically moot, the motion to strike is granted to the extent it seeks an order excluding consideration of the affidavits of Marion Cooper East, Jr. and David Lute in connection with defendants' motion for summary judgment.

## V. Conclusion

For the reasons set forth above, the motion for summary judgment [Doc. 29] filed by defendants Chevron Pipe Line Company and Chevron Midstream Pipelines, LLC is GRANTED IN PART and DENIED IN PART. The motion is granted to the extent it seeks dismissal of the claims brought by plaintiffs against Chevron Pipe Line Company; the motion is denied to the extent it seeks dismissal of plaintiffs' claims against Chevron Midstream Pipelines, LLC. The motion to strike [Doc. 50] is GRANTED.

THUS DONE AND SIGNED in Chambers, ~~Lafayette,~~ Louisiana, this 23 day of February, 2016.

REBECCA F. DOHERTY
UNITED STATES DISTRICT JUDGE