UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

MAYS, ET AL : CIVIL ACTION

VERSUS : NO. 14-03098-BAJ-CBW

CHEVRON PIPE LINE
CO., ET AL : FEBRUARY 1, 2019

=======================================================

CONTINUED TRIAL BY JURY
BEFORE THE HONORABLE BRIAN A. JACKSON
UNITED STATES DISTRICT JUDGE

VOLUME 5

A P P E A R A N C E S

FOR THE PLAINTIFFS:

BRADLEY STEELE & PIERCE
BY: JILL SWEARINGEN PIERCE, ESQ.
BY: LANCE P. BRADLEY, ESQ.
3120 CENTRAL MALL DRIVE
PORT ARTHUR, TEXAS 77642

FERGUSON LAW FIRM
BY: JANE SWEARINGEN LEGER, ESQ.
350 PINE STREET, SUITE 1440
BEAUMONT, TEXAS 77701

WALTERS PAPILLION
BY: DARRELL J. PAPILLION, ESQ.
12345 PERKINS ROAD, BUILDING ONE
BATON ROUGE, LOUISIANA 70810

FOR THE DEFENDANTS:

KEAN MILLER
BY: JAMES R. SILVERSTEIN, ESQ.
BY: SEAN T. MCLAUGHLIN, ESQ.

909 POYDRAS STREET, SUITE 3600
NEW ORLEANS, LOUISIANA 70112

REPORTED BY: NATALIE W. BREAUX, RPR, CRR
UNITED STATES COURTHOUSE
777 FLORIDA STREET
BATON ROUGE, LOUISIANA 70801
(225) 389-3565

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY USING COMPUTER-AIDED TRANSCRIPTION SOFTWARE

INDEX

CLOSING ARGUMENTS: PAGE
BY PLAINTIFFS' COUNSEL MS. PIERCE ................10
BY DEFENSE COUNSEL MR. SILVERSTEIN ..............28
BY PLAINTIFFS' COUNSEL MS. LEGER ................57
VERDICT ........................................115

PROCEEDINGS

**THE COURT:** GOOD MORNING, EVERYONE. BE SEATED.

ALL RIGHT. I HOPE EVERYONE HAD A RESTFUL EVENING AND IS READY TO GO. IS THERE ANYTHING WE SHOULD TAKE UP BEFORE THE JURY RETURNS TO THE COURTROOM?

**MS. PIERCE:** NOTHING FROM THE PLAINTIFFS, YOUR HONOR.

**MR. SILVERSTEIN:** JUDGE, THE DEFENSE HAS TWO THINGS TO TAKE UP AND A QUICK QUESTION FOR THE COURT.

FIRST, WE WOULD JUST LIKE TO PROFFER AS DEFENDANTS' EXHIBIT NO. 2 OUR REQUESTED JURY CHARGES WHICH WERE NOT GIVEN BY THE COURT, AND WE WOULD LIKE TO OBVIOUSLY OBJECT TO THE FACT THAT THESE REQUESTED JURY CHARGES WEREN'T GIVEN AND ASK THAT THEY BE MADE A PART OF THE RECORD AS DEFENDANTS' PROFFER EXHIBIT NO. 2.

**THE COURT:** VERY WELL. THEY WILL BE ENTERED INTO THE RECORD AS DEFENSE PROFFER NO. 2.

**MR. SILVERSTEIN:** JUDGE, THE SECOND THING IS, IS -- AND I HAVE TO MAKE SURE THAT NOBODY IS INTERRUPTED DURING CLOSING ARGUMENT. I SUGGEST -- AND I THINK MY COUNSEL DISAGREES -- THAT WE LOOK AT EACH WHAT WE'RE GOING TO SHOW THE JURY DURING --

BEFORE THE JURY SEES IT; AND IF THERE IS A PROBLEM, THAT IT BE TAKEN UP BEFOREHAND RATHER THAN -- IF THERE IS AN ISSUE DURING THE TRIAL -- DURING THE CLOSING ARGUMENT. AND I WOULD SUGGEST THAT IT WOULD BE APPROPRIATE IF THE PARTIES EXCHANGE WHAT THE JURY IS GOING TO BE SHOWN IN CLOSING ARGUMENT, SO IF THERE IS AN ISSUE WE CAN TAKE IT UP NOW RATHER THAN IN THE MIDDLE OF CLOSING ARGUMENT.

**THE COURT:** WELL, LET ME JUST SAY, AS YOU WELL KNOW -- AND I ASSUME THAT WHAT YOU'RE GETTING AT, THAT IT IS -- I WILL -- IT'S HIGHLY UNUSUAL FOR THERE TO BE OBJECTIONS DURING CLOSING, BECAUSE I ASSUME -- AND, IN FACT, I'M FAIRLY CERTAIN THAT BOTH SIDES UNDERSTAND THE REASON FOR CLOSING ARGUMENTS AND WHAT'S PERMITTED, WHAT'S NOT PERMITTED IN CLOSING ARGUMENTS. OBVIOUSLY ANYTHING THAT'S BEEN ENTERED INTO THE RECORD IS FAIR GAME.

NOW, IF THERE IS SOMETHING THAT HAS NOT BEEN ADMITTED INTO THE RECORD AS EVIDENCE IN THE CASE, IT MAY NOT NECESSARILY BE FAIR GAME. IT MAY BE, I ASSUME, A DEMONSTRATIVE AID. IS THAT WHAT YOU'RE GETTING AT?

**MR. SILVERSTEIN:** JUDGE, I'M JUST NOT SURE. AND I JUST WANT TO -- IF THERE IS A PROBLEM, I'D RATHER KNOW NOW SO I DON'T HAVE TO INTERRUPT. I

DIDN'T INTERRUPT IN OPENING STATEMENT.

**THE COURT:** I UNDERSTAND. BUT THERE IS NOTHING THAT OBVIOUSLY I CAN DO WITH RESPECT TO ANY CONTENT OF ARGUMENT.

BUT I WILL ASK: MS. PIERCE, ARE YOU DESIGNATED TO PROVIDE THE CLOSING ARGUMENT HERE, AT LEAST THE FIRST PART?

**MS. PIERCE:** THE FIRST PART. I DO HAVE A DEMONSTRATIVE AID.

**THE COURT:** AND WHAT IS THAT?

**MS. PIERCE:** IT IS MY PAPPY'S DOMINOES.

**THE COURT:** WHAT IS IT?

**MS. PIERCE:** MY PAPPY'S DOMINOES. MY GRANDFATHER.

**THE COURT:** OKAY. AND YOU INTEND TO USE THAT TO MAKE A POINT TO THE JURY?

**MS. PIERCE:** YES, I DO, YOUR HONOR.

**THE COURT:** ALL RIGHT. IS THERE ANYTHING IMPROPER ABOUT THAT? IT'S A DEMONSTRATIVE AID, AND CERTAINLY DEMONSTRATIVE AIDS ARE PERMITTED.

**MR. SILVERSTEIN:** JUDGE, THERE ISN'T.

**THE COURT:** ANYTHING ELSE, MS. PIERCE? ANY OTHER DEMONSTRATIVE AIDS?

**MS. PIERCE:** NO, SIR.

**MR. SILVERSTEIN:** JUDGE, THE THIRD THING I

JUST WANTED TO MAKE IS THAT WE HAD ASKED FOR SOME GUIDANCE FROM THE COURT ON WHAT THE JURY CAN AND CAN'T BE TOLD ABOUT THE *VALLIDOLID* ISSUE. I ASSUME THAT THE -- THE COURT HAS SAID BEFORE TRIAL IT APPLIES TO CLOSING ARGUMENT.

**THE COURT:** CORRECT.

**MR. SILVERSTEIN:** AND, JUDGE, ON A PERSONAL MATTER, CAN WE APPROACH THE BENCH VERY QUICKLY?

**THE COURT:** YES. ARE WE ON THE RECORD OR OFF THE RECORD?

**MR. SILVERSTEIN:** OFF THE RECORD.

**(WHEREUPON, THERE WAS AN OFF-THE-RECORD BENCH CONFERENCE.)**

**THE COURT:** OKAY. LET'S HAVE ORDER IN THE COURT.

**MR. SILVERSTEIN:** 50 MINUTES. CORRECT?

**THE COURT:** 50 MINUTES.

NOW, MS. PIERCE, HOW WOULD YOU LIKE TO APPORTION YOUR TIME?

**MS. PIERCE:** 35 MINUTES FOR MYSELF AND 15 FOR MY CO-COUNSEL.

**THE COURT:** OKAY. 35 AND 15. VERY GOOD. AND AGAIN, JORDAN IS OBTAINING THE VERDICT FORM -- THE REVISED VERDICT FORM AND INSTRUCTIONS.

ALL RIGHT. ANYTHING FURTHER?

**MS. LEGER:** I THINK WE'RE GETTING THE DOMINOES SET UP, YOUR HONOR, JUST TO MAKE SURE WE DON'T FLUB THIS PART.

**MS. PIERCE:** WE HAD PRACTICED LAST NIGHT.

**MS. LEGER:** SHE DID PRACTICE, BUT YOU NEVER KNOW. WE'RE ALL HUMANS.

**THE COURT:** OKAY. ARE WE ABOUT READY?

**MS. PIERCE:** WE'RE READY, YOUR HONOR.

**THE COURT:** LET'S ALL RISE FOR THE JURY.

**REPORTER'S NOTE: (WHEREUPON, THE JURY IS IN THE COURTROOM.)**

**THE COURT:** BE SEATED. GOOD MORNING, LADIES AND GENTLEMEN. WELCOME BACK. I HOPE YOU ALL HAD A GOOD EVENING. YOU GOT OUT A LITTLE EARLY YESTERDAY, SO HOPEFULLY YOU HAD A CHANCE TO ACTUALLY ENJOY A LITTLE SUNSHINE FOR A CHANGE.

BEFORE WE ADJOURNED, OF COURSE I GAVE YOU THE USUAL INSTRUCTIONS: NOT TO DISCUSS THE CASE WITH ANYONE; NOT TO WATCH OR READ OR LISTEN TO ANY POSSIBLE NEWS ACCOUNTS OF THIS TRIAL; NOT TO CONDUCT ANY OUTSIDE RESEARCH OF ANYTHING YOU'VE LEARNED ABOUT THUS FAR; AND NOT TO YET BEGIN TO FORM ANY OPINIONS ABOUT THE EVIDENCE IN THE CASE OR THE ISSUES IN THE CASE BECAUSE YOU HAVEN'T HEARD THE ARGUMENTS OF COUNSEL, NOR HAVE YOU RECEIVED THE INSTRUCTIONS FROM

THE COURT.

IF ANYONE HERE WAS UNABLE TO ABIDE BY THOSE INSTRUCTIONS, PLEASE RAISE YOUR HAND AND I WILL HAVE ADDITIONAL QUESTIONS FOR YOU. LET THE RECORD REFLECT THAT NO HANDS ARE RAISED, SO ONCE AGAIN, WE THANK YOU FOR ABIDING BY THOSE INSTRUCTIONS THROUGHOUT THE COURSE OF THIS ENTIRE WEEK.

AS I TOLD YOU YESTERDAY BEFORE YOU WERE DISMISSED, WE ARE NOW AT THE POINT OR THE STAGE OF THE TRIAL WHERE THE LAWYERS WILL HAVE THE OPPORTUNITY TO ADDRESS YOU IN WHAT IS CALLED CLOSING ARGUMENTS. NOW, THIS IS A VERY IMPORTANT STAGE OF ANY TRIAL. THIS IS THE LAWYERS' OPPORTUNITY TO PERSONALLY AND DIRECTLY EXPLAIN TO YOU AND SHARE WITH YOU THEIR ANALYSIS OF THE EVIDENCE IN THIS CASE, TO TELL YOU WHAT THEY BELIEVE WAS SHOWN OR PROVEN BY THE EVIDENCE AND PERHAPS WHAT WAS NOT PROVEN OR SHOWN BY THE EVIDENCE.

SO I WILL REMIND YOU, HOWEVER, THAT WHAT THE LAWYERS SAY IS NOT EVIDENCE. IT IS, HOWEVER, VERY IMPORTANT THAT YOU GIVE THEM YOUR FULL ATTENTION DURING THIS STAGE OF THE TRIAL. THANK YOU VERY MUCH, LADIES AND GENTLEMEN.

IT IS MY UNDERSTANDING THAT MS. PIERCE WILL -- AND BY THE WAY, YOU WILL HEAR TWICE FROM THE

PLAINTIFFS BECAUSE THE PLAINTIFFS, AS I'VE MENTIONED TO YOU REPEATEDLY THROUGHOUT THIS TRIAL, BEAR THE BURDEN OF PROOF. SO AT THIS POINT MS. PIERCE WILL ADDRESS YOU, AFTER WHICH MR. SILVERSTEIN WILL ADDRESS YOU, AND MS. PIERCE OR ONE OF HER COLLEAGUES WILL ADDRESS YOU ONE LAST TIME BEFORE I GIVE YOU THE INSTRUCTIONS.

MS. PIERCE, YOU MAY BEGIN.

**MS. PIERCE:** THANK YOU. MAY IT PLEASE THE COURT, DEFENSE COUNSEL.

GOOD MORNING, LADIES AND GENTLEMEN. FIRST OF ALL, ON BEHALF OF THE MAYS FAMILY, MYSELF, MS. LEGER, MR. BRADLEY, MR. PAPILLION, WE WANT TO THANK YOU FOR THE ATTENTION THAT YOU'VE PAID OVER THE LAST SEVERAL DAYS TO THE EVIDENCE IN THIS CASE. I KNOW WE'VE GONE THROUGH A LOT OF TESTIMONY IN THE LAST FEW DAYS. AND DESPITE THE FACT THAT CHEVRON HAS TRIED TO CONFUSE THE ISSUES, AS MS. LEGER SAID IN HER OPENING STATEMENT, THIS REALLY IS A VERY SIMPLE CASE. CHEVRON WOULD HAVE YOU FOCUS ON THE VERY LAST DAYS OF MR. MAYS'S LIFE, WHEN, IN REALITY, THE STAGE FOR THIS TRAGEDY WAS FIRST SET 15 YEARS AGO.

NOW, I WANT TO GO OVER THE TIMELINE. WHEN CHEVRON PURCHASED THIS ASSET IN 2000, OR MERGED WITH TEXACO, THEIR VERY FIRST VALVE INSPECTION RECORD SAYS

IT'S A WKM. FOR EVERY YEAR THEREAFTER IT CONTINUES TO SAY "WKM." EVERY SINGLE YEAR.

NOW, WE TALKED ABOUT BETWEEN THE YEAR 2000 AND BETWEEN ABOUT 2004 OR 2005 -- MR. MOTTY WASN'T REALLY SURE. BUT BETWEEN 2000 AND 2004 OR 2005, THAT VALVE WAS NOT YET WRAPPED. CHEVRON HAD EVERY OPPORTUNITY TO PROPERLY IDENTIFY THAT VALVE AND TO MAKE SURE THAT THEIR RECORDS WERE CORRECT. THERE WAS NO INSTRUCTION, NOTHING, KEEPING THEM FROM GETTING IT RIGHT. THEN WE HAVE HURRICANE RITA, AND CHEVRON LOST MOST OF THE RECORDS REGARDING THIS VALVE.

NOW, IT'S JUST NOT REASONABLE FOR A PIPELINE COMPANY NOT TO RECONSTRUCT THEIR RECORDS AFTER THEY'RE DESTROYED. MR. SILVERSTEIN SAID SEVERAL TIMES, "THEY WENT IN BLIND. THEY WENT IN BLIND." WELL, WHEN WE DON'T HAVE THE RECORDS THAT THIS PIPELINE OPERATOR IS REQUIRED TO KEEP, YOUR HANDS ARE TIED.

NOW, EVERY YEAR THEY GOT IT WRONG. EVERY SINGLE YEAR, FOR 15 YEARS IN A ROW, CHEVRON FAILED TO DO THEIR JOB. THEY FAILED IN THEIR PREVENTATIVE MAINTENANCE. THEY FAILED IN THEIR INSPECTION PROCEDURE NUMEROUS WAYS: THEY FAILED TO PROPERLY IDENTIFY IT; THEY FAILED TO ENSURE THAT THIS VALVE WAS PROPERLY TAGGED. THEY ALSO FAILED IN THEIR VALVE

REPAIR PROCEDURE.

NOW, WHEN YOU HEAR FROM REGGIE MOTTY, HE SAYS HE'S NOT DOING ANYTHING TO VERIFY THAT THIS IS RIGHT; HE'S JUST COPYING FROM THE YEAR BEFORE, NOT VERIFYING. COPYING IS NOT VERIFYING. COPYING IS WHAT WE GOT SCOLDED FOR IN SCHOOL IF WE DID IT.

THIS CASE IS ABOUT PROCESS SAFETY MANAGEMENT FAILURES. THE ONLY EXPERT WITNESS THAT YOU HEARD FROM THAT WAS QUALIFIED AS AN EXPERT WITNESS IN SAFETY WAS MIKE SAWYER. HE IS A CERTIFIED SAFETY SPECIALIST. AND HE TOLD YOU THE REASON WHY COMPANIES HAVE THESE SAFETY POLICIES IS SO THAT YOU CAN PROPERLY IDENTIFY HAZARDS AND BE PREPARED AND HAVE A PLAN TO PROTECT YOURSELF AND OTHERS.

PROCESS SAFETY MANAGEMENT IS THE ENGINEERING DISCIPLINE THAT PREVENTS ERRORS THAT START BACK HERE AND END UP KILLING SOMEBODY DOWN HERE. THAT'S WHY YOU HAVE THESE PROCEDURES AND THAT'S WHY THEY ARE ESSENTIAL. YOU HAVE TO TALK THE TALK AND THEN YOU HAVE TO WALK THE WALK.

NOW I WANT TO TALK ABOUT THESE LAST TWO EVENTS ON OUR TIMELINE. YOU'VE GOT SEPTEMBER 9, 2014 AND SEPTEMBER 13, 2014. ON THE 9TH YOU HAVE MR. MAYS, MR. THOMAS GO OUT THERE, AND REGGIE MOTTY. THEY GO OUT THERE TO GREASE VALVES AS NEEDED. THEN

MR. MOTTY DECIDES -- AND YOU HEARD NORMAN THOMAS TELL YOU HE DIDN'T -- MR. THOMAS DIDN'T KNOW THEY WERE GOING TO START SOME ISOLATION PROCEDURES FOR SOME JOB THAT WAS GOING TO HAPPEN NEXT WEEK.

MR. MOTTY SEES THE SCOPE OF WORK. THEY GO TRY TO START CLOSING THAT VALVE. IT'S IN TERRIBLE CONDITION. YOU SAW THE PICTURES. YOU HEARD MR. THOMAS DESCRIBE IT AFTER IT BROKE. THAT GEAR OPERATOR WAS DIFFICULT TO OPERATE IN MAY OF 2014, AND THEY DIDN'T FIX IT. THEY DID NOT FIX IT.

SO KNOWING IT'S DIFFICULT TO OPERATE IN MAY OF 2014, THEY SEND MR. MAYS AND MR. THOMAS OUT THERE WITH MR. MOTTY. MR. MOTTY DECIDES TO TRY TO CLOSE IT. HE CAN'T CLOSE IT MANUALLY USING TWO MEN'S HANDS. SO THEY GET A PIPE WRENCH. MR. MOTTY IS USING THE PIPE WRENCH, AND THE MANUAL GEAR OPERATOR BREAKS. THEN THEY HAVE TO TRY TO FIGURE OUT HOW TO REPAIR IT. AT THAT POINT MR. MOTTY SHOULD HAVE INSTITUTED VALVE REPAIR PROCEDURE MIP 803. AND HE DIDN'T. HE DIDN'T.

YOU HEARD FROM ROBERT KURIMA. AND THE REASON I HAD TO PUT IN HIS BRIEF VIDEO IS BECAUSE REGGIE MOTTY SAID, "MR. MAYS IS THE VALVE EXPERT. AT CHEVRON PIPE LINE WE DON'T HAVE VALVE EXPERTS." AND THAT'S JUST NOT TRUE. YOU HEARD MR. KURIMA:

"CHEVRON PIPE LINE COMPANY HAS A FACILITY ENGINEER SPECIFICALLY ASSIGNED TO THE HENRY HUB AREA. WHEN YOU HAVE A PROBLEM LIKE THIS AND WHEN YOU KNOW YOU DON'T HAVE THE MECHANICAL INTEGRITY FILE AND YOU DON'T HAVE THE RECORDS AND YOU HAVE A PROBLEM OUT THERE, YOU CONSULT WITH YOUR FACILITY ENGINEERS."

NOW, MR. MOTTY SAID HE DIDN'T KNOW THAT. THAT'S A FAILURE ON THE PART OF CHEVRON MANAGEMENT TO LET THEIR EMPLOYEES KNOW THE RESOURCES THAT THEY HAVE AVAILABLE.

SO MR. MOTTY DECIDES THEY WANT TO GO -- HE WANTS TO GO BACK ON SATURDAY. SO WE GET MR. MAYS, MR. JARRELL. THEY GO BACK OUT THERE SATURDAY, AND WE KNOW WHAT HAPPENED THAT DAY.

NOW, I'M GOING TO GO FORWARD TO THE NEXT SLIDE. THIS IS CHEVRON'S VALVE INSPECTION PROCEDURE THAT Y'ALL HEARD A LOT ABOUT. THE PURPOSE OF IT IS TO VERIFY THAT THEIR VALVES ARE IN GOOD CONDITION AND OPERATE PROPERLY. YOU'RE SUPPOSED TO ENSURE VALVE IDENTIFICATION TAGS ARE IN PLACE. WHY? WHY? SO THAT PEOPLE THAT GO OUT TO WORK ON THOSE VALVES WILL KNOW WHAT THEY'RE WORKING ON. THERE WAS NO VALVE IDENTIFICATION TAG THAT THESE WORKERS COULD READ.

THIS IS MR. SUIRE. Y'ALL REMEMBER MR. SUIRE. HE WAS THE FIRST WITNESS RIGHT AFTER NORMAN

THOMAS. THIS MAN IS REGGIE MOTTY'S BOSS. HE TOLD YOU THAT MR. MOTTY IS SUPPOSED TO -- IF THIS VALVE HAS BEEN MISIDENTIFIED, IT'S A GOOD TIME FOR HIM TO CORRECT IT. EVERY SINGLE YEAR HE HAS AN OPPORTUNITY TO CORRECT IT. AND IF HE DIDN'T DO THAT, MR. MOTTY'S BOSS TOLD YOU, MR. MOTTY WASN'T DOING HIS JOB.

NOW, WE KNOW HE DIDN'T GET THERE TILL ABOUT 2007. AND YES, THE ERROR HAD STARTED. BUT JUST BECAUSE THERE IS A MISIDENTIFICATION ALREADY IN THE PAPERWORK DOES NOT EXCUSE MR. MOTTY FROM DOING HIS JOB.

LET'S GO TO THE NEXT PAGE. THIS IS ALSO MR. SUIRE. AND THERE HAS BEEN SOME TALK ABOUT THIS, BUT I WANT TO BE CLEAR. MR. SUIRE, MR. MOTTY'S BOSS, SAID THAT VALVE -- THAT VALVE TAG THAT HE'S SUPPOSED TO VERIFY IS THERE EVERY SINGLE YEAR, IT NEEDS TO HAVE THE SERIAL NUMBER, MANUFACTURER AND -- IS THERE A NEXT PAGE? -- THE MODEL NUMBER. BUT I DIDN'T COPY THAT TESTIMONY. BUT YOU HEARD IT FROM MR. SUIRE. MR. SUIRE, REGGIE MOTTY'S BOSS: MANUFACTURER, SERIAL NUMBER, MODEL NUMBER. AND THAT'S IMPORTANT.

LET'S GO TO THE NEXT ONE. THIS IS MR. MOTTY. THIS IS MR. MOTTY WHEN HE WAS TESTIFYING AS THE CORPORATE REPRESENTATIVE OF CHEVRON PIPE LINE. AND HE HAS SPECIAL KNOWLEDGE IN THIS REGARD BECAUSE

OF HIS PAST EXPERIENCE OF WORKING FOR ACADIAN CONTRACTORS. HE WAS OUT THERE IN 2005 OR 2006 TIME FRAME FOR ACADIAN WHEN THEY PAINTED AND WRAPPED THE VALVE AT ISSUE IN MR. MAYS'S DEATH. HE ADMITTED, AS THE CORPORATE REPRESENTATIVE FOR CHEVRON, THAT WOULD HAVE BEEN CHEVRON'S BEST OPPORTUNITY DURING THAT PROJECT TO MAKE SURE THEY HAD THEIR RECORDS RIGHT.

THIS IS THE ADMISSION THAT MR. MOTTY MADE, READ INTO THE RECORD, AS THE CORPORATE REPRESENTATIVE OF CHEVRON. AND THIS IS IMPORTANT FOR SEVERAL REASONS. AND HE READ OFF THE PAPERWORK A REQUEST FOR ADMISSION. AND IN LAWSUITS, IF YOU WANT TO KNOW IF A PARTY ADMITS SOMETHING OR DENIES SOMETHING, YOU SEND THEM THESE REQUESTS FOR ADMISSIONS. CHEVRON ADMITTED AT SOME POINT THEY KNEW THIS WAS A DEMCO. THEY'RE NOT SAYING, "WE NEVER KNEW. WE NEVER KNEW." THEY ADMITTED THEY KNEW. AND BECAUSE THEY KNEW, THEY SHOULD HAVE GOTTEN THEIR RECORDS CORRECT.

NOW, THERE WAS A SUPPLEMENTAL RESPONSE THAT HE READS; THAT CHEVRON ADMITS THEY BELIEVE THEY KNEW AT SOME POINT, BUT IT WAS ALWAYS IDENTIFIED AS A WKM. THERE IS AN ADMISSION THAT THEY KNEW AND FAILED TO MAKE SURE THEIR RECORDS WERE CORRECT.

CAN WE MOVE FORWARD. THIS IS MR. MOTTY ADMITTING THAT THEIR RECORDS SHOULD HAVE BEEN CORRECT

BASED ON THAT KNOWLEDGE.

ALL RIGHT. SO NOW WE'VE TALKED ABOUT ALL THESE YEARS OF INSPECTION RECORDS THAT THEY GOT WRONG. NOW IT'S SEPTEMBER 9TH AND THEY HAVE A PROBLEM; THE MANUAL GEAR OPERATOR IS BROKEN. CHEVRON HAS A SAFETY PROCEDURE TO ENSURE THAT VALVES ARE SAFELY REPAIRED.

NEXT PAGE, PLEASE. IT TALKS ABOUT ROLES AND RESPONSIBILITIES, WHAT THE FIELD TEAM MEMBERS ARE. THEY ARE SUPPOSED TO OBTAIN THE DRAWINGS AND SPECIFICATIONS. THE FIELD TEAM MEMBER IS SUPPOSED TO ASSURE THAT THE WORK IS PERFORMED SAFELY. THEN THE FIELD TEAM LEADER, WHO WAS MR. MCCALL, AS YOU RECALL, HE'S SUPPOSED TO BE COORDINATING WITH HOUSTON. HE'S SUPPOSED TO BE COORDINATING WITH THEM ABOUT SHUTTING DOWN THE PIPELINE, ISOLATING. NONE OF THAT HAPPENED.

THIS IS MR. SUIRE WHEN HE'S ASKED ABOUT BEING APPROVED BY HOUSTON, AND HE SAYS THAT IT IS; IT'S SUPPOSED TO BE APPROVED.

"AND DO YOU KNOW WHETHER THAT WAS FOLLOWED FOR THE WORK THAT WAS BEING DONE AT THE TIME OF MR. MAYS'S DEATH?

"THE PROCEDURE WAS DISCUSSED LOCALLY, AND THE CONTROL CENTER DID KNOW WHAT WE WERE WORKING -- THAT WE WERE WORKING ON THAT VALVE."

THE PROCEDURE SAYS HOUSTON HAS TO HAVE A WRITTEN REPAIR PLAN. THERE WAS NO WRITTEN REPAIR PLAN. NEVER A WRITTEN PLAN, NEVER.

NOW, HAD THEY GOTTEN THAT WRITTEN REPAIR PLAN TO HOUSTON LIKE THEY WERE SUPPOSED TO AND HOUSTON WOULD HAVE LOOKED UP THEIR RECORDS, THEY COULD HAVE SAID, "YOU KNOW, WE'VE LOST ALL THE RECORDS ON THIS VALVE. WE DON'T HAVE A MECHANICAL INTEGRITY FILE. WE'RE NOT SURE EXACTLY WHAT'S OUT THERE." BUT THEY DIDN'T. THEY FAILED TO FOLLOW MIP 803, WHICH IS THE PROCEDURE TO ENSURE VALVES ARE REPAIRED SAFELY.

NOW MOVE FORWARD, PLEASE. AGAIN, I WANT TO ADDRESS THIS, BECAUSE THIS IS WHAT MS. LEGER TOLD YOU IN OPENING IS THE-DOG-CHASING-ITS-TAIL DEFENSE OF CHEVRON PIPE LINE. THEY'RE GOING TO SAY, "MR. MAYS, HE SHOULD HAVE GONE INTO THE LIBRARY AT FURMANITE AND DONE MORE RESEARCH." HAD HE GOTTEN THE MANUALS FROM HIS EMPLOYER, THEY WOULD HAVE BEEN MANUALS FOR A WKM. AND MR. SUIRE ADMITTED THAT. THEY WOULD HAVE NO MORE USEFUL INFORMATION THAN THEY HAD ALREADY.

MOVE FORWARD, PLEASE. THIS IS MR. SUIRE, AGAIN ADMITTING THAT HE HAD NOT DONE ANYTHING TO REALLY TRAIN MR. MOTTY ON THE IMPORTANCE OF MIP 803, THE VALVE REPAIR PROCEDURE.

GO FORWARD, PLEASE. GO FORWARD. JUST GO TO THE CHEVRON INVESTIGATION REPORT. THERE WAS A LOT OF TESTIMONY, BUT YOU HEARD IT FOR YOURSELVES. I NEED TO MOVE ON. OH, GO BACK. I'M SORRY.

I WANT TO TALK ABOUT THIS SLIDE FOR ONE MINUTE. MR. MOTTY WOULD HAVE YOU BELIEVE THAT MR. MAYS ON THE 9TH OR THE 13TH COULD HAVE JUST LOOKED THROUGH THIS WRAPPING AND IDENTIFIED THAT VALVE. WELL, LADIES AND GENTLEMEN, IF THAT IS TRUE, HOW COME MR. MOTTY DIDN'T LOOK THROUGH THAT WRAPPING WHEN HE WAS OUT THERE TO DO THE VALVE INSPECTION RECORDS? HE DIDN'T BECAUSE YOU CANNOT SEE THROUGH THAT WRAPPING.

SO WE TALKED A LOT ABOUT CHEVRON'S INVESTIGATION. YOU'RE GOING TO HAVE THE ENTIRE REPORT IN THE JURY ROOM, BECAUSE WE GOT A LITTLE CRUNCHED ON TIME AND COULDN'T GO INTO A LOT OF DETAIL ABOUT IT. BUT THE PLAINTIFFS HAD THAT FULL REPORT ADMITTED. IT'S PLAINTIFFS' EXHIBIT 15, AND YOU CAN LOOK AT IT.

AND LET ME TELL YOU THIS. IF CHEVRON REALLY THOUGHT THAT MR. MAYS WENT OUT THERE ON THE 13TH AND JUST DID SOMETHING CARELESS, THEY WOULD NOT HAVE GOTTEN TOGETHER SEVEN PEOPLE TO SPEND TEN DAYS DOWN THERE TO FIGURE OUT WHAT HAPPENED. THEY WOULD HAVE

JUST SAID, "MR. MAYS DID SOMETHING CARELESS. IT'S ALL HIS FAULT. WE'RE SORRY. HE DID IT." THEY KNEW THAT THERE WAS A FAILURE IN THEIR PROCESS -- SAFETY PROCESS MANAGEMENT SYSTEM. THEY KNEW.

SO THEY GOT SEVEN HIGHLY-TRAINED PEOPLE FROM CHEVRON TOGETHER -- ENGINEERS, YOU'LL SEE ON THE REPORT -- AND THEY SPENT TEN DAYS TRYING TO FIGURE OUT WHY THIS HAPPENED.

YOU CAN MOVE FORWARD, PLEASE. THIS IS LONG, BUT YOU'RE GOING TO BE ABLE TO READ IT BACK THERE. THIS TELLS YOU THAT HAD THIS BEEN THE WKM THAT THIS WORK CREW BELIEVED IT WAS, THAT WKM HAD A BLOW-OUT-PROOF STEM, STEM RETENTION PINS. WHAT THEY WERE REMOVING, IF THIS WAS A WKM, WOULD NOT HAVE BREACHED THE PRESSURE BARRIER. AND MR. THOMAS EVEN TOLD YOU THAT.

GO FORWARD. I'M ALSO GOING TO TALK TO YOU ABOUT THE EXAMINATION AT STRESS. THIS SAYS: "POSITIVE IDENTIFICATION ON THE PLATFORM WAS NOT POSSIBLE." THEIR OWN REPORT SAYS IT. BUT MR. MOTTY WANTS TO COME IN HERE AND SAY, "IF MR. MAYS WOULD HAVE JUST LOOKED CLOSER." MR. THOMAS TOLD YOU THAT BECAUSE THAT VALVE WAS PAINTED AND WRAPPED, IT WAS HARD TO TELL WHERE ONE PIECE STARTED AND ONE -- WHERE ONE PIECE STOPPED.

WE NOW KNOW THAT WHEN THEY REMOVED THAT MANUAL GEAR OPERATOR, THE MOUNTING PLATE WAS STUCK TO IT WITH THE PAINT AND THE WRAPPING. AND BECAUSE THEY DIDN'T HAVE THE MECHANICAL INTEGRITY FILE, THE CREW FAILED TO REALIZE THAT. BUT SEE, THAT'S WHAT HAPPENS WHEN A COMPANY DOES NOT FOLLOW PRUDENT PROCESS SAFETY MANAGEMENT PRACTICES.

LET'S GO TO THE ROOT CAUSES PAGE REAL QUICK. I DON'T WANT TO SPEND A LOT OF TIME BECAUSE YOU WILL HAVE THIS. HERE ARE THE ROOT CAUSES. IT TALKS ABOUT THE PLANNING; THE MANAGEMENT EXPECTATIONS CONCERNING POSITIVE IDENTIFICATION OF VALVES WAS INCOMPLETE; LACK OF CONTRACTOR STRUCTURE AND PROCESS. I DO WANT TO TALK ABOUT THIS, BECAUSE MR. CONNER TOLD YOU THIS IS A CRITICISM OF CHEVRON: "CONTRACTOR SELECTION & SUPERVISION IS INADEQUATE." THIS IS CHEVRON NOT PROPERLY SUPERVISING THEIR CONTRACTORS.

NOW I WANT TO TALK TO YOU A LITTLE BIT ABOUT CREDIBILITY, BECAUSE YOU'RE GOING TO BE ASKED TO JUDGE THE CREDIBILITY OF THE WITNESSES. WHEN MS. LEGER AND I WERE YOUNG, WE LEARNED THE PERILS OF CROSS-EXAMINATION THE HARD WAY. OUR DAD WAS A LAWYER. WHEN WE WERE ABOUT 16 YEARS OLD AND GOT OUR FIRST CAR AND HAD SOME FREEDOM, WE TOLD OUR PARENTS WE WERE GOING TO GO TO MCDONALD'S AND A MOVIE WITH

TWO FRIENDS. WELL, WE WENT SOMEWHERE ELSE, SOMEWHERE WE WEREN'T SUPPOSED TO BE.

AND WHEN WE GOT HOME AND OUR DAD SUSPECTED THAT WE HAD NOT DONE WHAT WE TOLD HIM WE WERE GOING TO DO, WHEN WE WALKED IN THAT DOOR, HE TOLD OUR MOTHER, "TAKE JILL TO THE LIVING ROOM." HE TOOK MS. LEGER TO THE BEDROOM AND SAID, "WHAT DID YOU EAT AT MCDONALD'S? WHAT DID YOUR SISTER EAT? WHAT DID YOUR FRIEND KIMMIE EAT? WHAT DID YOUR FRIEND CHRISTY EAT? WHEN Y'ALL GOT TO THE MOVIES, WHO SAT BESIDE EACH OTHER?"

WHEN SHE WAS DONE, MY MOM BROUGHT ME INTO MY PARENTS' BEDROOM, AND I HAD TO ANSWER ALL THE SAME QUESTIONS. AND WHEN THEY DIDN'T MATCH UP IDENTICALLY, WE WERE IN TROUBLE. AND THAT, LADIES AND GENTLEMEN OF THE JURY, IS HOW YOU FIGURE OUT WHEN SOMEONE IS TELLING THE TRUTH AND WHEN THEY'RE NOT.

MR. MOTTY HAD SO MANY INCONSISTENCIES IN HIS TESTIMONY. HE SAID YOU COULD SEE THROUGH IT. YOU CAN'T. NORMAN THOMAS AND DAVID JARRELL SAID YOU CAN'T JUST SEE THROUGH THAT AND TELL WHAT THAT IS. HE ALSO SAID -- WELL, LET'S TALK ABOUT THE CHEATER PIPE A LITTLE BIT. MR. MOTTY KNEW THAT ADMISSION WAS GOING TO HURT HIS COMPANY'S CASE. HE KNEW IT.

SO WHAT DID HE DO? WHAT DID HE DO ABOUT IT?

HE CONCOCTED SOME STORY THAT THEY USED IT ON THE VERY LAST BOLT. THEY MET ABOUT IT, THEY ALL AGREED, IT WAS A VERY CONTROLLED ENVIRONMENT. ABSOLUTELY, ABSOLUTELY FALSE. THAT ENVIRONMENT WENT FROM A DAY AT WORK TO TOTAL CHAOS, A DEAD MAN IN THE WATER AND GAS ESCAPING INTO THE ENVIRONMENT. HE MADE UP THAT STORY BECAUSE HE KNEW THAT ADMISSION WAS GOING TO HURT HIS COMPANY'S DEFENSE.

NOW -- AND I NEED THIS TURNED ON, PLEASE. I NEED TO TALK TO YOU A LITTLE BIT ABOUT THE JURY QUESTIONS YOU'RE GOING TO BE ASKED TO ANSWER IN THIS CASE. THE FIRST ONE: WE HAVE TO PROVE THAT MR. MAYS'S INJURY WAS -- HAD A SIGNIFICANT CAUSAL LINK TO CHEVRON'S OPERATIONS ON THE OUTER CONTINENTAL SHELF FOR THE PURPOSE OF EXTRACTING OR TRANSPORTING NATURAL RESOURCES. IT'S PROBABLY CONFUSING WHY YOU NEED TO ANSWER THIS, BUT JUST LET ME TELL YOU.

MIKE SAWYER TOLD YOU, AND REGGIE MOTTY ADMITTED, WHEN THIS HAPPENED HE HAD TO SHUT DOWN TWO PLATFORMS ON THE OUTER CONTINENTAL SHELF. TWO. THERE WAS ALSO ONE IN STATE WATERS. BUT FROM TWO PLATFORMS ON THE OUTER CONTINENTAL SHELF, THAT'S WHERE THIS GAS IS COMING FROM. WE SAY THE ANSWER TO THIS IS YES. IF YOU SAY NO, CHEVRON IS NOT GOING TO HAVE TO ACCOUNT TO THE MAYS FAMILY FOR THE HARM THAT

THEY'VE CAUSED THE MAYS FAMILY. CHEVRON --

**MR. SILVERSTEIN:** OBJECTION, JUDGE.

**THE COURT:** ON WHAT BASIS?

**MR. SILVERSTEIN:** WHAT WE TALKED ABOUT EARLIER, BUT --

**MR. SILVERSTEIN:** WELL, WE'RE NOT TALKING SPECIFIC CASES OF LAW. RIGHT? AGAIN, WE CAN JUST TALK ABOUT THE FACTS. BUT LET'S PROCEED.

**MS. PIERCE:** CHEVRON -- IF YOU ANSWER NO, CHEVRON IS GOING TO CALL HOUSTON -- THE LOCAL CHEVRON IS GOING TO CALL HOUSTON AND SAY, "HOUSTON, WE DON'T HAVE A PROBLEM OVER IN LOUISIANA. IT'S BUSINESS AS USUAL." AND THAT WILL CONTINUE TO EXPOSE OTHERS TO THE RISK OF HARM IF THEY DO NOT KNOW THEY'RE GOING TO BE HELD ACCOUNTABLE FOR THEIR FAILURE TO FOLLOW THEIR PROCEDURES.

WE BELIEVE THAT FURMANITE DIDN'T CAUSE THIS. WE DIDN'T -- WE DON'T BELIEVE THAT ACADIAN CAUSED THIS. "NO" AND "NO." CHEVRON CAUSED THIS. WE DON'T BELIEVE MR. MAYS CAUSED THIS. IF MR. MAYS MADE A MISTAKE BACK HERE, THE ONLY MISTAKE HE MADE WAS TRUSTING CHEVRON. THE ONLY MISTAKE HE MADE WAS HE STEPPED IN A TRAP THAT HAD BEEN LAID BY CHEVRON PIPE LINE FOR 15 YEARS. 15 YEARS. NOW THEY WANT TO PUSH THE BLAME TO MR. MAYS AND FURMANITE, AND THAT'S JUST

NOT FAIR.

NOW I WANT TO TALK ABOUT DAMAGES. THESE ARE MY HAND-SCRATCHED NOTES, BUT -- TALK ABOUT DAMAGES IN THIS CASE. FUNERAL EXPENSES, STIPULATED. EASY. LOSS OF SUPPORT, THE FINANCIAL HARM. THIS IS THE STIPULATION THAT WE ENTERED. I USUALLY TELL JURIES THESE NUMBERS ARE EASY. YOU SHOW A BILL, YOU SHOW YOUR ECONOMIST. WELL, AS WE SAW, THIS ENDED UP BEING A LITTLE MORE DIFFICULT, BUT ONLY BECAUSE DR. GRECO HAD A TYPO THAT CHEVRON PIPE LINE ATTEMPTED TO EXPLOIT.

NOW, THESE ARE THE HARDER ONES. THESE ARE THE HARDER ONES YOU'RE GOING TO HAVE TO ANSWER. WHAT IS THE VALUE? WHAT IS THE MEASURE OF VALUE OF A MAN'S LIFE? YOU HEARD THE MAYS FAMILY'S TESTIMONY. YOU FELT THEIR LOSS. AND NONE OF THEM GOT UP THERE AND SAID, "WE MISS HIS PAYCHECK." NOT ONE OF THEM. THEY MISS HIS LOVE, HIS COMFORT, HIS ADVICE, THE LITTLE THINGS HE DID, DROPPING BREAKFAST BY THE BACK DOOR AND SENDING A TEXT, "I LEFT YOU BREAKFAST." THE MAN THAT IF HIS DAUGHTER HAD A FLAT, SHE COULD CALL AND HE WOULD BE THERE. THIS WAS A CLOSE-NIT, LOVING FAMILY. MR. MAYS WAS THEIR ROCK. HE WAS THE GLUE THAT HELD THIS FAMILY TOGETHER. AND BECAUSE HIS DEATH WAS PREVENTABLE, THE LAW PROVIDES THAT THEY ARE

FULLY COMPENSATED FOR THEIR LOSS.

NOW, WE SUGGEST 500,000 FOR EACH ONE OF MR. MAYS'S KIDS. WE BELIEVE HIS ADVICE, HIS LOVE, AND HIS SUPPORT WAS VALUABLE. FOR MS. MAYS, $4 MILLION. NOW, I KNOW CHEVRON IS GOING TO GET UP HERE AND SAY, "OH, MY GOODNESS. THAT'S OUTRAGEOUS." BUT YOU KNOW WHAT? IF MR. MAYS HAD LIVED ANOTHER 25 YEARS, THIS IS ABOUT $438 A DAY FOR MS. MAYS'S GRIEF. THAT'S NOT UNREASONABLE.

WE ALL KNOW THE VALUE OF WHEN WE'VE HAD A BAD DAY, WHEN WE'VE HAD A GREAT DAY, WHEN WE ARE NERVOUS, WHEN WE ARE STRESSED, WHEN WE THINK THE WORLD IS FALLING APART, TO BE ABLE TO HOLD TIGHTLY TO YOUR LOVED ONE'S HAND --

**THE COURT:** FIVE MINUTES, COUNSEL.

**MS. PIERCE:** -- AND KNOW THAT EVERYTHING IS GOING TO BE OKAY.

THANK YOU VERY MUCH FOR YOUR TIME AND ATTENTION.

**THE COURT:** THANK YOU, MS. PIERCE.

MR. SILVERSTEIN?

**MR. SILVERSTEIN:** JUDGE, WE NEED TO TAKE A FIVE-MINUTE BREAK.

**THE COURT:** YES, WE WILL TAKE, LADIES AND GENTLEMEN, A VERY BRIEF FIVE-MINUTE BREAK. AND WHEN

WE RETURN, MR. SILVERSTEIN WILL ADDRESS YOU ON BEHALF OF THE DEFENDANTS.

PLEASE REMEMBER THE RULES. AND AGAIN, PLEASE DON'T DISCUSS THE CASE JUST YET.

LET'S ALL RISE.

**REPORTER'S NOTE: (WHEREUPON, THE JURY IS OUT OF THE COURTROOM.)**

**THE COURT:** ALL RIGHT. JUST SO YOU KNOW, MS. LEGER, IF YOU DO THE SECOND CLOSE, YOU ACTUALLY HAVE 20 MINUTES LEFT. OKAY?

**MS. LEGER:** THANK YOU, YOUR HONOR.

**MR. SILVERSTEIN:** JUDGE, I WOULD LIKE THE JURY TO BE TOLD -- MS. PIERCE SAID THERE WAS A STIPULATION AS TO HIS NUMBER. THERE WAS NO STIPULATION. THE STIPULATION WAS IF HE WERE CALLED, HE WOULD SAY THIS WOULD BE HIS NUMBER. THAT IMPLIES THAT WE AGREE WITH THAT NUMBER. I JUST WOULD LIKE THE JURY TOLD THAT THE PARTIES DO NOT STIPULATE --

**THE COURT:** WHAT I WOULD SUGGEST WE DO IS THAT YOU TAKE THE OPPORTUNITY TO CLARIFY THAT. AND, MS. LEGER, WHEN YOU ADDRESS ON YOUR SECOND CLOSING, IF YOU WOULD SIMPLY CONFIRM WHAT MR. SILVERSTEIN WILL EXPLAIN TO THE JURY, I THINK THAT'S THE BEST WAY TO HANDLE THAT. IF THE LAWYERS CAN DO JUDICIAL INSTRUCTIONS, I THINK THAT'S A LOT MORE EFFECTIVE.

OKAY?

COURT IS IN RECESS.

**(WHEREUPON, A RECESS WAS TAKEN.)**

**THE COURT:** LET'S ALL REMAIN STANDING FOR THE JURY.

**REPORTER'S NOTE: (WHEREUPON, THE JURY IS IN THE COURTROOM.)**

**THE COURT:** BE SEATED. WELCOME BACK, LADIES AND GENTLEMEN. AT THIS TIME MR. SILVERSTEIN WILL ADDRESS YOU ON BEHALF OF CHEVRON.

**MR. SILVERSTEIN:** GOOD MORNING, LADIES AND GENTLEMEN. LIKE MS. PIERCE, I TOO WOULD LIKE TO THANK YOU FOR THE TIME AND ATTENTION THAT YOU'VE GIVEN ME, SEAN MCLAUGHLIN, MS. PIERCE, MS. LEGER, MR. PAPILLION AND ALL ATTORNEYS. WE KNOW YOU HAVE MORE IMPORTANT AND PRESSING MATTERS IN YOUR LIFE OTHER THAN COMING TO FEDERAL COURT AND SITTING AS JURORS. YOU'VE BEEN ATTENTIVE, YOU'VE BEEN PATIENT, AND BOTH SIDES VERY MUCH APPRECIATE THAT.

I WANT TO BEGIN, LADIES AND GENTLEMEN, BY ASKING YOU TO THINK BACK TO MONDAY MORNING WHEN WE FIRST STARTED THIS TRIAL WHEN YOU TOOK THE JUROR'S OATH. AND IN THAT OATH YOU PROMISED TO DECIDE THIS CASE BASED SOLELY ON THE EVIDENCE AND THE LAW AS GIVEN TO YOU BY JUDGE JACKSON. NOW, THAT OATH IS

VERY IMPORTANT BECAUSE HUMAN NATURE BEING WHAT IT IS, PEOPLE SYMPATHIZE WITH PEOPLE. PEOPLE DO NOT SYMPATHIZE WITH PIPELINE COMPANIES LIKE CHEVRON PIPE LINE COMPANY.

I WOULD CERTAINLY UNDERSTAND IF YOU FEEL COMPASSION AND SYMPATHY FOR THE MAYS FAMILY. JAMES MAYS WAS A GOOD MAN. I TOLD YOU THAT IN OPENING STATEMENT. AND HIS WIFE AND CHILDREN ARE GOOD PEOPLE. AND ABSOLUTELY DO I -- I BELIEVE THAT THEIR GRIEF IS VERY REAL.

BUT JUDGE JACKSON WILL TELL YOU THAT A CORPORATION IS ENTITLED TO THE SAME RIGHTS AND PRIVILEGES UNDER THE LAW AS AN INDIVIDUAL. HE WILL INSTRUCT YOU THAT YOU MUST DISREGARD ANY FEELINGS OF SYMPATHY, COMPASSION, BIAS AND DECIDE THIS CASE FAIRLY AND TREAT BOTH PARTIES EQUALLY. THIS CASE MUST BE DECIDED ON THE LAW AND THE EVIDENCE AND NOT BY COMPASSION OR SYMPATHY. OTHERWISE, LADIES AND GENTLEMEN, OUR LEGAL SYSTEM SIMPLY WILL NOT WORK.

NOW, JUDGE JACKSON ALSO TOLD YOU AT THE BEGINNING OF TRIAL THAT THE PLAINTIFF HAS THE BURDEN OF PROOF. AND THE MAYS FAMILY, AS THE PLAINTIFFS, MUST PROVE BY A PREPONDERANCE OF THE EVIDENCE, WHICH MEANS MORE LIKELY THAN NOT, THE ELEMENTS OF THEIR CLAIM. AND THE FIRST IS LIABILITY OR FAULT. IN

OTHER WORDS, THE MAYSES MUST PROVE THAT THIS ACCIDENT RESULTED AS A RESULT OF CHEVRON PIPE LINE'S FAULT OR LIABILITY.

AND THERE IS TWO COMPONENTS TO THAT. THERE IS MISTAKES, NEGLIGENCE, WHATEVER YOU WANT TO CALL IT, AND THEN THERE IS CAUSATION FACTORS. AND YOU HAVE TO HAVE NEGLIGENCE AND IT HAS TO CAUSE THE ACCIDENT. NOW, ALONG THOSE LINES YOU WILL ALSO HAVE THE OPPORTUNITY TO ASSESS THE FAULT OF MR. MAYS, FURMANITE AND ACADIAN CONTRACTORS. SECOND, THEY HAVE TO PROVE DAMAGES. THEY HAVE TO SHOW WHAT AMOUNT OF MONEY WILL FAIRLY AND REASONABLY COMPENSATE THEM FOR THEIR LOSS. AND FINALLY, THEY HAVE TO PROVE THAT THERE IS A SIGNIFICANT CASUAL (SIC) CONNECTION. LET ME SAY THAT AGAIN -- A SIGNIFICANT CASUAL (SIC) CONNECTION BETWEEN MR. MAYS'S ACCIDENT AND CHEVRON PIPE LINE'S OPERATIONS ON THE OUTER CONTINENTAL SHELF.

I WANT TO BEGIN THIS MORNING BY TALKING ABOUT LIABILITY, BECAUSE THAT'S, FRANKLY, WHAT WE'VE SPENT MOST OF THIS TRIAL TALKING ABOUT. THE EVENTS WHICH STARTED THIS CASE BEGAN BACK ON SEPTEMBER 9, 2014, WHEN REGGIE MOTTY, AS YOU NOW KNOW WAS A CHEVRON PIPE LINE PIPELINE OPERATOR, CALLED JAMES MAYS, THE FURMANITE VALVE EXPERT -- THE GUY WHO THEY

HAD BEEN GOING TO FOR MORE THAN TEN YEARS -- TO COME WITH HIM TO LIGHTHOUSE POINT TO HELP WITH A VALVE PROBLEM. AND WHAT HE WANTED HIM TO DO WAS HELP GREASE SOME VALVES AND THEN CLOSE IT.

NOW, MR. MAYS BROUGHT A SECOND VALVE PERSON WITH HIM. WE NOW KNOW THAT WAS NORMAN THOMAS. AND MR. THOMAS, LIKE MR. MAYS, WAS A LEVEL 3 VALVE TECHNICIAN. SO MR. MOTTY, MR. THOMAS AND MR. MAYS, THEY GO TO LIGHTHOUSE POINT, THEY GREASE THAT VALVE, ONE OR THREE VALVES, AND THEY GO TO TURN THE GEAR OPERATOR AND THE GEAR OPERATOR BROKE. WE NOW KNOW THAT. THEY TRIED TO REMOVE IT AND THEY DIDN'T HAVE THE TOOLS. SO WHAT DID THEY DO? THEY GOT BACK ON THE BOAT AND THEY CAME BACK IN. AND MR. MAYS WAS GOING TO LOOK FOR A REPLACEMENT GEAR OPERATOR.

NOW, MR. MAYS KNEW THAT HE WAS COMING BACK TO LIGHTHOUSE POINT BECAUSE HE HAD TO REMOVE THAT BROKEN GEAR OPERATOR AND EITHER REPAIR IT OR REPLACE IT. YET HE DIDN'T TAKE ANY ACTION TO IDENTIFY THE MANUFACTURER, MODEL NUMBER, AND SERIAL NUMBER OF THE VALVE. AND THAT COULD HAVE BEEN DONE SIMPLY BY CUTTING THE WRAP.

NOW, MS. PIERCE ARGUED, "YOU COULDN'T SEE THROUGH THE WRAP." SHE MAY BE RIGHT. THIS WRAP WAS -- HAD BEEN THERE FOR 10, 12 YEARS. YOU PROBABLY

COULDN'T SEE THROUGH IT. THAT'S WHY YOU HAD TO CUT IT. LIKE EVERY SINGLE FURMANITE WITNESS SAID, CUT IT, PEEL IT BACK, AND YOU READ THAT LABEL OFF THE VALVE.

NOW, MR. MAYS COULDN'T FIND A REPLACEMENT GEAR OPERATOR. SO FOUR DAYS LATER, ON SEPTEMBER 13, 24 (SIC), HE AND MR. MOTTY GO BACK TO LIGHTHOUSE POINT TO REMOVE THE BROKEN GEAR OPERATOR SO THAT HE CAN BRING IT BACK AND REPAIR IT. NOW, WE NOW KNOW THAT FURMANITE'S VALVE TECHNICIANS WERE BUSY, SO WHO DID FURMANITE CALL? THEY CALLED DAVID JARRELL, THE WITNESS THAT YOU HEARD TESTIFY YESTERDAY.
MR. JARRELL WAS A NICE MAN. BUT MR. JARRELL, AS HE TOLD YOU, DIDN'T KNOW ANYTHING ABOUT VALVES. THAT'S WHO FURMANITE BROUGHT OUT THERE, BECAUSE THEY DIDN'T CALL NORMAN THOMAS OR SOMEONE ELSE.

NOW, DURING THE BOAT RIDE OUT TO LIGHTHOUSE POINT, MR. MOTTY COMPLETED THE PERMIT TO WORK, WHICH I KNOW I'VE SPENT A LOT OF TIME WITH; BUT, LADIES AND GENTLEMEN, THAT'S CRITICAL TO THIS CASE.

CAN YOU SHOW THE PERMIT TO WORK. AS THE WITNESSES TOLD YOU, THE PURPOSE OF THE PERMIT TO WORK IS TO DEFINE THE JOB SCOPE. THAT'S WHAT FURMANITE'S HIRED TO DO. THAT'S WHAT THEY'RE AUTHORIZED TO DO. AND IT WAS: REMOVE THE GEAR OPERATOR FROM A 12-INCH

VALVE, SIGNED BY MR. MOTTY AND MR. MAYS.

NOW, AFTER MR. MOTTY DOES THE PERMIT TO WORK, THEN THE BALL GOES IN MR. MAYS'S COURT, AND HE DOES THAT JOB SAFETY HAZARD ANALYSIS. NOW, I'VE SPENT A LOT OF TIME ON THAT.

CAN YOU PUT THE JOB SAFETY HAZARD UP? I WENT THROUGH THE FURMANITE MANUAL WHICH SHOWS WHAT YOU HAVE TO DO WHEN YOU COMPLETE THE JOB SAFETY HAZARD. THE PURPOSE OF THIS IS YOU HAVE TO GO THROUGH AND IDENTIFY ALL THE RISKS ASSOCIATED WITH THE JOB. IT WAS MR. MAYS'S RESPONSIBILITY TO KNOW EVERYTHING ABOUT THAT JOB AND THEN HOW TO ELIMINATE THE RISKS ASSOCIATED WITH THE JOB.

MR. MAYS KNEW THAT HE WAS DOING MAINTENANCE ON THE VALVE, THERE WAS 800 POUNDS OF PRESSURE, AND THAT HE WAS GOING TO BE PULLING A GEAR. AND HE DETERMINED THAT EVEN THOUGH THIS VALVE HAD 800 POUNDS OF PRESSURE, IT WASN'T NECESSARY TO DO A LOCKOUT/TAGOUT TO REMOVE A GEAR. AND HE'S RIGHT. EVERYBODY AGREES. IF ALL YOU'RE GOING TO DO IS TAKE OFF THOSE FOUR BOLTS SECURING THE GEAR OPERATOR TO THE VALVE, YOU DON'T NEED TO DO A LOCKOUT/TAGOUT. BUT UNFORTUNATELY MR. MAYS, NOT KNOWING WHAT HE WAS DOING, TOOK IT ONE STEP FURTHER AND REMOVED THE BONNET COVER, WHICH IS WHY WE ARE HERE TODAY.

NOW, AFTER THE PERMIT TO WORK AND THE JSA WERE DONE, THE JOB BEGAN AND THE CREW REMOVED THE BROKEN GEAR OPERATOR. CAN YOU PULL UP THE GEAR OPERATOR, PLEASE. THIS PIECE OF EQUIPMENT WAS ON THE DECK OF THE PLATFORM. THAT IS A STIPULATED FACT. THE JOB IN THE PERMIT TO WORK AND THE JOB THAT MR. MAYS DISCUSSED AND ANALYZED IN HIS JSHA WAS COMPLETE. EVERY FURMANITE WITNESS TOLD YOU: WHAT THEY SHOULD HAVE DONE IS PICKED UP THAT GEAR OPERATOR AND PUT IT ON THE BOAT AND COME ON IN.

BUT THAT'S NOT WHAT HAPPENED. MR. MAYS TOOK A STEP FURTHER -- CAN WE SHOW THE NEXT PICTURE -- AND HE NOW REMOVED THAT EIGHT-BOLTED BONNET COVER, SECURED BY EIGHT BOLTS, WHICH A VALVE EXPERT SHOULD KNOW IS A PRESSURE-CONTAINING COMPONENT. YOU CAN'T GET TO THE BONNET COVER UNLESS YOU REMOVE THE GEAR OPERATOR AND MOUNTING PLATE. AND MR. MAYS'S EXACT WORDS TO MR. MOTTY AND THE CREW WAS: "LET'S GO REMOVE THE MOUNTING PLATE." HE DIDN'T KNOW THE DIFFERENCE. AND WHEN HE REMOVED IT, THE ACCIDENT HAPPENED.

NOW, LADIES AND GENTLEMEN, LET ME POINT SOMETHING OUT THAT'S CRITICAL. WE'VE BEEN IN THIS CASE FOR FIVE DAYS. NOT ONE TIME HAVE THE PLAINTIFFS STOOD UP HERE AND GIVEN YOU AN EXPLANATION ON WHY

MR. MAYS DIDN'T KNOW WHAT THAT BONNET COVER WAS AND WHY HE REMOVED THAT. NOT ONCE. AND YOU KNOW WHY? BECAUSE WE ASKED THEIR OWN EXPERT. THE PLAINTIFFS WENT OUT AND HIRED AN EXPERT -- WHO THEY DIDN'T WANT TO CALL; WE HAD TO CALL HIM ON OUR CASE -- NAMED GORDON AAKER. AND WE ASKED HIM -- CAN YOU PULL UP DR. AAKER'S TESTIMONY.

**MS. PIERCE:** HE'S NOT A DOCTOR.

**MR. SILVERSTEIN:** THIS IS MISTER -- THIS WAS THE PLAINTIFFS' HIRED EXPERT WHO THEY PAID $315 AN HOUR TO ANALYZE THE CASE. "BUT YOU WOULD AGREE WITH ME THAT IT WASN'T REASONABLE, IT WASN'T PRUDENT FOR AN EXPERIENCED LEVEL 3 VALVE TECHNICIAN TO TAKE A VALVE CAP OFF OF A VALVE THAT'S UNDER 800 POUNDS OF PRESSURE UNLESS HE KNEW EXACTLY WHAT HE WAS DOING AND THE VALVE WORKED?

"ANSWER: THAT'S CORRECT.

"ALL RIGHT.

"BUT HE WAS CONVINCED HE HAD A WKM.

"QUESTION: WELL, THAT DOESN'T MAKE THE ACCIDENT ANY LESS LIKELY TO OCCUR?"

LOOK AT WHAT THEIR OWN HIRED EXPERT SAYS: "A VETERAN LIKE THAT DOESN'T MAKE A DUMBASS MISTAKE LIKE THAT."

LADIES AND GENTLEMEN, THOSE ARE HARSH WORDS,

BUT THOSE AREN'T MY WORDS. THOSE ARE THE EXPERT'S THAT MS. PIERCE PAID $315 AN HOUR FOR TO ANALYZE THIS CASE AND THEN TO COME IN HERE AND PRESENT EVIDENCE. THEY DIDN'T CALL HIM, SO WE CALLED HIM. AND WHEN HE -- THEIR OWN EXPERT HIRED IN THIS CASE, HE SAYS, "A VETERAN LIKE THAT DOESN'T MAKE A DUMBASS MISTAKE LIKE THAT."

WHEN I BEGAN THIS CASE I TOLD YOU IN OPENING STATEMENT RIGHT OFF THE BAT THAT MISTAKES WERE MADE BY EVERYBODY: MR. MAYS, MR. MOTTY, MR. JARRELL, MR. THOMAS, MR. VICE. I STAND BY THAT STATEMENT. INCREDIBLY THIS TRIAL BEGAN WITH MS. LEGER STANDING UP AND TELLING YOU IT WAS ALL CHEVRON'S FAULT. I'VE GOT TO TELL YOU, I WAS SHOCKED, BECAUSE I KNEW THEY HAD HIRED AND PAID FOR TWO LIABILITY EXPERTS WHO BLAMED MR. MAYS. THEIR OWN HIRED EXPERTS SAID IT WAS MR. MAYS'S FAULT. BUT YET THEY STOOD UP HERE AND TRIED TO TELL YOU IT WAS ALL CHEVRON'S FAULT.

MR. AAKER TESTIFIED VERY CLEARLY THAT MR. MAYS WAS AT FAULT FOR REMOVING A PRESSURIZED BONNET COVER FROM A VALVE. HE SAID, "IT DOESN'T MATTER IF IT'S A WKM, IT DOESN'T MATTER IF IT'S A DEMCO, IT DOESN'T MATTER IF IT'S A CAMERON. YOU NEVER, EVER DO WHAT MR. MAYS DID." NOW, HE ALSO FAULTED THE OTHER CREW MEMBERS BECAUSE THEY BELIEVED

HE SHOULD HAVE STOPPED MR. MAYS, THE VALVE EXPERT HIRED FROM CHEVRON, FROM DOING WHAT HE DID AT THE TIME OF THE ACCIDENT.

THEN WE HEARD FROM MICHAEL SAWYER. HE MAY HAVE ONLY BEEN $300 AN HOUR. AND WHAT HE SAID WAS: "MR. MAYS WAS AT FAULT FOR FAILING TO FOLLOW HIS OWN OPERATIONS MANUAL AND SAFETY MANUAL." AND HE ADMITTED THAT EVERY SINGLE FURMANITE EMPLOYEE HAS AN OBLIGATION TO FIRE -- FOLLOW THE RULES AND REGULATIONS. WHAT MR. SAWYER ULTIMATELY SAID, THE PLAINTIFFS' OWN EXPERT -- AND IT WAS CRITICAL -- HE SAID, "THIS ACCIDENT WOULDN'T HAVE HAPPENED IF MR. MAYS HAD FOLLOWED HIS OWN SAFETY RULES." LET ME SAY THAT AGAIN. THEIR OWN EXPERT, WHO THEY HIRED AND PAID FOR, SAID, "THIS ACCIDENT WOULDN'T HAVE HAPPENED IF HE HAD FOLLOWED THEIR OWN SAFETY RULES."

LADIES AND GENTLEMEN, I STRONGLY ENCOURAGE YOU TO CONSIDER WHAT THE ATTORNEYS HAVE TOLD YOU IN THIS CASE AND WEIGH WHAT WE'RE SAYING IN CONSIDERING THE CREDIBILITY OF OUR POSITIONS AND THE POSITIONS OF OUR CLIENTS. WHO IS BEING CANDID ABOUT THE FACTS IN THIS CASE? WHO'S TRYING TO MISLEAD YOU? AND I THINK THAT SHOULD BE CONSIDERED BY EVERYONE ON THIS JURY.

NOW, LET ME TALK A LITTLE BIT MORE ABOUT MR. MAYS. THE FACT IS: MR. MAYS WAS THE ARCHITECT

OF HIS OWN ACCIDENT. HE WAS A LEVEL 3 VALVE EXPERT WITH 40 YEARS OF EXPERIENCE. BUT MOST SIGNIFICANTLY, HE WAS THE ONLY VALVE TECHNICIAN, THE ONLY VALVE EXPERT, ON THIS PLATFORM AT THE TIME OF THE ACCIDENT. HE WAS TELLING THE CREW WHAT TO DO, AND HE MADE MANY MISTAKES. LET ME JUST GO THROUGH SOME OF THOSE.

WHEN MR. MAYS WENT OUT THERE ON SEPTEMBER 9TH THAT VERY FIRST TIME, HE SHOULD HAVE IDENTIFIED THE VALVE BY REMOVING THAT TAPE AND GETTING THE MANUFACTURER AND MODEL NUMBER. THAT WOULD HAVE ALLOWED HIM TO GET THE DRAWINGS AND SPECIFICATIONS, BECAUSE HE KNEW HE WAS COMING BACK FOUR DAYS LATER TO WORK ON THAT VALVE AND REMOVE THE GEAR OPERATOR.

INSTEAD, AS MR. THOMAS TOLD YOU, HE AND MR. MAYS SIMPLY LOOKED AT THE VALVE AND SAID, "IT LOOKS LIKE A WKM BASED ON THE SIZE AND SHAPE" -- ALTHOUGH THEY NEVER SAID WHAT PARTICULAR MODEL IT WAS -- "AND WE'LL JUST ASSUME THAT." IT WOULD HAVE BEEN VERY EASY TO HAVE CUT THE TAPE BACK AND GET THAT INFORMATION.

NOW, YOU RECALL THAT MR. THOMAS TOLD YOU THEY CUT THE TAPE OFF THAT FIRST DAY WHEN THEY WERE TRYING TO REMOVE THE GEAR OPERATOR. THEY KNEW THEY COULD CUT THE TAPE, BUT THEY DIDN'T DO IT. SECOND, MR. MAYS WAS REQUIRED BY THE FURMANITE OPERATIONS

MANUAL -- IT'S SECTIONS 2.2 AND 2.3 -- TO GET THE DRAWINGS AND SPECIFICATIONS BEFORE YOU DO A JOB.

I CALLED MR. SHANE WILLIAMS TO THE STAND YESTERDAY. YOU'LL RECALL HE'S THE GENTLEMAN WHO HAD LEFT FURMANITE A NUMBER OF YEARS AGO. HE APPEARED ON BEHALF OF FURMANITE AS THEIR CORPORATE REPRESENTATIVE WHEN I TOOK HIS DEPOSITION FOUR YEARS AGO. AND I SAID TO HIM, I SAID, "MR. WILLIAMS, AS FURMANITE'S REPRESENTATIVE, SHOULD A LEVEL 3 VALVE TECHNICIAN KNOW TO GET THE DRAWINGS AND SPECIFICATIONS, OR DO YOU NEED TO GO CONSULT A MANUAL?"

HIS ANSWER WAS: "THAT'S COMMON SENSE. WE WOULD EXPECT ALL OF OUR VALVE TECHNICIANS TO KNOW HOW THAT VALVE OPERATES AND TO GET THE DRAWINGS AND SPECIFICATIONS BEFORE YOU EVER TOUCH A VALVE THAT'S UNDER 800 POUNDS OF PRESSURE."

NOW, MR. MAYS ALSO MADE FATAL ERRORS WHEN HE CAME BACK OUT ON THE DATE OF THE ACCIDENT. FIRST OF ALL, HE AND THE CREW DID THE PERMITTED WORK. THEY DID THE GEAR OPERATOR. AND THAT IS SO IMPORTANT, BECAUSE THIS GEAR OPERATOR AND MOUNTING PLATE WERE ON THE DECK. THE JOB WAS COMPLETE. BUT MR. MAYS TOLD THE CREW, WHICH INCLUDED MR. MOTTY, MR. JARRELL AND MR. VICE, "GO REMOVE THE MOUNTING PLATE," WHICH LED TO THE ACCIDENT.

BUT MOST CRITICALLY, LADIES AND GENTLEMEN, A LEVEL 3 VALVE TECHNICIAN DID NOT KNOW THE DIFFERENCE BETWEEN A MOUNTING PLATE AND A BONNET COVER. HE DIDN'T KNOW THE DIFFERENCE BETWEEN A FOUR-BOLT DEVICE THAT SECURES A GEAR OPERATOR TO THE VALVE AND AN EIGHT-BOLTED DEVICE THAT SECURES THAT WHOLE PIECE OF EQUIPMENT TO THE VALVE. AND THAT'S SOMETHING THAT A LEVEL 3 VALVE TECHNICIAN SHOULD KNOW HOW TO DO.

MR. MAYS ALSO VIOLATED SECTION 4.5 OF THE OPERATIONS MANUAL. CAN YOU PULL THAT UP, PLEASE. IT SAID: "HAND AND CONTROL VALVES SHALL BE DISASSEMBLED IN ACCORDANCE WITH APPROVED FURMANITE PROCEDURES OR THE MANUFACTURER'S RECOMMENDED GUIDELINES." EVERY WITNESS IN HERE HAS TOLD YOU THAT THE REMOVAL OF A BONNET COVER IS A DISASSEMBLY.

AND MR. WILLIAMS' WORDS, AS MR. THOMAS AND MR. JARRELL SAID, "THAT'S WHAT WE CALL BLACK LETTER LAW AT FURMANITE. YOU DON'T EVER DISASSEMBLE OR TOUCH A PIECE OF EQUIPMENT WITHOUT FOLLOWING THE MANUFACTURER'S RECOMMENDED GUIDELINES." NOT ONCE HAS THE PLAINTIFF OFFERED AN EXPLANATION ON WHY MR. MAYS NEVER TRIED TO IDENTIFY THIS VALVE THE RIGHT WAY AND GET THE DRAWINGS AND SPECIFICATIONS BEFORE THEY CAME OUT THERE TO WORK ON THIS VALVE.

LET ME NOW TALK ABOUT LOCKOUT/TAGOUT. UNDER

THE FURMANITE AND CHEVRON RULES, IF YOU WORK ON ANY PIPE, VALVE OR EQUIPMENT WHERE THERE IS THE POTENTIAL FOR THE RELEASE OF STORED ENERGY, YOU HAVE TO LOCK IT OUT AND TAG IT OUT. WE'VE EXPLAINED THAT. THAT'S WHERE YOU CUT THE GAS OFF, YOU BLEED THE PRESSURE OUT SO IT'S NOT UNDER PRESSURE. MR. MAYS WAS REMOVING A GEAR OPERATOR. THERE IS NO QUESTION IN THIS CASE THAT THE REMOVAL OF A GEAR OPERATOR DOES NOT REQUIRE A LOCKOUT.

HOWEVER, ALTHOUGH THIS JOB DIDN'T NEED TO BE LOCKED OUT AND TAGGED OUT, MR. MAYS TOOK IT ONE STEP FURTHER AND REMOVED THE PRESSURE-CONTAINING BONNET COVER. AT THAT POINT THERE WAS THE POTENTIAL FOR THE RELEASE OF STORED ENERGY. UNFORTUNATELY MR. MAYS, AS CHEVRON'S VALVE EXPERT, THE GUY THAT THEY HIRED AND WERE PAYING TO DO THAT WORK, DIDN'T RECOGNIZE IT. AND BECAUSE OF THAT, THIS JOB WASN'T LOCKED OUT AND TAGGED OUT. ONCE AGAIN, IT WASN'T NECESSARY TO REMOVE THE GEAR OPERATOR. BUT ONCE MR. MAYS TOOK IT TO THAT NEXT STEP AND BEGAN REMOVING THE BONNET COVER, THE JOB NEEDED TO BE ISOLATED.

MR. MAYS WAS ALSO IN THE LINE OF FIRE. YOU'VE HEARD FROM FURMANITE EMPLOYEES TALKING ABOUT THAT. THAT SIMPLY MEANS THAT WHEN YOU OPEN A VALVE OR EQUIPMENT, YOU STAND AWAY FROM IT SO IF THE

UNEXPECTED HAPPENS AND PRESSURE IS RELEASED, YOU'RE NOT IN THE LINE OF FIRE. I DON'T THINK THERE IS ANY QUESTION, NOBODY EXPECTED THIS PRESSURE TO BE RELEASED WHEN THEY TOOK OFF THAT EIGHT-BOLTED BONNET COVER. BUT THAT'S WHY YOU STAND AWAY IN CASE THE UNEXPECTED HAPPENED. AND MR. MAYS AS A VALVE EXPERT SHOULD HAVE KNOWN THAT.

FINALLY, MR. MAYS VIOLATED THE CARDINAL RULE, THE RULE THAT EVERY FURMANITE VALVE TECHNICIAN LIVES BY. YOU HEARD IT FROM EVERY -- THE TWO EXPERTS THAT WERE CALLED, BOTH HIRED FROM THE PLAINTIFF. YOU HEARD IT FROM EVERY FURMANITE WITNESS: MR. WILLIAMS, MR. JARRELL AND MR. THOMAS. AND THAT IS, YOU NEVER EVER, EVER TOUCH A VALVE. YOU NEVER DISASSEMBLE A VALVE UNLESS YOU, ONE, FULLY IDENTIFY IT, YOU KNOW EXACTLY WHAT YOU'RE WORKING ON; TWO, YOU FULLY UNDERSTAND HOW THAT VALVE OPERATES; AND THREE, YOU UNDERSTAND THE CONSEQUENCES OF YOUR ACTIONS.

THAT RULE APPLIES WHETHER YOU'RE WORKING WITH A WKM, A DEMCO, OR ANY OTHER TYPE OF VALVE. AND MR. MAYS VIOLATED THAT. THERE IS NO QUESTION ABOUT THAT. AND THERE HAS NEVER BEEN ANY EXPLANATION AS TO WHY HE DID IT.

AND PERHAPS THAT'S WHY MR. THOMAS TESTIFIED THAT VERY FIRST DAY WHEN HE SAID, "I SURE WISH

MR. MAYS HAD CALLED ME LIKE I WAS EXPECTING HIM TO TO GO BACK OUT THAT SECOND DAY. BECAUSE HAD I BEEN THERE, I WOULD HAVE SAID, 'MR. MAYS, THAT GEAR OPERATOR HAS BEEN REMOVED. IT'S ON THE DECK. LET'S PUT IT ON THAT BOAT AND LET'S GO HOME. WE'RE NOT GOING TO WORK OUTSIDE THE SCOPE OF THE PERMIT TO WORK.'" THAT WAS MR. THOMAS'S OWN WORDS. HIS BEST FRIEND, HE SAYS, "I WISH I HAD BEEN THERE BECAUSE I WOULD HAVE STOPPED MR. MAYS FROM MAKING A BIG MISTAKE AND VIOLATING WHAT'S KNOWN AS FURMANITE'S CARDINAL RULE."

NOW, FURMANITE ALSO MADE SOME MISTAKES IN THIS CASE. SHANE WILLIAMS, WHO WAS THE FACILITY MANAGER, IN SECTION 2.2 WAS RESPONSIBLE FOR GETTING THE MANUALS, SPECIFICATIONS ON THE VALVE. AND WE KNOW THAT FURMANITE HAD THAT RESOURCE CENTER. THEY PRODUCED THE DEMCO MANUAL IN THIS CASE. HAD FURMANITE OR HAD MR. MAYS IDENTIFIED THIS VALVE, PULLED THAT TAPE OFF, THEY COULD HAVE EASILY HAVE GOTTEN THE MANUAL.

LET'S TALK ABOUT MR. THOMAS AGAIN. ONCE AGAIN, HE ALONG WITH MR. MAYS IDENTIFIED THE VALVE AS A WKM BASED ON ITS SIZE AND SHAPE. AND MR. THOMAS ADMITTED, THAT'S NOT THE RIGHT WAY, BECAUSE VALVES LOOK ALIKE BUT OPERATE DIFFERENTLY. THAT'S WHY YOU

HAVE TO KNOW THE MANUFACTURER, THE MODEL NUMBER AND THE SERIAL NUMBER. HE ALSO SHOULD HAVE PROPERLY IDENTIFIED THE VALVE SO THAT THE FURMANITE CREW COULD HAVE THOSE DRAWINGS AND SPECIFICATIONS IN HAND WHEN THEY WERE GOING BACK OUT FOUR DAYS LATER.

THEY KNEW THEY WERE GOING BACK OUT TO WORK ON THIS VALVE. AND THERE WAS NO REASON WHEN THEY WENT OUT THERE FOUR DAYS EARLIER THAT THEY COULDN'T HAVE IDENTIFIED IT, KNOWING THEY WERE COMING BACK OUT AND HAD THE LITERATURE IN HAND BEFORE IT HAPPENED.

SO WHAT DID FURMANITE DO ON SEPTEMBER 13TH? THEY SENT DAVID JARRELL TO DO THE JOB. AND MR. JARRELL TOLD YOU HE HAD NO VALVE EXPERTISE. WHEN I ASKED HIM ABOUT THE ACCIDENT, HE SAID, "I ASSUMED THAT MR. MAYS KNEW WHAT HE WAS DOING AND I WAS FOLLOWING HIS INSTRUCTIONS." HE SAID, "I DIDN'T KNOW THAT THAT BONNET COVER WASN'T THE MOUNTING PLATE. I TOOK -- I DID WHAT MR. MAYS WANTED ME TO DO."

WELL, PERHAPS IF FURMANITE HAD SENT OUT A VALVE TECHNICIAN LIKE THEY DID THAT FIRST JOB, SOMEBODY WOULD HAVE CAUGHT MR. MAYS'S FATAL ERROR AND NOT ALLOWED THIS TRAGEDY TO OCCUR.

NOW, LET ME TALK ABOUT CHEVRON PIPE LINE'S MISTAKES. AND ONCE AGAIN, I TOLD YOU IN OPENING STATEMENT AND I'M GOING TO SAY IT AGAIN, CHEVRON PIPE

LINE MISIDENTIFIED THAT VALVE FOR YEARS. PUT THAT UP FRONT. I TOLD YOU IN OPENING STATEMENT, AND WE LIVE BY THAT. THEY CALLED IT A WKM. IT WAS A DEMCO. A PIPELINE COMPANY SHOULD KNOW BETTER. CHEVRON PIPE LINE SHOULD KNOW BETTER. IT REALLY WAS A BAD MISTAKE.

HOWEVER -- AND THIS IS CRITICAL -- IT HAD NOTHING TO DO WITH CAUSING THIS ACCIDENT. IT LOOKS BAD, BUT IT DIDN'T CAUSE THE ACCIDENT. HOW DO WE KNOW? BECAUSE MR. MAYS AND HIS CREW NEVER SAW THOSE REPORTS. I ASKED MR. THOMAS THAT, I ASKED MR. JARRELL THAT, I ASKED MR. MAYS (SIC) THAT. NOBODY WHO WAS OUT THERE SAW THOSE VALVE INSPECTION REPORTS. DID IT LOOK BAD? YES. BUT NOBODY RELIED ON IT.

BUT LET'S ASSUME MR. MAYS HAD RELIED ON IT, THAT HE HAD SEEN IT. ALL IT TOLD YOU WAS IT WAS MANUFACTURED BY WKM. WKM MAKES HUNDREDS OF TYPES OF VALVES. HE WOULD HAVE NEEDED TO KNOW THE MODEL NUMBER, THE YEAR IT WAS MANUFACTURED, AND THE SERIAL NUMBER TO UNDERSTAND HOW THAT VALVE WORKED. IT LOOKS BAD, BUT THAT INFORMATION WOULDN'T HAVE PROVIDED HIM WITH ANY INFORMATION. THE VALVE INSPECTION REPORTS -- I TALKED ABOUT CAUSATION -- HAD NOTHING TO DO WITH CAUSING THIS ACCIDENT.

WHAT ELSE DID -- WHAT OTHER MISTAKE DID CHEVRON MAKE? WELL, REGGIE MOTTY, ALONG WITH THE REST OF THE CREW OUT THERE -- DAVID JARRELL AND TRENT VICE -- ARGUABLY SHOULD HAVE EXERCISED STOP WORK AUTHORITY AND SAID TO MR. MAYS, "STOP. WE'VE DONE THE PERMITTED WORK. THE GEAR OPERATOR AND MOUNTING PLATE ARE ON THE DECK." THAT WAS WHAT WAS DISCUSSED IN THE PERMIT TO WORK, THAT WAS WHAT WAS DISCUSSED IN THE JSHA. "WE SHOULD GO NO FURTHER."

AND THAT SOUNDS GREAT IN PRINCIPLE, BUT THE PROBLEM WITH THAT IS: MR. MOTTY IS A PIPELINE OPERATOR. MR. JARRELL DOES SOME INSTRUMENTATION WORK. WE'RE NOT REALLY SURE WHAT MR. VICE DOES. BUT EVERYBODY WAS FOLLOWING THE ONE VALVE EXPERT OUT THERE, THE ONE PERSON WHO KNEW WHAT HE WAS DOING. IT'S LIKE -- WHEN I TOLD YOU IN OPENING STATEMENT, IT'S LIKE WHEN YOU HIRE THAT ELECTRICIAN TO COME TO YOUR HOUSE AND HE TELLS YOU TO DO SOMETHING, YOU'RE DEPENDING ON HIM TO DO THE JOB CORRECTLY. AND THAT'S WHAT HAPPENED HERE.

SO AFTER CONSIDERING ALL THAT, HOW DO YOU ASSESS OR EVALUATE THE LIABILITY SCENARIO IN THIS CASE? THERE IS NO FORMULA OR SCIENTIFIC METHOD IN FIGURING THIS OUT. BUT I SUBMIT TO YOU, LADIES AND GENTLEMEN, THE CRITICAL FACT IS -- IT'S NOT IN

DISPUTE THAT NOBODY CAN CONTEST -- THERE WAS ONLY ONE VALVE EXPERT OUT THERE, ONLY ONE LEVEL 3 VALVE EXPERT, AND THAT WAS JAMES MAYS. HE WAS THE PERSON CONDUCTING THE WORK. HE WAS THE ONE WHO MADE THE DECISIONS ON THE DATE OF THE ACCIDENT. HE IS THE ONE WHO REMOVED THE BONNET COVER.

AND THERE WERE OTHER MISTAKES THAT WERE MADE, BUT THAT, LADIES AND GENTLEMEN, IS WHAT REALLY CAUSED THIS ACCIDENT. THERE IS NO QUESTION ABOUT IT. THIS ACCIDENT WAS CAUSED BECAUSE MR. MAYS TOOK OFF A PRESSURE-CONTAINING COMPONENT FROM A VALVE. AND THAT'S WHAT CAUSED THIS ACCIDENT. AND I SUBMIT, LADIES AND GENTLEMEN, THAT WAS THE PROXIMATE CAUSE AND HE SHOULD BE ASSIGNED WITH 100 PERCENT OF THE LIABILITY.

BUT LET ME TELL YOU THIS. IF YOU DISAGREE WITH ME BECAUSE OTHER MISTAKES WERE MADE, I SUGGEST HE SHOULD GET A MINIMUM OF 75 PERCENT OF THE FAULT. KEEP IN MIND -- AND THIS IS SO CRITICAL -- HE WAS THE ONLY VALVE EXPERT OUT THERE. HE WAS MAKING EVERY DECISION. THE PLAINTIFFS DON'T WANT TO TALK ABOUT IT, BUT THERE WAS ONE GUY DECIDING WHAT HAPPENED. AND IF HE HAD DONE THE PERMIT TO WORK, AND IT WAS HIS DECISION TO GO FURTHER.

NOW, LET ME TALK ABOUT -- BRIEFLY ABOUT

DAMAGES. MS. PIERCE IN ASKING YOU FOR I THINK 5 MILLION, 6 MILLION -- I DON'T REMEMBER WHAT NUMBER SHE WROTE UP THERE -- IS DOING WHAT EVERYBODY LEARNS IN LAW SCHOOL. YOU GO FOR A JURY AND YOU ASK FOR A GIGANTIC SUM OF MONEY AND YOU HOPE THAT JURY CARVES OFF A PIECE OF IT TO MAKE YOU HAPPY. WELL, THE PROBLEM WITH THAT, THIS ISN'T A CASINO. THIS IS A COURTROOM OF LAW WHERE THIS CASE MUST NOT BE DECIDED ON EMOTIONS. THE MAYSES ARE NOT -- ARE NICE PEOPLE, AND WE ALL FELT FOR THEM WHEN THEY TESTIFIED AT TRIAL.

BUT THAT'S NOT WHAT THIS CASE IS ABOUT. THE MAYS FAMILY FILED THIS LAWSUIT, AND CHEVRON PIPE LINE IS ALLOWED AND HAS THE RIGHT TO COME IN AND DEFEND ITSELF. AND YOU NEED TO PUT ASIDE THOSE EMOTIONS AND DECIDE THIS CASE BASED SOLELY ON THE LAW AND EVIDENCE. ONCE AGAIN, IF YOU DON'T DO THAT, LADIES AND GENTLEMEN, OUR LEGAL SYSTEM WILL NOT WORK.

NOW, MS. PIERCE CALLED ANTHONY GRECO, AN ECONOMIST THEY HIRED, TO MAKE SOME CALCULATIONS. THEY DID THAT FIVE WEEKS BEFORE TRIAL. NOW, SHE SAID WE'VE STIPULATED TO HER NUMBER. LET ME TELL YOU RIGHT NOW: WE ABSOLUTELY DO NOT AGREE WITH ANYTHING THAT HE SAID. AND PERHAPS BECAUSE HE WAS RUSHING TO GET HIS EXPERT REPORT DONE IN TIME, YOU'LL RECALL HE

CAME UP HERE, HE HAD ERRORS, HE CAME UP WITH DIFFERENT NUMBERS. AND I'M NOT SURE WHAT HE FINALLY DECIDED.

AND THEN HE TRIED TO SUBMIT A STIPULATION WHICH SAID, "IF I WAS ALLOWED TO COME BACK AND TESTIFY, THIS IS WHAT I WOULD NOW SAY." THAT'S WHAT THE STIPULATION WAS. BUT HE IS BASING HIS NUMBERS ON ASSUMPTIONS, ON INFORMATION THAT THEY HAVE ASKED HIM TO ASSUME. AND HIS CALCULATIONS ARE DEPENDENT UPON INFORMATION THAT NOBODY KNOWS: HOW LONG WILL MR. MAYS LIVE? HOW LONG WILL MR. MAYS WORK? WILL FURMANITE STILL BE IN BUSINESS? IS THE OIL PATCH STILL GOING TO HAVE JOBS? AND FROM THAT EARNINGS, YOU HAVE TO DEDUCT HIS PERSONAL CONSUMPTION; THAT IS, WHATEVER MR. MAYS WOULD HAVE CONSUMED IF HE HAD BEEN ALIVE COMES OUT OF HIS EARNINGS.

SO I ASKED DR. GRECO -- OR MR. GRECO, I SAID, "DID YOU GET HIS BANK RECORDS? HAD YOU EVER TALKED TO THE MAYS FAMILY? DID YOU DO ANYTHING TO FIND OUT ABOUT HIS CONSUMPTION SO THESE NUMBERS THAT YOU'RE TRYING TO GIVE THIS JURY HAVE SOME MEANING?"

HE SAID, "NO. I JUST GOT THE CASE FIVE WEEKS AGO. THAT'S NOT SOMETHING I DID." SO HE CAME UP WITH A NUMBER AND HE GAVE THAT TO YOU. WELL, HIS ENTIRE PROJECTION IS SPECULATIVE AND IT'S BASED ON

ASSUMPTIONS THAT WERE DESIGNED TO GIVE YOU A BIG NUMBER TO INFLUENCE YOU AND PREJUDICE YOUR DELIBERATIONS.

NOW, LET ME TALK ABOUT THE CLAIM BY MS. MAYS AND HER THREE CHILDREN. ONCE AGAIN, I HAVE NO DOUBT THAT MS. MAYS AND HER CHILDREN LOVED THEIR FATHER AND THAT THEIR GRIEF WAS REAL AND THAT THEY MISS HIM. I BELIEVE THAT. THERE IS NO QUESTION ABOUT THAT. BUT THE ONE FORTUNATE THING ABOUT THIS CASE IS THE MAYS CHILDREN ARE IN THEIR THIRTIES AND FORTIES; THEY HAVEN'T LIVED AT HOME IN 20 YEARS; THEY'RE ADULTS; THEY'RE MARRIED AND THEY HAVE FAMILIES OF THEIR OWN. THEY'RE EMPLOYED AND THEY'RE MOVING ON WITH THEIR LIFE. AND THE MAYS FAMILY WILL CONTINUE TO MOVE ON. THEY HAVE THEIR MOTHER, WHO IS A GRANDMOTHER. THEY HAVE EACH OTHER, THEY HAVE THEIR CHILDREN AND THEY WILL MOVE ON.

NOW, IF YOU FEEL THAT THE MAYS FAMILY HAS MET THEIR BURDEN OF PROOF -- WHICH, FOR THE REASONS THAT I SUGGEST TO YOU, I STRONGLY DISAGREE -- I THINK THAT IF YOU'RE GOING TO AWARD THEM DAMAGES, ABOUT ONE-THIRD OF THEIR ECONOMIC LOSS WOULD FAIRLY AND REASONABLY COMPENSATE THEM.

NOW I WANT TO TALK TO YOU ABOUT THAT LAST ISSUE THAT IS GOING TO BE THE VERY FIRST ISSUE ON

YOUR VERDICT FORM. THE FIRST QUESTION YOU'RE GOING TO HAVE TO DECIDE IS: WAS THERE A SUBSTANTIAL NEXUS -- SUBSTANTIAL NEXUS -- BETWEEN MR. MAYS'S DEATH AND CHEVRON PIPE LINE'S OPERATIONS ON THE OUTER CONTINENTAL SHELF? THAT ISSUE IS GOING TO LET US KNOW AS LAWYERS WHETHER THIS CASE IS CONTROLLED BY STATE LAW OR FEDERAL LAW.

LADIES AND GENTLEMEN, FOR THE REASONS THAT I'M GOING TO EXPLAIN IN A MINUTE, THERE IS NO QUESTION THAT THIS CASE HAS NO NEXUS TO ANY SUBSTANTIAL ACTIVITIES ON THE OUTER CONTINENTAL SHELF.

CAN YOU PULL UP EXHIBIT 21, PLEASE. YOU'LL RECALL WITH MR. MOTTY, THE WHOLE REASON THIS JOB WITH MR. MAYS WAS BEING PLANNED WAS BECAUSE THEY WERE GOING TO SHUT IN A PIPELINE AT LIGHTHOUSE POINT. THEY WERE GOING TO CLOSE AND REPAIR A CHECK VALVE THAT WENT FROM THE 24 SUBPLATFORM TO THE 31 SUBPLATFORM, A DISTANCE WHICH MR. MOTTY ESTIMATED WAS ABOUT 200 FEET. THIS WHOLE JOB, BY STIPULATION OF THE PARTIES, WAS AT LIGHTHOUSE POINT, WHICH IT WAS IN LOUISIANA STATE WATERS. NO PART OF THIS JOB AT ANY TIME WAS ON THE OUTER CONTINENTAL SHELF.

NOW, THE ACCIDENT HAPPENED OF COURSE ON SEPTEMBER 13, 2014, WHEN MR. MAYS AND HIS CREW, IN

FURTHERANCE OF THIS JOB, WENT TO LIGHTHOUSE POINT TO CLOSE THE VALVE THAT BROKE, AND THEN THEY CAME BACK TO REMOVE THE GEAR OPERATOR. ALL OF THIS WORK, 100 PERCENT, TOOK PLACE ON THIS FACILITY, WHICH THE PARTIES HAVE STIPULATED WAS IN STATE WATERS.

WE NOW KNOW THEY REMOVED THE GEAR OPERATOR AND MOUNTING PLATE, THEY PUT IT ON THE DECK, AND MR. MAYS THEN WENT TO REMOVE THE BONNET COVER. ONCE AGAIN, ALL OF THAT WAS ON THE PLATFORM IN STATE WATERS. NOT A SINGLE PERSON EVER TOOK ONE STEP ON THE OUTER CONTINENTAL SHELF. EVERY PART OF THIS JOB WAS DONE 100 PERCENT ON THESE FACILITIES IN STATE WATERS.

NOW, KEEP IN MIND THE TEST IS A SUBSTANTIAL -- OR EXCUSE ME -- A SUBSTANTIAL NEXUS OR A SIGNIFICANT CAUSAL LINK BETWEEN THE ACCIDENT AND OPERATIONS ON THE OUTER CONTINENTAL SHELF. LET ME SAY THIS ONE MORE TIME. 100 PERCENT OF THE WORK THEY DID WAS ON THIS PLATFORM IN STATE WATERS. NOBODY EVER TOOK ONE STEP ON THE OUTER CONTINENTAL SHELF.

NOW, MS. PIERCE'S ARGUMENT IS: BUT GAS CAME FROM THE OCS IN STATE COURT (SIC) PLATFORMS TO THIS FACILITY AND MR. MOTTY HAD TO SHUT DOWN SOME OF THOSE FACILITIES AFTER THE ACCIDENT. WELL, MR. MOTTY'S ACTIONS IN SHUTTING DOWN THE PLATFORMS OWNED BY OTHER

COMPANIES HAD NOTHING TO DO WITH THE ACCIDENT.

THE ACTIONS TAKEN BY MR. MOTTY WERE AFTER THE ACCIDENT. IT WAS AFTER THE VALVE BLEW. AFTER THE ACCIDENT HE HAD TO SHUT DOWN FACILITIES ALL OVER THE PLACE TO PREVENT GAS FROM COMING OUT OF THAT VALVE. AND IF MR. MAYS HAD DONE HIS JOB CORRECTLY, IF HE HAD NOT NEGLIGENTLY REMOVED THAT BONNET COVER FROM A PRESSURIZED VALVE, THAT WOULDN'T HAVE BEEN NECESSARY.

AND ONCE AGAIN, 100 PERCENT OF THIS WORK WAS ON THE OUTER CONTINENTAL SHELF. THE PLAINTIFFS' ARGUMENT THAT THIS CASE HAS SOME SORT OF SUBSTANTIAL OR SIGNIFICANT CONNECTION TO THE OUTER CONTINENTAL SHELF, I SUBMIT, LADIES AND GENTLEMEN, MAKES ABSOLUTELY NO SENSE.

THIS IS NO DIFFERENT, IF YOU CALL AN ELECTRICIAN TO COME TO YOUR HOUSE AND YOU SAY "I HAVE A PROBLEM WITH MY LIGHTS." SO HE COMES TO YOUR HOUSE IN LAFAYETTE OR WHEREVER YOU MAY LIVE TO FIX YOUR LIGHTS AND HE FORGETS TO CUT OFF THE ELECTRICITY TO YOUR HOUSE AND HE HAS A BAD ACCIDENT. WELL, THAT'S -- ELECTRICITY IS SUPPLIED BY ENERGY. AND ENERGY SHIPS THAT ELECTRICITY FROM ARKANSAS. WELL, THAT ACCIDENT DIDN'T HAPPEN BECAUSE OF SOMETHING THAT HAPPENED IN ARKANSAS. THAT ACCIDENT HAPPENED BECAUSE

THAT ELECTRICIAN IN LAFAYETTE DIDN'T CUT THE POWER OFF.

AND THE SAME SITUATION APPLIES HERE. THIS ACCIDENT HAPPENED BECAUSE OF DECISIONS THAT MR. MAYS MADE ON THIS PARTICULAR PLATFORM. WHAT HAPPENED ON THE OUTER CONTINENTAL SHELF HAD NOTHING TO DO WITH THE EVENTS LEADING UP TO AND CAUSING THIS ACCIDENT.

ONCE AGAIN, LET ME READ THIS LANGUAGE BECAUSE IT IS CRITICAL. IT'S NOT SOME SPECULATIVE CONNECTION. IT'S A SUBSTANTIAL NEXUS; THAT IS, A SIGNIFICANT CAUSAL LINK. THERE IS NO EVIDENCE IN THIS RECORD THAT ANYBODY EVER STEPPED ON THE OUTER CONTINENTAL SHELF OR THAT ANYBODY EVER DID ANY WORK OTHER THAN ON THIS PLATFORM IN STATE WATERS IN CONNECTION WITH THIS JOB. LADIES AND GENTLEMEN, THOSE FACTS ARE CRITICAL TO YOUR DECISIONS IN THIS CASE.

NOW, AFTER I FINISH SPEAKING, MS. PIERCE OR MS. LEGER ARE GOING TO HAVE THE OPPORTUNITY TO SPEAK WITH YOU AGAIN. AND I'M SURE YOU'VE HEARD ENOUGH OF ME TO KNOW HOW LONG-WINDED I CAN BE TO KNOW THAT I'M GOING TO BE JUMPING UP AND DOWN AND WANTING TO COME BACK UP AND SAY SOMETHING AGAIN. BUT UNFORTUNATELY I DON'T THINK JUDGE JACKSON IS GOING TO ALLOW ME TO DO THAT BECAUSE THOSE ARE THE RULES. AND SO AFTER I SIT

DOWN, YOU WON'T HAVE TO LISTEN TO ME AGAIN. YOU'LL HEAR FROM MS. LEGER. AND THEN JUDGE JACKSON'S GOING TO INSTRUCT YOU ON THE LAW, AND YOU'LL GO TO THE JURY ROOM AND YOU'LL BEGIN YOUR DELIBERATIONS.

AND AS PART OF YOUR DELIBERATIONS, YOU'RE GOING TO BE ASKED TO ANSWER THIS VERDICT FORM. LADIES AND GENTLEMEN, I SUBMIT YOU DON'T NEED TO GO ANY FURTHER THAN QUESTION NO. 1, WHICH SAYS: "HAVE PLAINTIFFS PROVED, BY A PREPONDERANCE OF THE EVIDENCE, THAT THERE IS A SUBSTANTIAL NEXUS" -- LET ME SAY THAT AGAIN; "A SUBSTANTIAL NEXUS," THEN IT GOES ON -- "THAT IS, A SIGNIFICANT CAUSAL LINK -- BETWEEN MR. MAYS'S DEATH AND DEFENDANT CHEVRON PIPE LINE COMPANY'S OPERATIONS CONDUCTED ON THE OUTER CONTINENTAL SHELF FOR THE PURPOSE OF EXTRACTING OR TRANSPORTING NATURAL RESOURCES BY PIPELINE?"

SO ONCE AGAIN ASK YOURSELF, WHY WAS MR. MAYS -- WHAT WAS HE DOING AT THE TIME OF THE ACCIDENT? DID HE EVER GO TO THE SHELF? WHY DID HE REMOVE THE EQUIPMENT THAT HE DID? AND NOT A SINGLE PERSON STEPPED OR EVER WENT ON THE OUTER CONTINENTAL SHELF ON THE DAY OF HIS ACCIDENT.

LADIES AND GENTLEMEN, WHEN YOU FINISH WITH YOUR DELIBERATIONS, YOU WILL RETURN TO THE COURTROOM AND YOUR VERDICT WILL BE READ. AND WHEN YOU DO,

LADIES AND GENTLEMEN, I JUST ASK THIS: I ASK THAT YOU REACH A JUST AND FAIR VERDICT -- AND I KNOW YOU WILL -- BASED ON THE LAW AND EVIDENCE. PLEASE DO NOT ALLOW ANY EMOTIONS, SYMPATHY OR COMPASSION FOR THE MAYS FAMILY, WHO ARE GOOD PEOPLE. THERE IS NO QUESTION ABOUT THAT.

BUT THAT'S NOT WHAT THIS CASE IS ABOUT. THIS CASE IS ABOUT THE LAW AND THE EVIDENCE. AND REMEMBER, CHEVRON PIPE LINE HAS A RIGHT TO DEFEND ITSELF. WE WOULDN'T BE HERE TODAY, LADIES AND GENTLEMEN, I CAN PROMISE YOU, IF WE DIDN'T FEEL -- IF WE FELT WE WERE RESPONSIBLE FOR THIS CASE, FOR THIS ACCIDENT. SO ASK YOURSELF TO PLEASE PUT ASIDE ANY COMPASSION OR SYMPATHY AND DECIDE THIS CASE BASED SOLELY ON THE EVIDENCE. THANK YOU VERY MUCH FOR YOUR TIME.

**THE COURT:** OKAY. THANK YOU, MR. SILVERSTEIN.

AS I MENTIONED EARLIER, LADIES AND GENTLEMEN, THE PLAINTIFFS NOW THROUGH THEIR REPRESENTATIVE LAWYER HAVE A CHANCE TO ADDRESS YOU ONCE AGAIN IN WHAT IS CALLED REBUTTAL ARGUMENT; THAT IS, TO RESPOND TO THE ARGUMENT PRESENTED BY MR. SILVERSTEIN ON BEHALF OF CHEVRON.

IT IS MY UNDERSTANDING THAT -- MS. PIERCE?

MS. LEGER?

**MS. LEGER:** SHE'S JUST HELPING.

**THE COURT:** OKAY. VERY GOOD.

**MS. LEGER:** MAY IT PLEASE THE COURT, COUNSEL.

LADIES AND GENTLEMEN, IT IS OFFENSIVE TO ME FOR MR. SILVERSTEIN TO GET UP HERE AND COMPARE THIS COURTROOM TO A CASINO. THIS COURTROOM IS NOT ABOUT A GAME. IT'S NOT ABOUT A WIN. THE HARM THAT HAS BEEN CAUSED THESE PEOPLE WILL NEVER BE UNDONE.

THE PARTY THAT GAMBLED HERE WAS CHEVRON PIPE LINE. AND WHAT THEY GAMBLED WITH WAS SAFETY. AND WHAT THEY RISKED WAS THE LIVES OF MR. MAYS, MR. MOTTY, EVEN HIMSELF, AND EVERYBODY ELSE THAT WENT OUT THERE AND WORKED ON THAT PLATFORM. AND THEY'RE GAMBLING WITH YOUR VERDICT BECAUSE THEY'RE HOPING YOU'RE GOING TO PUT ALL THE BLAME ON SOMEBODY ELSE. CHEVRON ADMITS THEY DIDN'T FOLLOW THEIR OWN POLICIES, BUT THEY WANT TO GET UP HERE AND SAY, "DON'T HOLD US ACCOUNTABLE."

NOW, LISTEN, MY HUSBAND IS IN LAW ENFORCEMENT. HE COMMANDS OUR LOCAL SWAT TEAM BACK HOME IN JEFFERSON COUNTY, TEXAS. HIS FAVORITE QUOTE IS FROM *THE COMPLETE SHERLOCK HOLMES*. AND THAT QUOTE THAT HE ALWAYS TALKS ABOUT WHEN THEY COME BACK FROM A

SWAT CALL-OUT IS: "IT'S EASY TO BE WISE AFTER THE FACT." RIGHT? IT'S LIKE, MR. BRADLEY LIKES TO SAY, THE BEST DEFENSE IS A GOOD OFFENSE. OKAY?

WHAT MR. SILVERSTEIN HAS GOT UP HERE AND DONE IN ACCUSING MR. MAYS OF BEING THE ARCHITECT OF HIS DEATH IS JUST WHAT MR. THOMAS TOLD YOU IS; IT'S HINDSIGHT. RIGHT? WE ALL KNOW HINDSIGHT IS 20/20. WE'RE NOT PERFECT. THAT'S NOT THE WAY WE WERE MADE. WE'RE HUMAN BEINGS. AND EVERY SINGLE ONE OF US IS CAPABLE OF MAKING A MISTAKE.

YOU SAW MR. GRECO UP THERE -- AND LET ME ADDRESS THIS BRIEFLY. ALL THIS TALK ABOUT "HE CAME IN AT THE LAST MINUTE AND MUST HAVE BEEN IN A RUSH TO GET HIS REPORT OUT," WHAT HAPPENED WAS MS. PIERCE HAD AN ECONOMIST THAT WAS HIRED IN THE BEGINNING OF THIS CASE WHO RETIRED AND WASN'T WILLING TO --

**THE COURT:** WAIT JUST A MOMENT.

**MR. SILVERSTEIN:** OBJECTION.

**THE COURT:** THOSE ARE FACTS NOT IN EVIDENCE IN THIS CASE.

**MS. LEGER:** LET ME PUT IT THIS WAY. YOU SAW WHAT MR. SILVERSTEIN DID TO MR. GRECO BECAUSE HE HAD A TYPO. HE POUNCED ON IT. THEN HE TWISTED IT. THEN HE TRIED TO ACT LIKE HE HAD MESSED UP HIS MATHEMATICAL CALCULATIONS. THAT'S NOT WHAT HAPPENED.

IT WAS A TYPO.

**THE COURT:** BEHIND THE PODIUM, COUNSEL.

**MS. LEGER:** YOUR HONOR, MAY I GO TO THE FLIP CHART, PLEASE?

**THE COURT:** YES.

**MS. LEGER:** I WANT TO TALK ABOUT THE PEOPLE AT CHEVRON WHO DIDN'T DO THEIR JOB, THE PEOPLE AT CHEVRON THAT COULD HAVE PREVENTED THIS DEATH THAT WAS PREVENTABLE.

MR. MOTTY. WHEN MR. SILVERSTEIN GETS UP HERE AND TELLS YOU, "JAMES MAYS WAS THE VALVE EXPERT. HE WAS THE ONE MAKING ALL THE DECISIONS. HE WAS THE ONE CALLING ALL THE SHOTS," THAT'S NOT HOW IT WAS OUT THERE THAT DAY ON THAT PLATFORM. THAT'S NOT HOW IT WAS OUT THERE IN THE REAL WORLD. THE PERSON THAT CHEVRON PIPE LINE DESIGNATED AS THE PERSON IN CHARGE WAS REGGIE MOTTY. REGGIE MOTTY THOUGHT THAT VALVE WAS A WKM. HE TOLD THE CREW THAT.

MR. TERRY SUIRE TOLD YOU, MR. MOTTY'S -- THAT'S HIS BOSS, MR. MOTTY'S BOSS -- "MR. MOTTY SHOULD HAVE KNOWN THE VALVES ON THIS PLATFORM." MR. MCCALL WAS THE ONE THAT SHOULD HAVE ENSURED THERE WAS A WRITTEN PLAN.

DENNIS MAYON. LET'S TALK ABOUT DENNIS BECAUSE I THINK IT'S IMPORTANT. MR. SILVERSTEIN GETS

UP HERE AND TELLS YOU -- AND HAS REPEATEDLY THROUGH THIS TRIAL -- "THAT THEY DIDN'T -- THIS CREW DID NOT RELY ON THE VALVE INSPECTION REPORTS SO OVERLOOK THEIR 15-YEAR MISTAKE. DON'T HOLD THEM ACCOUNTABLE FOR THAT." THE PROBLEM WITH THAT IS THAT DENNIS MAYON TESTIFIED, AS YOU MAY RECALL -- I ASKED THE QUESTION: "WERE YOU RELYING ON THE VALVE INSPECTIONS AND THE PAPERWORK THAT CHEVRON DID HAVE AVAILABLE?"

HIS ANSWER WAS: "YES."

REMEMBER THE MEETING THEY TALKED ABOUT? MR. MAYS DIDN'T LEAVE THAT PLATFORM ON THE 9TH AND GO BACK ON THE 13TH HAVING DONE NO WORK OR MADE NO EFFORT TO VERIFY WHAT WAS OUT THERE. THEY HAD A MEETING ABOUT IT. THE MAINTENANCE COORDINATOR, MR. MAYON, TOLD YOU ABOUT THAT MEETING. AND THEN HE TOLD YOU THEY RELIED ON THE VALVE INSPECTION REPORTS. AND WE ALL KNOW THOSE VALVE INSPECTION REPORTS WERE WRONG.

NOW, I WANT TO TALK ABOUT THE OUTER CONTINENTAL SHELF AND THEN GO BACK -- AND I APOLOGIZE, I'M JUMPING AROUND HERE. I'M TRYING TO RESPOND TO SOME OF THE THINGS. BUT WHEN YOU GO BACK AND ANSWER THAT QUESTION NO. 1, I WANT YOU TO RELY ON YOUR COMMON SENSE. AND THE SAYING THAT JUST JUMPS IN MY MIND IS: THE PROOF IS IN THE PUDDING. WE ALL

KNOW WHAT THAT MEANS.

AFTER THIS VALVE CAP BLEW OUT AND KILLED MR. MAYS, WHEN IT WAS TIME -- BECAUSE IT'S NOW A 9-1-1 TO DO SOMETHING ABOUT IT -- MR. MOTTY TOLD YOU HE HAD TWO PLATFORMS ON THE OUTER CONTINENTAL SHELF TURNED OFF, SHUT OFF. THAT'S HOW THEY LOCKED OUT THAT PART OF THE PIPE. THAT'S HOW THEY SHUT DOWN THAT PART OF THE PIPELINE AFTER THE FACT. NOW, THAT'S THE TRUTH. THAT'S WHAT REGGIE MOTTY TOLD YOU AND THAT'S WHAT MIKE SAWYER, THE CERTIFIED SAFETY PROFESSIONAL, TOLD YOU.

WHY DOES THAT MATTER TO THE FACT THAT MR. MAYS WAS INJURED? IT MATTERS BECAUSE UNDER CHEVRON'S VALVE REPAIR SAFETY PROCEDURE MIP 803, CHANGING A MANUAL GEAR OPERATOR REQUIRED A SHUTDOWN AND A LOCKOUT AND A TAGOUT OF THAT PIECE OF PIPELINE. READ IT FOR YOURSELVES. IT'S IN THE EXHIBITS. IT'S IN SECTION 5.4. MIKE SAWYER TOLD YOU THAT.

SO HERE'S WHY THAT MATTERS. HAD CHEVRON PIPE LINE NOT GAMBLED WITH SAFETY, NOT RISKED THE LIVES OUT THERE, HAD THEY WALKED THE WALK INSTEAD OF JUST TALK THE TALK, THAT PIPELINE WOULD HAVE BEEN TURNED OFF IN TWO LOCATIONS ON THE OUTER CONTINENTAL SHELF, AS 803 REQUIRES. THOSE VALVES WOULD HAVE BEEN CLOSED. THE GAS IN THAT SECTION WOULD HAVE STOPPED

FLOWING FROM THE OUTER CONTINENTAL SHELF. THE PRESSURE INSIDE THE PIPE WOULD HAVE BEEN BLED OFF. PEOPLE WOULD PUT THEIR LOCKS, VERIFYING THAT IT WAS SHUT DOWN AND COULDN'T BE REOPENED, AND WE WOULDN'T BE HERE TODAY.

NOW, LADIES AND GENTLEMEN, THAT IS CAUSATION. THAT IS CAUSAL CONNECTION. I WANT TO -- YOUR HONOR, MAY I GO TO THE FLIP CHART?

**THE COURT:** YES.

**MS. LEGER:** I WANT TO TALK TO YOU ABOUT THE FAULT ALLOCATION. AND I WANT TO TELL YOU THAT DURING THIS TRIAL I HAVE BEEN REMINDED REPEATEDLY OF TWO FUNDAMENTAL PRINCIPLES OF MY FAITH. AND THE FIRST OF THOSE IS THE EVIL OF HYPOCRISY; THE SECOND IS THE IMPORTANCE OF REPENTANCE.

NOW, LADIES AND GENTLEMEN, EVERY TIME CHEVRON PIPE LINE POINTS A FINGER AT MR. MAYS, THEY'VE GOT THE FINGER OF REGGIE MOTTY, DENNIS MAYON, TERRY SUIRE AND LYNN MCCALL POINTED AT THEM. NOW, THAT'S HYPOCRISY.

THE IMPORTANCE OF REPENTANCE. MRS. MAYS TOLD YOU THAT SHE'S HERE AND WE'RE HERE BECAUSE IT'S IMPORTANT FOR PEOPLE THAT PUT THEIR LIVES ON THE LINE EVERY DAY TO EARN PROFIT FOR SHAREHOLDERS OF BIG CORPORATIONS LIKE THIS. THESE PEOPLE SHOULD BE

PROTECTED. MR. SILVERSTEIN GOT UP HERE AND TOLD YOU, "DON'T BE -- DON'T BASE YOUR VERDICT ON SYMPATHY." AND THAT'S TRUE. AND HE ASKED YOU TO GIVE CHEVRON PIPE LINE AS A CORPORATION TWO THINGS THAT AN INDIVIDUAL WOULD HAVE. THEY WANTED THE SAME RIGHTS AND THEY WANTED THE SAME PRIVILEGES.

BUT YOU KNOW WHAT WORD HE DIDN'T ASK FOR? "OBLIGATION." CALL THIS PIPELINE COMPANY TO THEIR OBLIGATIONS, LADIES AND GENTLEMEN. THIS COMPANY WAS OBLIGATED TO KNOW WHAT ITS EQUIPMENT WAS. AND FOR 15 YEARS -- 365 DAYS OF 15 YEARS -- THEY SHOULD HAVE KNOWN WHAT THAT VALVE WAS AND WHAT NEEDED TO BE DONE TO WORK ON IT SAFELY. IF YOU DO THE MATH ON THAT, THAT'S LESS THAN 1 PERCENT. LESS THAN 1 PERCENT.

**MR. SILVERSTEIN:** OBJECTION; THAT'S A UNIT OF TIME ARGUMENT, AND THAT'S ABSOLUTELY INADMISSIBLE.

**THE COURT:** LET'S MOVE ON.

**MS. LEGER:** IT'S NOT A UNIT OF TIME. IT'S A MATHEMATICAL EQUATION.

**THE COURT:** LET'S MOVE ON, PLEASE.

**MS. LEGER:** COULD YOU PUT UP MY SLIDE, PLEASE. NOW I NEED TO BE CONNECTED TO THE OVERHEAD, YOUR HONOR. GETTING THAT SET UP. I APOLOGIZE FOR THE DELAY.

I WANT TO TALK, BEFORE I GET THAT FAR, ABOUT

THE SCOPE OF WORK BEING EXCEEDED BECAUSE I THINK THAT'S IMPORTANT. MR. MOTTY TOLD YOU WHEN HE WAS TESTIFYING THAT THERE IS A SMALL SPACE THERE TO WRITE IN WHAT THE CREW IS SUPPOSED TO DO, AND SO YOU GENERALLY STATE WHAT THE WORK IS THAT YOU'RE GOING TO DO. BUT MORE IMPORTANTLY, HE ADMITTED, AS THE CORPORATE REPRESENTATIVE OF CHEVRON -- AND WHAT THAT MEANS, FOLKS, IS HE WAS CHEVRON PIPE LINE UP THERE TESTIFYING.

AND WHAT HE TESTIFIED TO ABOUT SCOPE OF WORK IS THAT CHEVRON KNEW ON THE 9TH, THE FIRST TIME THEY WENT OUT THERE, THEY KNEW THAT THE ADAPTOR PLATE WAS GOING TO HAVE TO COME INSHORE SO THAT THE BOLTING PATTERN COULD BE MATCHED UP SO THAT THE NEW GEAR OPERATOR, THE MANUAL GEAR OPERATOR, COULD BE MATCHED TO THE VALVE. CHEVRON KNEW THAT WAS PART OF THE SCOPE OF WORK. THEY KNEW WHEN THEY WENT BACK ON THE 13TH THEY WERE GOING TO HAVE TO REMOVE THAT.

SO ALL OF THIS, "THEY SHOULD HAVE PUT IT ON THE BOAT AND GONE BACK TO SHORE. THEY EXCEEDED THE SCOPE OF WORK," IS FRANKLY NONSENSE, WHEN THEY KNEW ALL ALONG THEY WERE GOING TO HAVE TO BRING THAT IN TO MATCH THOSE TWO THINGS UP.

I WANT TO SAY ONE MORE THING ABOUT SCOPE OF WORK AND STOP WORK, BECAUSE I WANT YOU TO UNDERSTAND

THAT IN CHEVRON'S ATTEMPT TO RUN FROM ANY ACCOUNTABILITY HERE, THEY'VE PUT ACADIAN ON THE VERDICT FORM FOR YOU TO ASSIGN A PERCENTAGE TO. NOW --

**MR. SILVERSTEIN:** OBJECTION, JUDGE; WE DIDN'T PUT ACADIAN ON THE VERDICT FORM.

**MS. LEGER:** THE COURT PUT THE --

**THE COURT:** I HAVE PLACED IT -- THE VERDICT FORM IS MY WORK PRODUCT, IF YOU WILL. SO LET'S MOVE ON.

**MS. LEGER:** I APOLOGIZE.

**THE COURT:** NO APOLOGY IS NECESSARY.

**MS. LEGER:** THE COURT HAS ASKED YOU TO ASSIGN FAULT TO ACADIAN. NOW, I WANT TO BE CLEAR THAT WHEN MRS. PIERCE PUT THE TIMELINE UP THAT SHOWS THAT REGGIE MOTTY WORKED FOR ACADIAN WHEN THIS VALVE WAS WRAPPED, THAT'S NOT THE KIND OF FAULT THAT CHEVRON IS TRYING TO ATTRIBUTE TO ACADIAN. CHEVRON IS TRYING TO ATTRIBUTE TO ACADIAN -- YOU HEARD THAT THERE WAS A GENTLEMAN NAMED TRENT VICE ON THE PLATFORM THAT DAY AND THAT EVERYBODY OUT THERE SHOULD HAVE USED STOP WORK AUTHORITY.

NOW, FIRST OF ALL, WE DON'T EVEN KNOW WHO TRENT VICE WAS, WHY HE WAS OUT THERE, WHAT HIS SCOPE OF WORK WAS. I THINK IT'S PRETTY FAR-FETCHED.

HOWEVER, YOU'RE GOING TO BE ASKED TO CONSIDER THAT. BUT WHEN YOU DO START LOOKING AT THAT, I WANT YOU TO ASK YOURSELVES THIS: AS THE PERSON IN CHARGE FOR CHEVRON PIPE LINE, AS THE PERSON WHO WAS SUPPOSED TO ENSURE THIS WORK WAS DONE SAFELY, HOW ABOUT MR. MOTTY'S DECISION TO BREAK AND VIOLATE HIS COMPANY'S SAFETY POLICY AND USE A CHEATER BAR?

I WONDER IF THINGS WOULD HAVE BEEN DIFFERENT IF HE WOULD HAVE SAID TO THAT CREW THAT DAY, "GUYS, HERE IT IS. I'M BRINGING OUT THE CHEATER BAR BECAUSE WE'RE HAVING TROUBLE HERE. AND YOU KNOW WHAT? IN ALL FAIRNESS TO EVERYBODY ON THIS PLATFORM, CHEVRON PIPE LINE SAYS DON'T DO WHAT I'M ABOUT TO DO BECAUSE IT'S DANGEROUS. BUT YOU KNOW WHAT? I'M GOING TO DO IT ANYWAY." HAD MR. MOTTY DONE THAT, I BET YOU SOMEBODY WOULD HAVE STOPPED WORK. I BET PEOPLE WOULD HAVE GOTTEN ON THAT BOAT AND LEFT.

NOW, IT'S BAD ENOUGH TO ME THAT CHEVRON PIPE LINE BY THEIR OWN FAILURE TO LOCK OUT AND TAG OUT BEFORE THAT CREW WENT OUT THERE TO CHANGE THAT MANUAL GEAR OPERATOR, AS IS REQUIRED BY MIP 803, BECAUSE THEY SIMPLY DID NOT PRACTICE WHAT THEY PREACHED ABOUT SAFETY --

**THE COURT:** FIVE MINUTES.

**MS. LEGER:** -- THEY CAUSED THE DEATH OF

MR. MAYS. THEY SENT HIS BODY HOME IN SUCH A CONDITION THAT HIS FAMILY COULD NOT HONOR HIS FINAL WISHES. YET EVEN AT THAT, THEY'RE NOT FINISHED INFLICTING HARM ON MR. MAYS. BECAUSE WHAT YOU'VE HEARD IS THEM GET UP DAY AFTER DAY AFTER DAY DURING THIS TRIAL AND ACCUSE THIS MAN OF BEING THE ARCHITECTURE OF HIS OWN DEATH.

THEY WANT YOU TO JOIN THEM IN TAKING THE MEMORY, THE LAST THING, THE ONLY THING THIS FAMILY WILL EVER HAVE TO CLING TO OF JAMES MAYS AND RUIN IT. THEY WANT YOU TO FIND THAT THIS MAN, WHO WAS A PERFECTIONIST, A CAREFUL WORKER, TRUSTED BY HIS COWORKERS, A LOYAL HUSBAND, A DEVOTED DAD, A PAPPY AND SOMEONE WHO TOOK CARE OF OTHERS, SOMEONE WHO CALLED HIS WIFE AND SAID, "DON'T BE MAD, BABE. I'M GOING TO GO OUT AND HELP REGGIE MOTTY. I'LL SEE YOU LATER TODAY" -- THEY WANT YOU TO FAULT THAT MAN FOR THEIR FAILURES, WHEN ALL HE DID WRONG WAS TAKE THEM AT THEIR WORD.

LADIES AND GENTLEMEN, I ASK THAT YOU HOLD CHEVRON TO THEIR WORD, YOU HOLD THEM TO THE CORPORATE OBLIGATIONS THAT THE LAW IMPOSES ON THEM, AND YOU LOOK AT THEIR INVESTIGATION REPORT AND YOU DETERMINE WHO IS AT FAULT HERE. BECAUSE WHEN YOU LOOK AT THE POSITIONS THEY TOOK OUT IN THE REAL WORLD, NOT IN

HERE THAT MR. SILVERSTEIN COMPARED TO A CASINO -- WHEN YOU LOOK AT WHAT THEY DID IN THEIR THOROUGH AND CAREFUL EVALUATION AND INVESTIGATION, THEY DIDN'T SAY THIS WAS JAMES MAYS'S FAULT. THEY DIDN'T SAY THIS WAS FURMANITE'S FAULT. THEY SAID IT WAS THEIR FAULT.

THE JURY CHARGE TELLS YOU YOU ARE THE COMMUNITY WHEN YOU GO BACK THERE TO MAKE YOUR DECISION. AND AS THE COMMUNITY, I WANT YOU TO THINK ABOUT CHEVRON'S OBLIGATION TO THE MEN AND WOMEN AND THEIR SPOUSES AND THEIR CHILDREN AND THEIR GRANDCHILDREN AND THEIR LOVED ONES; THAT WHEN THOSE PEOPLE STEP OUT ON THEIR PROPERTY TO HELP PROFITS FLOW TO THEIR SHAREHOLDERS, THAT THEY PROTECT THEM THE WAY THEY SAY THEY'RE GOING TO.

I THANK YOU FOR YOUR ATTENTION.

**THE COURT:** THANK YOU, MS. LEGER.

**MS. LEGER:** THANK YOU.

**THE COURT:** ALL RIGHT. LADIES AND GENTLEMEN, WE HAVE REACHED THE POINT WHERE YOU HAVE HEARD ALL THE ARGUMENTS OF COUNSEL. IT IS NOW MY DUTY TO INFORM YOU AND, IN FACT, INSTRUCT YOU ON THE LAW THAT YOU MUST CONSIDER WHEN YOU BEGIN YOUR DELIBERATIONS.

NOW, WHAT I WILL DO IS I WILL HAVE -- JORDAN, MY TRUSTED LAW CLERK ON THIS CASE, WILL --

WE'RE GOING TO USE THE ELMO, MS. HARTER. AND SO IN ORDER FOR YOU TO FOLLOW ALONG WITH ME, WE'LL GO ON AND DISPLAY THE INSTRUCTIONS ON THE ELMO SO THAT AS I READ THEM YOU CAN FOLLOW ALONG JUST TO -- JORDAN. THERE WE GO. ALL RIGHT.

MEMBERS OF THE JURY, NOW THAT THE EVIDENCE IN THIS CASE HAS BEEN PRESENTED AND THE LAWYERS HAVE MADE THEIR CLOSING ARGUMENTS, IT IS MY DUTY AND RESPONSIBILITY TO INSTRUCT YOU ON THE LAW YOU ARE TO APPLY IN THIS CASE. THE LAW CONTAINED IN THESE INSTRUCTIONS IS THE ONLY LAW YOU MAY FOLLOW. IT IS YOUR DUTY TO FOLLOW WHAT I INSTRUCT YOU WHAT THE LAW IS, REGARDLESS OF ANY OPINION YOU HAVE AS TO WHAT THE LAW OUGHT TO BE.

IF I HAVE GIVEN YOU THE IMPRESSION DURING THIS TRIAL THAT I FAVOR EITHER PARTY, YOU MUST DISREGARD THAT IMPRESSION. IF I HAVE GIVEN YOU THE IMPRESSION DURING THE TRIAL THAT I HAVE AN OPINION ABOUT THE FACTS OF THIS CASE, YOU MUST DISREGARD THAT IMPRESSION. YOU ARE THE SOLE JUDGES OF THE FACTS OF THIS CASE. OTHER THAN MY INSTRUCTIONS TO YOU ON THE LAW, YOU SHOULD DISREGARD ANYTHING I MAY HAVE SAID OR DONE DURING THE TRIAL IN ARRIVING AT YOUR VERDICT.

YOU SHOULD CONSIDER ALL OF THE INSTRUCTIONS ABOUT THE LAW AS A WHOLE AND REGARD EACH INSTRUCTION

IN LIGHT OF THE OTHERS, WITHOUT ISOLATING A PARTICULAR STATEMENT OR PARAGRAPH.

THE TESTIMONY OF THE WITNESSES AND OTHER EXHIBITS INTRODUCED BY THE PARTIES CONSTITUTE THE EVIDENCE. THE STATEMENTS OF COUNSEL ARE NOT EVIDENCE. THEY ARE ONLY ARGUMENTS. IT IS IMPORTANT FOR YOU TO DISTINGUISH BETWEEN THE ARGUMENTS OF COUNSEL AND THE EVIDENCE ON WHICH THESE ARGUMENTS REST. WHAT THE LAWYERS SAY AND DO IS NOT EVIDENCE. YOU MAY, HOWEVER, CONSIDER THEIR ARGUMENTS IN LIGHT OF THE EVIDENCE THAT HAS BEEN ADMITTED AND DETERMINE WHETHER THE EVIDENCE ADMITTED IN THIS TRIAL SUPPORTS THEIR ARGUMENTS. YOU MUST DETERMINE THE FACTS FROM ALL OF THE TESTIMONY THAT YOU HAVE HEARD AND THE OTHER EVIDENCE ADMITTED. YOU ARE THE JUDGES OF THE FACTS, BUT IN FINDING THOSE FACTS YOU MUST APPLY THE LAW AS I INSTRUCT YOU.

YOU ARE REQUIRED TO DECIDE THE LAW IN A FAIR, IMPARTIAL, AND UNBIASED MANNER BASED ENTIRELY ON THE LAW AND THE EVIDENCE PRESENTED TO YOU IN THE COURTROOM. YOU MUST NOT BE INFLUENCED BY PASSION, PREJUDICE, OR SYMPATHY THAT YOU MIGHT HAVE FOR THE PLAINTIFFS OR THE DEFENDANT IN ARRIVING AT YOUR VERDICT.

IN EACH CIVIL CASE SUCH AS THIS, PLAINTIFFS

HAVE THE BURDEN OF PROVING EVERY ELEMENT OF THEIR CLAIM BY A PREPONDERANCE OF THE EVIDENCE. TO ESTABLISH AN ELEMENT OF A CLAIM BY A PREPONDERANCE OF THE EVIDENCE MEANS TO PROVE THAT THE ELEMENT OF THE CLAIM IS MORE LIKELY SO THAN NOT SO.

IF YOU FIND THAT THE PLAINTIFFS HAVE FAILED TO PROVE AN ELEMENT OF ANY CLAIM BY A PREPONDERANCE OF THE EVIDENCE, THEN PLAINTIFFS MAY NOT RECOVER ON THAT CLAIM.

THE EVIDENCE YOU ARE TO CONSIDER CONSIST OF THE TESTIMONY OF THE WITNESSES, THE DOCUMENTS AND OTHER EXHIBITS ADMITTED INTO EVIDENCE, AND ANY FAIR INFERENCES AND REASONABLE CONCLUSIONS YOU CAN DRAW FROM THE FACTS AND CIRCUMSTANCES THAT HAVE BEEN PROVED.

GENERALLY SPEAKING, THERE ARE TWO TYPES OF EVIDENCE. ONE IS DIRECT EVIDENCE, SUCH AS THE TESTIMONY OF AN EYEWITNESS. THE OTHER IS INDIRECT OR CIRCUMSTANTIAL EVIDENCE. CIRCUMSTANTIAL EVIDENCE IS EVIDENCE THAT PROVES A FACT FROM WHICH YOU MAY LOGICALLY CONCLUDE ANOTHER FACT EXISTS. AS A GENERAL RULE, THE LAW MAKES NO DISTINCTION BETWEEN DIRECT AND CIRCUMSTANTIAL EVIDENCE BUT SIMPLY REQUIRES THAT YOU FIND THE FACTS FROM A PREPONDERANCE OF ALL OF THE EVIDENCE, BOTH DIRECT AND CIRCUMSTANTIAL.

NOW, CERTAIN STIPULATIONS WERE OFFERED TO YOU THROUGHOUT THE TRIAL. A STIPULATION IS AN AGREEMENT. WHEN THERE IS NO DISPUTE ABOUT CERTAIN FACTS, THE ATTORNEYS MAY AGREE OR STIPULATE AS TO THOSE FACTS. YOU MUST ACCEPT A STIPULATED FACT AS EVIDENCE AND TREAT THAT FACT AS HAVING BEEN PROVED HERE IN COURT.

YOU ALONE ARE TO DETERMINE THE CREDIBILITY OR TRUTHFULNESS OF THE WITNESSES. IN WEIGHING THE TESTIMONY OF THE WITNESSES, YOU MAY CONSIDER THE WITNESS'S MANNER AND DEMEANOR ON THE WITNESS STAND, ANY FEELINGS OR INTEREST IN THE CASE, ANY PREJUDICE OR BIAS IN THE CASE THAT HE OR SHE MAY HAVE, AND THE CONSISTENCY OR INCONSISTENCY OF HIS OR HER TESTIMONY CONSIDERED IN THE LIGHT OF THE CIRCUMSTANCES. HAS THE WITNESS BEEN CONTRADICTED BY OTHER CREDIBLE EVIDENCE? HAS HE OR SHE MADE STATEMENTS AT OTHER TIMES OR PLACES CONTRARY TO THOSE MADE HERE ON THE WITNESS STAND? YOU MUST GIVE THE TESTIMONY OF EACH WITNESS THE CREDIBILITY YOU THINK IT DESERVES.

EVEN THOUGH A WITNESS MAY BE A PARTY TO THIS CASE AND THEREFORE INTERESTED IN ITS OUTCOME, THAT WITNESS'S TESTIMONY MAY BE ACCEPTED IF IT IS NOT CONTRADICTED BY DIRECT EVIDENCE OR BY ANY INFERENCE THAT MAY BE DRAWN FROM THE EVIDENCE, IF YOU BELIEVE

THE TESTIMONY.

YOU ARE NOT TO DECIDE THIS CASE BY COUNTING THE NUMBER OF WITNESSES WHO HAVE TESTIFIED ON OPPOSING SIDES. WITNESS TESTIMONY IS WEIGHED; WITNESSES ARE NOT COUNTED. THE TESTIMONY -- THE TEST IS NOT THE RELATIVE NUMBER OF WITNESSES BUT THE RELATIVE CONVINCING FORCE OF THE EVIDENCE. THE TESTIMONY OF A SINGLE WITNESS IS SUFFICIENT TO PROVE ANY FACT, EVEN IF A GREATER NUMBER OF WITNESSES TESTIFIED TO THE CONTRARY, IF, AFTER CONSIDERING ALL OF THE OTHER EVIDENCE, YOU BELIEVE THAT WITNESS.

WHEN KNOWLEDGE OF A TECHNICAL SUBJECT MATTER MAY BE HELPFUL TO THE JURY, A PERSON WHO HAS SPECIAL TRAINING OR EXPERIENCE IN THAT TECHNICAL FIELD IS PERMITTED TO STATE HIS OR HER OPINION ON THOSE TECHNICAL MATTERS.

NOW, DURING THIS TRIAL YOU HEARD THE TESTIMONY FROM THE FOLLOWING EXPERT WITNESSES: DR. ANTHONY GRECO, AN ECONOMIC LOSS EXPERT; MR. MICHAEL SAWYER, AN EXPERT IN PROCESS SAFETY MANAGEMENT; AND MR. G.A. AAKER, JR., A METALLURGICAL ENGINEER.

YOU ARE NOT REQUIRED TO ACCEPT THEIR OPINIONS. AS WITH ANY OTHER WITNESSES -- OR ANY OTHER WITNESS, IT IS UP TO YOU TO DECIDE WHETHER TO

RELY ON A PARTICULAR WITNESS'S TESTIMONY.

IN DETERMINING THE WEIGHT TO GIVE TO THE TESTIMONY OF A WITNESS, CONSIDER WHETHER THERE WAS EVIDENCE THAT AT SOME OTHER TIME THE WITNESS SAID OR DID SOMETHING OR FAILED TO SAY OR DO SOMETHING THAT WAS DIFFERENT FROM THE TESTIMONY GIVEN AT THE TRIAL.

A SIMPLE MISTAKE BY A WITNESS DOES NOT NECESSARILY MEAN THAT THE WITNESS DID NOT TELL THE TRUTH AS HE OR SHE REMEMBERS IT. PEOPLE MAY FORGET SOME THINGS OR REMEMBER OTHER THINGS INACCURATELY. IF A WITNESS MADE A MISSTATEMENT, CONSIDER THAT MISSTATEMENT -- OR WHETHER THAT MISSTATEMENT WAS AN INTENTIONAL FALSEHOOD OR SIMPLY AN INNOCENT MISTAKE. THE SIGNIFICANCE OF THAT MAY DEPEND ON WHETHER IT HAS TO DO WITH AN IMPORTANT FACT OR WITH ONLY AN UNIMPORTANT DETAIL.

AT VARIOUS TIMES DEMONSTRATIVE EVIDENCE WAS PRESENTED. DEMONSTRATIVE EVIDENCE IS USED TO DESCRIBE SOMETHING INVOLVED IN THIS TRIAL. IF YOUR RECOLLECTION OF THE EVIDENCE DIFFERS FROM THE DEMONSTRATIVE, RELY ON YOUR RECOLLECTION.

CERTAIN TESTIMONY HAS BEEN PRESENTED TO YOU THROUGH A DEPOSITION. A DEPOSITION IS THE SWORN, RECORDED ANSWERS TO QUESTIONS OF A WITNESS ASKED IN ADVANCE OF A TRIAL. UNDER CERTAIN CIRCUMSTANCES IF A

WITNESS CANNOT BE PRESENT TO TESTIFY FROM THE WITNESS STAND, THAT WITNESS'S TESTIMONY MAY BE PRESENTED, UNDER OATH, IN THE FORM OF A DEPOSITION. SOME TIME BEFORE THIS TRIAL ATTORNEYS REPRESENTING THE PARTIES IN THIS CASE QUESTIONED THESE WITNESSES UNDER OATH. A COURT REPORTER WAS PRESENT AND RECORDED THE TESTIMONY. THE QUESTIONS AND ANSWERS HAVE BEEN READ TO YOU DURING THIS TRIAL. THIS DEPOSITION TESTIMONY IS ENTITLED TO THE SAME CONSIDERATION AS IF THE WITNESS HAD BEEN PRESENT AND HAD TESTIFIED FROM THE WITNESS STAND IN THIS COURTROOM.

THE FACT THAT A PERSON BROUGHT A LAWSUIT AND IS IN COURT SEEKING DAMAGES CREATES NO INFERENCE THAT THE PERSON IS ENTITLED TO A JUDGMENT. ANYONE MAY MAKE A CLAIM AND FILE A LAWSUIT. THE ACT OF MAKING A CLAIM IN A LAWSUIT, BY ITSELF, DOES NOT IN ANY WAY TEND TO ESTABLISH THAT CLAIM AND IS NOT EVIDENCE.

DO NOT LET BIAS, PREJUDICE, OR SYMPATHY PLAY ANY PART IN YOUR DELIBERATIONS. A CORPORATION AND ALL OTHER PERSONS ARE EQUAL BEFORE THE LAW AND MUST BE TREATED AS EQUALS IN A COURT OF JUSTICE.

PLAINTIFFS CLAIM THAT JAMES MAYS'S DEATH IS COVERED BY PROVISIONS OF FEDERAL LAW, AS EXTENDED BY THE OUTER CONTINENTAL SHELF LANDS ACT.

TO ESTABLISH THAT JAMES MAYS'S DEATH IS

COVERED BY PROVISIONS OF FEDERAL LAW, AS EXTENDED BY THE OUTER CONTINENTAL SHELF LANDS ACT, PLAINTIFFS MUST PROVE, BY A PREPONDERANCE OF THE EVIDENCE, THAT THERE IS A SUBSTANTIAL NEXUS -- THAT IS, A SIGNIFICANT CAUSAL LINK -- BETWEEN JAMES MAYS'S DEATH AND DEFENDANT CHEVRON PIPE LINE COMPANY'S OPERATIONS CONDUCTED ON THE OUTER CONTINENTAL SHELF FOR THE PURPOSE OF EXTRACTING OR TRANSPORTING NATURAL RESOURCES BY A PIPELINE FROM THE OUTER CONTINENTAL SHELF.

DEFENDANT CHEVRON PIPE LINE COMPANY DENIES THAT A SUBSTANTIAL NEXUS EXISTS IN THIS CASE.

PLAINTIFFS ALLEGE THAT JAMES MAYS'S DEATH WAS CAUSED BY DEFENDANT CHEVRON PIPE LINE COMPANY'S NEGLIGENCE.  THIS CLAIM IS BASED ON ARTICLE 2315 OF THE LOUISIANA CIVIL CODE, WHICH PROVIDES "EVERY ACT WHATEVER OF MAN THAT CAUSES DAMAGE TO ANOTHER OBLIGES HIM BY WHOSE FAULT IT HAPPENED TO REPAIR IT."

TO SUCCEED ON THIS CLAIM, PLAINTIFFS MUST PROVE THREE ELEMENTS BY A PREPONDERANCE OF THE EVIDENCE:  ONE, DEFENDANT CHEVRON PIPE LINE COMPANY WAS AT FAULT; TWO, JAMES MAYS'S DEATH WAS CAUSED BY THE CONDUCT OF DEFENDANT CHEVRON PIPE LINE COMPANY; AND THREE, ACTUAL DAMAGES.

FAULT, THE FIRST ELEMENT, IS OFTEN DEFINED

AS THE FAILURE TO EXERCISE THE DEGREE OF CARE THAT MIGHT REASONABLY BE EXPECTED OF AN ORDINARILY PRUDENT PERSON UNDER THE SAME OR SIMILAR CIRCUMSTANCES.

A PERSON IS AT FAULT IF HE ACTED OR -- AS HE SHOULD NOT HAVE ACTED OR FAILED TO DO SOMETHING THAT HE SHOULD HAVE DONE. THE STANDARD BY WHICH YOU ARE TO MEASURE DEFENDANT CHEVRON PIPE LINE'S ACTIONS IS THAT OF AN ORDINARILY PRUDENT PERSON, NOT THAT OF AN EXTRAORDINARILY CAUTIOUS INDIVIDUAL OR AN EXCEPTIONALLY SKILLFUL PERSON. MORE SPECIFICALLY, THAT STANDARD -- THE STANDARD REQUIRED DEFENDANT CHEVRON PIPE LINE COMPANY TO EXERCISE REASONABLE CARE FOR THE SAFETY OF PERSONS ON ITS PREMISES AND NOT TO EXPOSE SUCH PERSONS TO UNREASONABLE RISKS OF INJURY.

IN DECIDING WHETHER DEFENDANT CHEVRON PIPE LINE COMPANY VIOLATED THE STANDARD OF CONDUCT, YOU MAY WEIGH THE LIKELIHOOD THAT SOMEONE MIGHT HAVE BEEN INJURED BY ITS CONDUCT AND THE SERIOUSNESS OF THAT INJURY IF IT SHOULD OCCUR AGAINST THE IMPORTANCE TO THE COMMUNITY OF WHAT DEFENDANT CHEVRON PIPE LINE COMPANY WAS DOING AND THE ADVISABILITY OF THE WAY DEFENDANT CHEVRON PIPE LINE COMPANY WAS DOING IT UNDER THE CIRCUMSTANCES.

THE INQUIRY INTO CAUSATION -- THAT IS, THE SECOND ELEMENT -- SEEKS TO DETERMINE WHETHER JAMES

MAYS WOULD HAVE SUFFERED A FATAL INJURY IN THE ABSENCE OF DEFENDANT CHEVRON PIPE LINE COMPANY'S CONDUCT.

I DO NOT MEAN THAT THE LAW RECOGNIZES ONLY ONE CAUSE OF AN INJURY, CONSISTING OF ONLY ONE FACTOR OR THING, OR THE CONDUCT OF ONLY ONE PERSON. ON THE CONTRARY, A NUMBER OF FACTORS MAY OPERATE AT THE SAME TIME, EITHER INDEPENDENTLY OR TOGETHER, TO CAUSE INJURY OR DAMAGE. YOU HAVE TO DECIDE WHETHER JAMES MAYS PROBABLY WOULD NOT HAVE SUFFERED THE FATAL INJURY IN THE ABSENCE OF DEFENDANT CHEVRON PIPE LINE COMPANY'S CONDUCT.

NOW, IF YOU DECIDE THAT PLAINTIFFS HAVE PROVED FAULT AND CAUSATION BY A PREPONDERANCE OF THE EVIDENCE AND DEFENDANT CHEVRON PIPE LINE COMPANY HAS FAILED TO ESTABLISH A DEFENSE THAT WOULD PREVENT PLAINTIFFS FROM RECOVERING, YOU MUST DECIDE WHETHER PLAINTIFFS HAVE SUFFERED ACTUAL DAMAGES.

LIKE THE OTHER PARTS OF PLAINTIFFS' CASE, PLAINTIFFS HAVE THE BURDEN OF PROVING THAT THEY SUFFERED DAMAGES, AS WELL AS THAT AMOUNT OF THOSE DAMAGES BY A PREPONDERANCE OF THE EVIDENCE. I WILL EXPLAIN DAMAGES IN GREATER DETAIL LATER IN THESE INSTRUCTIONS.

IF PLAINTIFFS HAVE PROVEN EACH ELEMENT OF A

CLAIM AGAINST DEFENDANT CHEVRON PIPE LINE COMPANY BY A PREPONDERANCE OF THE EVIDENCE, THEN YOU MUST DETERMINE THE DAMAGES TO WHICH PLAINTIFFS ARE ENTITLED. YOU SHOULD NOT INTERPRET THE FACT THAT I AM GIVING YOU INSTRUCTIONS ABOUT PLAINTIFFS' DAMAGES AS AN INDICATION IN ANY WAY THAT I BELIEVE THAT PLAINTIFFS SHOULD OR SHOULD NOT WIN THIS CASE. IT IS YOUR TASK FIRST TO DECIDE WHETHER DEFENDANT CHEVRON PIPE LINE COMPANY IS LIABLE.

I AM INSTRUCTING YOU ON DAMAGES ONLY SO THAT YOU WILL HAVE GUIDANCE IN THE EVENT YOU DECIDE THAT DEFENDANT CHEVRON PIPE LINE COMPANY IS LIABLE AND THAT PLAINTIFFS ARE ENTITLED TO RECOVER MONEY FROM DEFENDANT CHEVRON PIPE LINE COMPANY.

IF YOU FIND THAT THE PLAINTIFFS HAVE PROVED EACH ELEMENT OF A CLAIM AGAINST DEFENDANT CHEVRON PIPE LINE COMPANY BY A PREPONDERANCE OF THE EVIDENCE, THEN YOU MUST DECIDE AN AMOUNT THAT IS FAIR COMPENSATION FOR ALL OF PLAINTIFFS' DAMAGES. THESE DAMAGES ARE CALLED COMPENSATORY DAMAGES. THE PURPOSE OF COMPENSATORY DAMAGES IS TO MAKE PLAINTIFFS WHOLE; THAT IS, TO COMPENSATE PLAINTIFFS FOR THE DAMAGES THEY HAVE SUFFERED.

THE DAMAGES THAT YOU AWARD MUST BE FAIR COMPENSATION FOR ALL OF THE PLAINTIFFS' DAMAGES, NO

MORE AND NO LESS. YOU SHOULD NOT AWARD COMPENSATORY DAMAGES FOR SPECULATIVE INJURIES BUT ONLY FOR THOSE INJURIES THAT PLAINTIFFS HAVE ACTUALLY SUFFERED OR THAT PLAINTIFFS ARE LIKELY TO SUFFER IN THE FUTURE.

IF YOU DECIDE TO AWARD COMPENSATORY DAMAGES, YOU SHOULD BE GUIDED BY DISPASSIONATE COMMON SENSE. COMPUTING DAMAGES MAY BE DIFFICULT, BUT YOU MUST NOT LET THAT DIFFICULTY LEAD YOU TO ENGAGE IN ARBITRARY GUESSWORK. ON THE OTHER HAND, THE LAW DOES NOT REQUIRE THAT PLAINTIFFS PROVE THE AMOUNT OF THEIR LOSSES WITH MATHEMATICAL PRECISION BUT ONLY WITH AS MUCH DEFINITENESS AND ACCURACY AS THE CIRCUMSTANCES PERMIT.

IN A CASE LIKE THIS ONE, LOUISIANA LAW PERMITS PLAINTIFFS, AS THE SURVIVING BENEFICIARY OF JAMES MAYS -- IT SHOULD HAVE BEEN "BENEFICIARIES OF MR. MAYS" -- TO PRESENT EVIDENCE OF THE LOSS THAT THEY'VE SUFFERED AS A RESULT OF THE DEATH AND FOR WHICH YOU MAY AWARD DAMAGES TO THEM. LIKE THE OTHER PARTS OF PLAINTIFFS' CASE, PLAINTIFFS HAVE THE BURDEN OF PROVING THAT THEY'VE SUFFERED DAMAGES, AS WELL AS THE AMOUNT OF THOSE DAMAGES, BY A PREPONDERANCE OF THE EVIDENCE. THESE DAMAGES MAY INCLUDE: ONE, LOSS OF ECONOMIC SUPPORT; TWO, LOSS OF THE LOVE, AFFECTION, AND COMPANIONSHIP OF JAMES MAYS; AND

THREE, FUNERAL EXPENSES.

IN THIS CASE THE PARTIES HAVE STIPULATED THAT THE EXPENSES FOR MR. JAMES MAYS'S FUNERAL TOTALED $12,549.79.

THE AMOUNT OF DAMAGES FOR AN ITEM SUCH AS LOSS OF ECONOMIC SUPPORT IS NECESSARILY SPECULATIVE AND CANNOT BE CALCULATED WITH MATHEMATICAL CERTAINTY. HOWEVER, IF YOU FEEL THAT SUCH DAMAGES SHOULD BE AWARDED, YOU SHOULD EXERCISE YOUR DISCRETION IN CONSIDERING ALL THE CIRCUMSTANCES AND AWARD AN AMOUNT THAT IS JUST TO THE LITIGANTS AND NOT UNDULY OPPRESSIVE TO ANY.

IN DETERMINING A LOSS-OF-SUPPORT AWARD, YOU MAY CONSIDER JAMES MAYS'S PHYSICAL CONDITION BEFORE AND AFTER THIS INCIDENT, HIS WORK RECORD, HIS EARNINGS IN PRIOR YEARS, THE PROBABILITY THAT HE WOULD HAVE EARNED SIMILAR AMOUNTS IN THE REMAINDER OF HIS WORK LIFE, AND SIMILAR FACTORS.

SINCE, IF YOU MAKE SUCH AN AWARD, PLAINTIFFS WOULD BE RECEIVING TODAY SUMS OF MONEY THAT OTHERWISE THEY WOULD ONLY RECEIVE OVER A NUMBER OF YEARS IN THE FUTURE, THE LAW REQUIRES THAT YOU, QUOTE, "DISCOUNT," OR REDUCE TO ITS PRESENT VALUE, THE AMOUNT OF THE FUTURE LOSS YOU MIGHT OTHERWISE AWARD.  IN SIMPLE TERMS, THIS IS A REDUCTION BY THE

AMOUNT OF MONEY, OR INTEREST, WHICH THIS SIMILAR SUM OF MONEY WILL EARN FOR PLAINTIFFS OVER THE PERIOD OF TIME IN WHICH JAMES MAYS WOULD HAVE BEEN EARNING THESE FUTURE WAGES. YOU SHOULD LIST THIS DISCOUNTED FIGURE AS YOU AWARD YOUR LOSS OF SUPPORT. IN DETERMINING THIS DISCOUNT FIGURE, YOU MAY CONSIDER THE EVIDENCE OF THE EXPERT WHO TESTIFIED ON THE ISSUE.

PLAINTIFFS ALSO CLAIM DAMAGES FOR THE LOSS OF CONSORTIUM AND SOCIETY PREVIOUSLY ENJOYED WITH JAMES MAYS.

THE TERM OF "LOSS OF CONSORTIUM" NEEDS FURTHER DEFINITION. WHEN A PERSON IS KILLED, THE LAW AUTHORIZES AN AWARD FOR CERTAIN OF HIS SURVIVORS FOR THE LOSS OF LOVE AND COMPANIONSHIP THAT THEY SUFFER DUE TO THE DEATH.

"LOSS OF CONSORTIUM" IS THE TERM THAT THE LAW USES TO DESCRIBE THE LOVE, COMPANIONSHIP, COMFORT, AND SERVICES THAT A FAMILY MEMBER MIGHT HAVE PROVIDED IF HE HAD NOT BEEN INJURED. YOU MAY CONSIDER THE FOLLOWING FACTORS IN MAKING THIS DETERMINATION: LOSS OF LOVE AND AFFECTION AND LOSS OF COMPANIONSHIP AND MORAL SUPPORT.

YOU ARE NOT REQUIRED TO MAKE A LOSS OF CONSORTIUM AWARD IN THIS CASE TO PLAINTIFFS MERELY

BECAUSE JAMES MAYS WAS KILLED. YOU SHOULD AWARD LOSS OF CONSORTIUM DAMAGES TO PLAINTIFFS ONLY IF YOU DETERMINE THAT PLAINTIFFS HAVE PROVED THAT THERE WAS A LOSS OF CONSORTIUM -- OR HAS BEEN A LOSS OF CONSORTIUM RESULTING FROM JAMES MAYS'S DEATH.

IF YOU DECIDE TO AWARD SUCH DAMAGES, YOU SHOULD SPECIFY AS TO EACH BENEFICIARY INDIVIDUALLY A SINGLE SUM FOR THE LOSS OF LOVE, AFFECTION, AND COMPANIONSHIP OF JAMES MAYS, AND THE GRIEF AND ANGUISH OF THAT BENEFICIARY. THE AWARDS NEED NOT BE THE SAME FOR EACH BENEFICIARY.

LOUISIANA LAW DOES NOT PERMIT AN AWARD OF DAMAGES TO PUNISH DEFENDANT CHEVRON PIPE LINE COMPANY OR TO MAKE AN EXAMPLE OUT OF IT TO PREVENT OTHER SIMILAR CONDUCT, AND YOU SHOULD INCLUDE NO SUCH AMOUNT IN YOUR AWARD FOR PLAINTIFFS' NEGLIGENCE CLAIM.

NOW, IF YOU DECIDE THAT PLAINTIFFS HAVE PROVED, BY A PREPONDERANCE OF THE EVIDENCE, EACH ELEMENT OF A CLAIM AGAINST DEFENDANT CHEVRON PIPE LINE COMPANY, YOU MUST THEN DECIDE WHETHER DEFENDANT CHEVRON PIPE LINE COMPANY HAS PROVED, BY A PREPONDERANCE OF THE EVIDENCE, THAT JAMES MAYS HAS FAILED TO CONDUCT HIMSELF IN ACCORDANCE WITH THE STANDARD EXPECTED OF HIM, THEREBY CONTRIBUTING TO HIS

OWN INJURY.

IT IS THE LAW OF LOUISIANA THAT THE RECOVERY OF AN INJURED PERSON WHO HAS CONTRIBUTED TO HIS OWN INJURY BY HIS OWN SUBSTANDARD CONDUCT MUST BE REDUCED BY THE PERCENTAGE OF FAULT ATTRIBUTABLE TO HIM.

IN THIS CASE, THE STANDARD THAT APPLIES TO JAMES MAYS'S CONDUCT IS THE REQUIREMENT THAT HE EXERCISE THAT DEGREE OF CARE THAT WE MIGHT REASONABLY EXPECT A PERSON TO EXERCISE FOR HIS OWN SAFETY AND PROTECTION.

ON THIS ISSUE, DEFENDANT CHEVRON PIPE LINE COMPANY HAS THE BURDEN OF PROOF. THIS MEANS THAT DEFENDANT CHEVRON PIPE LINE COMPANY MUST PROVE, BY A PREPONDERANCE OF THE EVIDENCE, THAT JAMES MAYS FAILED TO CONFORM TO THAT STANDARD AND, BY THAT FAILURE, CONTRIBUTED TO HIS OWN INJURY.

IN DECIDING THE QUESTION OF WHETHER JAMES MAYS'S FAULT -- EXCUSE ME -- OF JAMES MAYS'S FAULT, YOU MAY ASK YOURSELF THIS QUESTION: SHOULD JAMES MAYS, AS AN ORDINARILY PRUDENT PERSON, UNDER ALL THE CIRCUMSTANCES SURROUNDING HIS CONDUCT, HAVE REASONABLY FORESEEN SOME SUCH INJURY AS HE SUFFERED AS A RESULT OF HIS CONDUCT, AND DID HE FAIL TO EXERCISE REASONABLE CARE TO AVOID SUCH INJURY TO HIMSELF?

IN DETERMINING WHETHER JAMES MAYS ACTED REASONABLY OR WITH ORDINARY CARE, YOU MAY CONSIDER JAMES MAYS'S BACKGROUND AND EXPERIENCE WITH VALVES.

YOU MAY ALSO CONSIDER: ONE, JAMES MAYS'S KNOWLEDGE OF THE DANGER AND THE KNOWLEDGE OF THE DANGER THAT HIS SUPERVISOR HAD; TWO, THE EXTENT OF CONTROL JAMES MAYS HAD OVER THE SITUATION AND THE EXTENT OF CONTROL HIS SUPERVISOR HAD; THREE, THE EXTENT TO WHICH JAMES MAYS'S CONDUCT WAS VOLUNTARY ON HIS PART; FOUR, ALTERNATIVES AVAILABLE TO JAMES MAYS WHEN HE ACTED; FIVE, THE OBVIOUS -- HOW OBVIOUS THE DANGER WAS; AND SIX, THE EXTENT TO WHICH JAMES MAYS COULD HAVE AVOIDED THE DANGEROUS SITUATION.

IF YOU CONCLUDE THAT JAMES MAYS'S CONDUCT WAS BELOW THE STANDARD OF BEHAVIOR WE WOULD NORMALLY EXPECT OF A REASONABLY PRUDENT PERSON AND THAT HIS CONDUCT HELPED TO CAUSE HIS DEATH, THEN YOU MUST ASSIGN A PERCENTAGE OF FAULT TO MR. MAYS.

IF YOU CONCLUDE THAT DEFENDANT CHEVRON PIPE LINE COMPANY, FURMANITE AMERICA, INC., ACADIAN CONTRACTORS, INC., AND JAMES MAYS WERE NEGLIGENT, AND THAT NEGLIGENCE -- AND THAT THE NEGLIGENCE OF EACH HELPED CAUSE JAMES MAYS'S DEATH, THEN YOU MUST ASSIGN PERCENTAGES OF FAULT TO EACH ONE. IN DETERMINING THOSE PERCENTAGES, YOU MAY CONSIDER BOTH THE NATURE

OF THE NEGLIGENT CONDUCT AND THE EXTENT OF THE CAUSAL RELATION BETWEEN THE CONDUCT AND JAMES MAYS'S DEATH.

IF YOU DECIDE THAT PLAINTIFFS HAVE PROVEN, BY A PREPONDERANCE OF THE EVIDENCE, EACH ELEMENT OF A CLAIM AGAINST DEFENDANT CHEVRON PIPE LINE COMPANY, THEN YOU MUST DECIDE WHETHER DEFENDANT CHEVRON PIPE LINE COMPANY HAS PROVED, BY A PREPONDERANCE OF THE EVIDENCE, THAT FURMANITE AMERICA, INC. HAS FAILED TO CONDUCT ITSELF IN ACCORDANCE WITH THE STANDARD EXPECTED OF IT, THEREBY CONTRIBUTING TO JAMES MAYS'S DEATH.

THE STANDARD BY WHICH YOU ARE TO MEASURE FURMANITE AMERICA, INC.'S ACTIONS IS THAT OF AN ORDINARILY PRUDENT PERSON, NOT THAT OF AN EXTRAORDINARILY CAUTIOUS INDIVIDUAL OR AN EXCEPTIONALLY SKILLFUL PERSON.

ON THIS ISSUE, DEFENDANT CHEVRON PIPE LINE COMPANY HAS THE BURDEN OF PROOF. IF YOU CONCLUDE THAT DEFENDANT CHEVRON PIPE LINE COMPANY HAS PROVED, BY A PREPONDERANCE OF THE EVIDENCE, THAT FURMANITE AMERICA, INC.'S CONDUCT WAS BELOW THE STANDARD OF BEHAVIOR WE WOULD NORMALLY EXPECT OF A REASONABLY PRUDENT PERSON AND THAT ITS CONDUCT HELPED TO CAUSE JAMES MAYS'S DEATH, THEN YOU MUST ASSIGN A PERCENTAGE OF FAULT TO FURMANITE AMERICA, INC.

IF YOU DECIDE THAT PLAINTIFFS HAVE PROVED, BY A PREPONDERANCE OF THE EVIDENCE, EACH ELEMENT OF A CLAIM AGAINST DEFENDANT CHEVRON PIPE LINE COMPANY, THEN YOU MUST DECIDE WHETHER DEFENDANT CHEVRON PIPE LINE COMPANY HAS PROVED, BY A PREPONDERANCE OF THE EVIDENCE, THAT ACADIAN CONTRACTORS, INC. HAS FAILED TO CONDUCT ITSELF IN ACCORDANCE WITH THE STANDARD EXPECTED OF IT, THEREBY CONTRIBUTING TO JAMES MAYS'S DEATH.

THE STANDARD BY WHICH YOU ARE TO MEASURE ACADIAN CONTRACTORS, INC.'S ACTIONS IS THAT OF AN ORDINARILY PRUDENT PERSON, NOT THAT OF AN EXTRAORDINARILY CAUTIOUS INDIVIDUAL OR AN EXCEPTIONALLY SKILLFUL PERSON.

ON THIS ISSUE, DEFENDANT CHEVRON PIPE LINE COMPANY HAS THE BURDEN OF PROOF. IF YOU CONCLUDE THAT DEFENDANT CHEVRON PIPE LINE COMPANY HAS PROVED, BY A PREPONDERANCE OF THE EVIDENCE, THAT ACADIAN CONTRACTORS, INC.'S CONDUCT WAS BELOW THE STANDARD OF BEHAVIOR WE WOULD NORMALLY EXPECT OF A REASONABLY PRUDENT PERSON AND THAT ITS CONDUCT HELPED TO CAUSE JAMES MAYS'S DEATH, THEN YOU MUST ASSIGN A PERCENTAGE OF FAULT TO ACADIAN CONTRACTORS, INC.

THIS COMPLETES MY REMARKS ON THE LAW THAT APPLIES TO THIS CASE. REMEMBER, AS I TOLD YOU AT THE

BEGINNING OF THE TRIAL, YOU WERE NOT TO DISCUSS THE CASE WITH ANYONE, INCLUDING YOURSELVES. I NOW REMOVE THIS RESTRICTION AND ASK YOU TO CONSULT WITH ONE ANOTHER IN AN EFFORT TO REACH A VERDICT. EACH OF YOU MUST DECIDE THIS CASE FOR YOURSELF BUT ONLY AFTER AN IMPARTIAL CONSIDERATION OF THE EVIDENCE WITH YOUR FELLOW JURORS. DURING YOUR DELIBERATIONS DO NOT HESITATE TO RE-EXAMINE YOUR OWN OPINIONS AND CHANGE YOUR MIND IF YOU ARE CONVINCED THAT YOU WERE WRONG. AT THE SAME TIME, DO NOT GIVE UP YOUR HONEST BELIEFS JUST BECAUSE YOUR FELLOW JURORS THINK DIFFERENTLY OR JUST TO FINISH THE CASE.

REMEMBER AT ALL TIMES THAT YOU ARE THE JUDGES OF THE FACTS. REMEMBER THAT YOUR VERDICT MUST BE BASED SOLELY ON THE EVIDENCE AND NOTHING ELSE.

REMEMBER THAT NEITHER OPENING STATEMENTS, CLOSING ARGUMENTS, NOR ANY OTHER STATEMENTS OR ARGUMENTS OF COUNSEL ARE EVIDENCE. IF YOUR RECOLLECTION OF THE FACTS DIFFERS FROM THE WAY THAT COUNSEL HAS STATED THEM, YOUR RECOLLECTION CONTROLS.

NOW, WHEN YOU RETURN TO THE JURY ROOM TO DELIBERATE, THE FIRST THING YOU SHOULD DO IS SELECT ONE FROM AMONG YOU TO SERVE AS YOUR FOREPERSON. THE FOREPERSON WILL SERVE ESSENTIALLY AS YOUR SPOKESPERSON HERE IN COURT AND WILL HELP GUIDE YOUR

DELIBERATIONS. YOU SHOULD THEN BEGIN TO ANSWER CERTAIN QUESTIONS FROM THE -- ON THE VERDICT FORM.

AND AT THIS TIME WE WILL REVIEW THE VERDICT FORM. NOW, THE VERDICT FORM IS FAIRLY SIMPLE AND CONTAINS I THINK VERY SIMILAR INSTRUCTIONS. BUT THESE ARE VERY IMPORTANT ANSWERS THAT YOU -- QUESTIONS YOU MUST ANSWER. THE FIRST: HAVE PLAINTIFFS PROVED, BY A PREPONDERANCE OF THE EVIDENCE, THAT THERE IS A SUBSTANTIAL LINK -- THAT IS, A SIGNIFICANT -- A NEXUS, EXCUSE ME -- THAT IS, A SIGNIFICANT CAUSAL LINK -- BETWEEN JAMES MAYS'S DEATH AND DEFENDANT CHEVRON PIPE LINE COMPANY'S OPERATIONS CONDUCTED ON THE OUTER CONTINENTAL SHELF FOR THE PURPOSE OF EXTRACTING OR TRANSPORTING NATURAL RESOURCES BY PIPELINE FROM THE OUTER CONTINENTAL SHELF?

IF YOUR ANSWER TO THAT QUESTION IS YES, YOU CAN PROCEED TO QUESTION TWO. AS YOU SEE FROM THE INSTRUCTIONS, HOWEVER, IF YOUR ANSWER IS NO, THEN YOU ARE TO PROCEED -- THAT IS, THE FOREPERSON -- IS TO PROCEED TO PAGE 6 AND TO DATE AND SIGN THE FORM. THAT WILL CONCLUDE YOUR DELIBERATIONS.

IF, HOWEVER, YOU ANSWER YES TO THAT QUESTION, YOU ARE TO PROCEED TO QUESTION 2, WHICH REQUIRES YOU TO DETERMINE IF THE PLAINTIFFS HAVE

PROVED, BY A PREPONDERANCE OF THE EVIDENCE, THAT DEFENDANT CHEVRON PIPE LINE COMPANY WAS NEGLIGENT AND THAT THE COMPANY'S NEGLIGENCE CAUSED JAMES MAYS'S DEATH.

SO LET ME REMIND YOU THERE ARE TWO ISSUES THERE WITH THAT QUESTION: WAS THERE NEGLIGENCE AND WAS THE NEGLIGENCE THE CAUSE OF MR. MAYS'S DEATH? SO YOU'VE GOT TWO CONSIDERATIONS THERE.

I WILL TELL YOU THAT THERE ARE SOMETIMES -- VERY, VERY OFTEN THERE IS NEGLIGENCE BUT NEGLIGENCE THAT DOESN'T RESULT IN WHAT YOU SAW -- WHAT YOU -- DOESN'T RESULT IN DEATH OR HARM OR INJURY TO ANYONE. SO LET ME JUST REMIND YOU THERE ARE TWO ISSUES THERE.

IF YOUR ANSWER IS NO TO THAT QUESTION, AGAIN, YOU SHOULD -- AS INSTRUCTED HERE, TURN TO PAGE 6, AND THE FOREPERSON WILL SIGN AND DATE THE VERDICT FORM.

IF YOUR ANSWER IS YES, YOU GO ON TO QUESTION NO. 3: HAS CHEVRON PIPE LINE COMPANY PROVED, BY A PREPONDERANCE OF THE EVIDENCE, THAT JAMES MAYS HIMSELF WAS NEGLIGENT AND THAT HIS NEGLIGENCE CAUSED HIS DEATH? YOU ANSWER THAT YES OR NO.

YOU GO ON TO QUESTION 4, WHICH INQUIRES AS TO WHETHER FURMANITE AMERICA WAS NEGLIGENT AND MAY HAVE CONTRIBUTED TO MR. MAYS'S DEATH. NO. 5 REQUIRED

YOU TO CONSIDER WHETHER ACADIAN CONTRACTORS WAS NEGLIGENT IN A WAY THAT MAY HAVE CONTRIBUTED TO MR. MAYS'S DEATH. NO. 6 AND 7 REQUIRE THAT IF YOU FIND THAT THERE WAS SOME -- OR NO. 6 REQUIRES YOU TO APPORTION SOME PERCENTAGE OF FAULT. IF YOU FIND THAT ANY OF THE OTHERS -- THAT IS, ANY -- FIRST OF ALL, DEFENDANT CHEVRON BUT ALSO FURMANITE AND ACADIAN AND OF COURSE MR. MAYS CONTRIBUTED TO MR. MAYS'S DEATH. AND AS INSTRUCTED ON PAGE 4, AS YOU CAN SEE, THOSE PERCENTAGES MUST EQUAL 100 PERCENT.

AND THEN FINALLY ON PAGE 5 YOU ARE TO INDICATE WHAT AMOUNTS OF DAMAGES YOU BELIEVE THE PLAINTIFFS HAVE PROVEN, BY A PREPONDERANCE OF THE EVIDENCE. AGAIN, PRETTY SELF-EXPLANATORY.

NOW RETURNING TO THE INSTRUCTIONS. YOUR VERDICT ON EACH QUESTION MUST BE UNANIMOUS, OR AT LEAST THE QUESTIONS THAT YOU ARE REQUIRED TO ANSWER. AS I SAID, YOU MAY NOT BE REQUIRED TO ANSWER EVERY QUESTION ON THE VERDICT FORM, BUT THOSE THAT YOU ARE REQUIRED TO ANSWER MUST BE UNANIMOUS. AND AGAIN, AFTER YOU'VE ANSWERED THE QUESTION -- OR QUESTIONS APPLICABLE, THEN YOU ARE TO -- THE FOREPERSON, THAT IS, MUST SIGN AND DATE THE VERDICT FORM.

NOW, IF YOU NEED TO COMMUNICATE WITH ME FOR ANY REASON, I'M GOING TO INSTRUCT YOU TO WRITE DOWN

YOUR QUESTION -- THAT IS, THE FOREPERSON TO SIMPLY WRITE DOWN THE QUESTION AND ALSO PLACE THE TIME -- THE DATE AND TIME ON IT AND JUST NOTIFY THE COURT SECURITY OFFICER, WHO WILL BE RIGHT OUTSIDE THE COURTROOM. AND JUST HAND THE NOTE TO THE COURT SECURITY OFFICER. I WILL EITHER RESPOND IN WRITING OR I MAY CALL YOU BACK INTO THE COURTROOM AND, IN THE PRESENCE OF THE LAWYERS, I MAY ANSWER YOUR QUESTION, DEPENDING ON WHAT IT IS, HERE IN COURT. MORE LIKELY THAN NOT I WILL SIMPLY ANSWER IN WRITING. BUT AGAIN, IF I HAVE TO RETURN YOU ALL TO COURT, I OF COURSE WON'T HESITATE TO DO THAT.

NOW, PLEASE KEEP IN MIND THAT NO ONE DURING THE COURSE OF YOUR DELIBERATIONS SHOULD MAKE ANY EFFORT TO COMMUNICATE WITH YOU THROUGHOUT THIS PROCESS. ALSO BEAR IN MIND THAT UNTIL YOU HAVE COMPLETED YOUR SERVICE AND I DISCHARGE YOU FROM THE RESPONSIBILITY, YOU ARE NOT TO DISCUSS YOUR DELIBERATIONS WITH ANYONE EXCEPT YOURSELVES. AND AGAIN, ONLY AFTER YOU REACH A VERDICT AND I ACCEPT YOUR VERDICT WILL YOU BE FREE TO TALK ABOUT THE CASE.

LET ME REMIND YOU ALSO THAT YOU IN THIS CASE REPRESENT THE COMMUNITY, AND THE COMMUNITY AND CERTAINLY EVERYONE ASSOCIATED WITH THIS CASE APPRECIATES YOUR SERVICE AND THE TIME YOU'VE SPENT

HERE IN COURT RECEIVING THIS EVIDENCE. AND WE CERTAINLY EXPECT AND KNOW THAT YOU WILL REACH A FAIR AND IMPARTIAL VERDICT IN THIS CASE.

NOW, I WILL EXCUSE YOU ALL IN JUST A MOMENT, BUT DO NOT YET BEGIN TO DELIBERATE. DON'T BEGIN TO DISCUSS THE CASE. DON'T EVEN BEGIN TO SELECT YOUR FOREPERSON YET UNTIL WE PROVIDE YOU THE EVIDENCE. ONE OF THE THINGS I HAVE TO -- THE LAST THING WE HAVE TO DO BEFORE YOU BEGIN YOUR DELIBERATIONS IS TO JUST SATISFY OURSELVES THAT EVERYBODY IS IN AGREEMENT WITH THOSE DOCUMENTS THAT, IN FACT, HAVE BEEN ACCEPTED AND ADMITTED INTO EVIDENCE.

SO THAT'S GOING TO TAKE ABOUT FIVE MINUTES FOR US TO JUST SATISFY OURSELVES THAT YOU'RE ENTITLED TO GET ALL THE EVIDENCE -- THAT WHAT YOU GET IS, IN FACT, EVIDENCE IN THE CASE. SO JUST BEAR WITH US. THAT'S GOING TO BE A VERY SHORT PROCESS. AFTER YOU RECEIVE THAT, MY COURTROOM DEPUTY WILL PROVIDE THOSE TO YOU AND SHE WILL THEN TELL YOU THAT "THE JUDGE SAYS YOU CAN NOW BEGIN YOUR DELIBERATIONS." BUT AGAIN, PLEASE DON'T BEGIN YOUR DELIBERATIONS UNTIL YOU HAVE RECEIVED THE INSTRUCTIONS TO DO SO.

THANK YOU AGAIN. AND LASTLY, AS YOU ALL KNOW, YOU MADE YOUR MENU SELECTIONS FOR YOUR LUNCH SO WE SHOULD HAVE LUNCH -- SO YOUR LUNCH WILL BE

PROVIDED TO YOU. WE HOPE THAT LUNCH WILL BE HERE MAYBE A LITTLE BIT BEFORE NOON. WE WILL NOT, AGAIN, TAKE A LUNCH BREAK, BUT WE WILL -- YOU WILL BE EXPECTED -- IF YOU HAVEN'T REACHED A VERDICT BEFORE LUNCH, YOU WILL BE EXPECTED TO WORK THROUGH LUNCH. IF YOU REACH A VERDICT BEFORE LUNCH, JUST EAT YOUR LUNCH, BUT DON'T FEEL LIKE YOU'RE IN ANY TYPE OF TIME CONSTRAINTS. PLEASE TAKE YOUR TIME. TAKE ALL THE TIME YOU NEED TO GO THROUGH THE EVIDENCE.

THANK YOU VERY MUCH, LADIES AND GENTLEMEN. LET'S ALL RISE FOR THE JURY.

**REPORTER'S NOTE: (WHEREUPON, THE JURY IS OUT OF THE COURTROOM.)**

**THE COURT:** BE SEATED. OKAY. LET'S ALL SATISFY OURSELVES VERY BRIEFLY WHAT'S BEEN ENTERED INTO THE RECORD IN THIS CASE AND WHAT HAS NOT. EXHIBITS. ALL RIGHT. COUNSEL, YOU MAY BE SEATED DURING THIS PROCESS. THERE IS NO NEED FOR YOU TO STAND AT THE PODIUM.

ALL RIGHT. ALL OF THE JOINT EXHIBITS ARE IN. IN AGREEMENT?

**MS. PIERCE:** YOUR HONOR, WE DID REDACT, AFTER THE COURT'S PRETRIAL RULING ON COLLATERAL -- THE COLLATERAL SOURCE, AND WE DID REDACT. WE'RE NOT SURE THE DEFENDANT AGREES WITH IT, BUT --

**THE COURTROOM DEPUTY:** WHICH NUMBER?

**MS. PIERCE:** JOINT 1.

**THE COURT:** MR. MCLAUGHLIN? THE MASTER SERVICES AGREEMENT, IS THAT -- ARE YOU SATISFIED WITH THE REDACTIONS MADE BY THE PLAINTIFFS?

**MR. MCLAUGHLIN:** JUDGE, THE LANGUAGE THAT SHE -- EXCUSE ME. THE LANGUAGE THAT SHE REMOVED REFERS TO -- I MEAN, IT'S THE STATUTE -- IT INCLUDES THE STATUTORY EMPLOYER PROVISION OBVIOUSLY, WHICH IS THE BASIS OF OUR STATUTORY --

**THE COURT:** WHAT'S THE SPECIFIC LANGUAGE? I'M NOT SURE THE JURY WOULD BE ABLE TO UNDERSTAND WHAT IT IS.

**MS. PIERCE:** I'LL SHOW YOU, YOUR HONOR, IF WE CAN GET THERE.

**MR. SILVERSTEIN:** JUDGE, I GUESS ONE OF THE ISSUES IS THE STATUTORY EMPLOYER LANGUAGE ENCOMPASSES OR PROVIDES THE ORIGIN FROM THE LOUISIANA WORKER'S COMPENSATION ACT.

**THE COURT:** CORRECT. AND WE SHOULD NOT HAVE ANY WORKER'S COMPENSATION.

**MR. SILVERSTEIN:** I JUST CAN'T AGREE TO ANY OF THE STATUTORY EMPLOYER LANGUAGE BEING REDACTED, MODIFIED. OBVIOUSLY THAT'S GOING TO -- IT'S VERY IMPORTANT THAT THE RECORD BE CORRECT AND COMPLETE TO

CHEVRON PIPE LINE ON THAT ISSUE.

**THE COURT:** LET ME SEE A COPY. THIS IS NOT THE STAGE OF THESE PROCEEDINGS -- THIS SHOULD HAVE BEEN RESOLVED A LONG TIME AGO. NOW, ONCE AGAIN WE'VE GOT THIS POOR JURY WAITING. LET ME SEE A COPY -- A REDACTED COPY OF THE PLAINTIFFS'.

**MS. PIERCE:** STARTING AT PAGE 26 WE --

**THE COURTROOM DEPUTY:** HE NEEDS A HARD COPY.

**THE COURT:** I DON'T HAVE A HARD COPY OF IT.

**MS. LEGER:** YOUR HONOR, MAY I EXCUSE MYSELF?

**THE COURT:** YES.

**MR. SILVERSTEIN:** JUDGE, WE MAY HAVE A POSSIBLE VERY QUICK, EASY SOLUTION. FOR THE RECORD, THAT THE ENTIRE CONTRACT BE ADMITTED AND YOU CAN REDACT JUST BEFORE IT GOES TO THE JURY. THAT MAY SOLVE IT.

**THE COURT:** YEAH.

**MS. PIERCE:** I'M AGREEABLE TO THAT. THEIR JOINT -- THE FULL JOINT 1 CAN BE IN THE RECORD, BUT OUR REDACTED JOINT 1 GOES TO THE JURY.

**THE COURT:** I THINK THAT'S A PERFECT SOLUTION. SO DO WE HAVE A PAPER COPY OF IT?

**MS. PIERCE:** WE DO. WE JUST CAN'T PUT OUR HANDS ON IT RIGHT NOW, BUT WE'VE GOT THE REDACTED JOINT 1 FOR THE JURY.

**MR. MCLAUGHLIN:** I HAVE THE UNREDACTED JOINT, WHICH WOULD JUST BE FOR THE RECORD.

**THE COURT:** THAT WILL BE FOR THE RECORD. BUT FOR THE JURY -- BECAUSE IT'S IMPORTANT THAT WE GET THESE EXHIBITS TO THE JURY NOW.

**MS. PIERCE:** YES, YOUR HONOR. WE'RE PRINTING THE REDACTED.

**MR. MCLAUGHLIN:** ONE OTHER THING, TOO, YOUR HONOR, I TALKED TO -- PLAINTIFFS' EXHIBIT 53, 195 WAS -- YOU KNOW, WE HAD ALL THE PICTURES.

**THE COURT:** BUT WE'LL GET THERE. LET ME -- JUST GIVE ME A MOMENT. LET ME JUST GO THROUGH IT IN NUMERICAL ORDER AND THEN WE'LL GET TO THAT. OTHERWISE I'M GOING TO GET CONFUSED, AND I'M VERY EASILY CONFUSED SOMETIMES.

ALL RIGHT. SO AGAIN, WE HAVE JOINT EXHIBITS 1 THROUGH 11. CORRECT?

**MS. PIERCE:** YES, SIR.

**THE COURT:** WE'RE ALL IN AGREEMENT ON THE PLAINTIFFS' SIDE?

**MS. PIERCE:** YES, SIR.

**THE COURT:** AND THE DEFENSE SIDE. CORRECT?

**MR. MCLAUGHLIN:** YES, YOUR HONOR.

**THE COURT:** ALL RIGHT. NOW, IN TERMS OF THE PLAINTIFFS' EXHIBITS, WE'VE GOT PLAINTIFFS' EXHIBITS

12, 13, 14, 15, 16. SO FAR SO GOOD FOR THE PLAINTIFFS?

**MS. PIERCE:** SO FAR SO GOOD.

**THE COURT:** AND FOR THE DEFENSE?

**MR. MCLAUGHLIN:** I BELIEVE SO, YOUR HONOR. I DIDN'T HAVE 15 ON THIS LIST THAT MS. HARTER -- OH, PLAINTIFF 15, THAT'S THE INVESTIGATIVE REPORT?

**THE COURT:** THAT IS THE RE -- IT'S THE REDACTED CHEVRON REPORT.

**MR. MCLAUGHLIN:** CAN I EYEBALL IT TO MAKE SURE IT HAS THE REDACTIONS, YOUR HONOR?

**THE COURT:** YES, PLEASE DO SO.

**MS. PIERCE:** IT'S RIGHT HERE.

**MR. MCLAUGHLIN:** YES, YOUR HONOR.

**THE COURT:** SO WE'RE SATISFIED WITH PLAINTIFFS' EXHIBIT 15, MR. MCLAUGHLIN?

**MR. MCLAUGHLIN:** YES, YOUR HONOR.

**THE COURT:** ALL RIGHT. MOVING ON NOW, I'VE GOT PLAINTIFFS' EXHIBIT 22, PLAINTIFFS' EXHIBIT 24, 25, 27.

**MR. MCLAUGHLIN:** YOUR HONOR --

**THE COURTROOM DEPUTY:** 16.

**MR. MCLAUGHLIN:** YOUR HONOR, BEFORE YOU CONTINUE, YOU SAID PLAINTIFFS' EXHIBIT 24.

**THE COURT:** 24.

**MS. PIERCE:** THERE WAS ONE PAGE, PAGE 6.

**THE COURT:** PAGE 6.

**MR. MCLAUGHLIN:** JUST THE PHOTOGRAPHS I BELIEVE, YOUR HONOR.

**THE COURT:** RIGHT. JUST THE PHOTO OF THE -- FROM THE STRESS REPORT. RIGHT?

**MS. PIERCE:** YES, SIR.

**THE COURT:** ALL RIGHT. MOVING ON NOW, WE HAVE PLAINTIFFS' EXHIBIT 25, NO. 27.

**MS. PIERCE:** YES, SIR.

**THE COURT:** WE HAVE EXHIBIT -- PLAINTIFFS' EXHIBIT 42, WHICH IS THE --

**MS. PIERCE:** YES, SIR.

**THE COURT:** -- WHY TREE CHART. CORRECT?

**MS. PIERCE:** YES, SIR.

**THE COURT:** WE'RE GOOD FOR THE PLAINTIFFS?

**MS. PIERCE:** YES, SIR.

**THE COURT:** AND FOR THE DEFENSE?

**MR. MCLAUGHLIN:** YES, SIR.

**THE COURT:** NEXT WE HAVE PLAINTIFFS' EXHIBIT 51, PAGE 40; PLAINTIFFS' EXHIBIT 53, AND THAT'S AN IN-GLOBO EXHIBITS. THOSE ARE PHOTOGRAPHS, PAGES 195, 32, 33, 34, 36, 47, 48, 100, 168, 200, 202 AND 103.

**MS. PIERCE:** 102.

**THE COURTROOM DEPUTY:** NOT 103, JUDGE.

**THE COURT:** 102? MR. MCLAUGHLIN?

**MR. MCLAUGHLIN:** YOUR HONOR, ON THAT PLAINTIFFS' EXHIBIT 53, 195, YOUR HONOR, THAT IS ONE OF THE PICTURES WITH THE BOOM.

**THE COURT:** THAT'S ONE THAT YOU SUBSTITUTED?

**MR. MCLAUGHLIN:** I THINK WE'RE PULLING THAT ONE OUT, BECAUSE THERE IS OTHER PICTURES THAT SHOW THE SAME AREA WITHOUT THE BOOM.

**MS. LEGER:** THAT'S CORRECT.

**THE COURTROOM DEPUTY:** SO IT'S WITHDRAWN?

**MS. LEGER:** THAT'S CORRECT.

**THE COURT:** SO WHY DON'T WE DO THIS, BECAUSE I WANT TO MAKE SURE THAT MY COURT REPORTER CAN -- MR. MCLAUGHLIN, WHY DON'T YOU TAKE THE MICROPHONE AND -- I DON'T MIND YOU ALL ADDRESSING THE COURT FROM BACK THERE, BUT I WANT TO MAKE SURE THAT SHE CAN HEAR YOU ALL. YEAH, WHATEVER WORKS. AND IS IT STILL ON, MR. MCLAUGHLIN?

**MR. MCLAUGHLIN:** I THINK SO. IS THAT COMING THROUGH?

**THE COURTROOM DEPUTY:** A LITTLE BIT.

**THE COURT:** WHILE WE'RE DOING THAT, LET'S KEEP GOING HERE. WELL, ACTUALLY, LET ME GET MY COURTROOM DEPUTY TO FINISH UP THIS TASK.

OKAY. WELL, LET'S JUST MOVE ON. WE DON'T

HAVE TIME FOR THAT. THAT'S NOT SO IMPORTANT. LET'S MOVE ON NOW.

65 -- WE HAVE 65, PAGES 1, 2, 29 AND 136. ARE WE ALL IN AGREEMENT? ON THE PLAINTIFFS' SIDE?

**MS. PIERCE:** YES, SIR.

**THE COURT:** ON THE DEFENSE SIDE?

**MR. MCLAUGHLIN:** YES, YOUR HONOR.

**THE COURT:** NEXT WE HAVE PLAINTIFFS' EXHIBIT 70, ALL OF -- IN ITS ENTIRETY. CORRECT?

**MS. PIERCE:** YES, SIR.

**MR. MCLAUGHLIN:** YES, SIR, WE'RE IN AGREEMENT ON IT.

**THE COURT:** WE HAVE IT WORKING NOW, IT SOUNDS LIKE.

NEXT WE HAVE PLAINTIFFS' EXHIBIT 81, PAGES 1 AND 7. CORRECT?

**MS. PIERCE:** YES, SIR.

**THE COURT:** MR. MCLAUGHLIN?

**MR. MCLAUGHLIN:** YES, YOUR HONOR.

**THE COURT:** NEXT, PLAINTIFFS' EXHIBIT 92, PAGES 1, 3, 4, AND 46. CORRECT?

**MS. PIERCE:** YES, SIR.

**THE COURT:** MR. MCLAUGHLIN?

**MR. MCLAUGHLIN:** YES, YOUR HONOR.

**THE COURT:** NEXT, PLAINTIFFS' EXHIBIT 93,

WHICH ARE ALSO PHOTOGRAPHS, NOS. 128, 193 AND 61. CORRECT?

**MS. PIERCE:** AND 136.

**THE COURT:** 136. OKAY.

**THE COURTROOM DEPUTY:** I DON'T HAVE A 193.

**THE COURT:** I DON'T HAVE -- IS THAT RIGHT, MISTER -- DO YOU HAVE THAT, MR. MCLAUGHLIN? I DON'T HAVE 136.

**MR. MCLAUGHLIN:** I HAVE 128 AND 136.

**THE COURT:** SO WE'LL ADD 136. DO YOU AGREE WITH THAT THEN, MR. MCLAUGHLIN?

**MR. MCLAUGHLIN:** YES, YOUR HONOR. 93, I HAD 61, 128 AND 136.

**THE COURTROOM DEPUTY:** THAT'S WHAT I HAVE.

**THE COURT:** SO YOU DON'T HAVE 193?

**MR. MCLAUGHLIN:** IT IS -- I THINK IT'S 93. I DON'T THINK -- THERE IS NO 193, YOUR HONOR.

**THE COURT:** VERY WELL. NEXT WE HAVE --

**MS. PIERCE:** WE'RE GOOD.

**THE COURT:** -- PLAINTIFFS' EXHIBIT 95. AND ARE WE IN AGREEMENT WITH THAT?

**MS. PIERCE:** YES, SIR.

**THE COURT:** PLAINTIFFS' EXHIBIT 97, WHICH IS A COLLECTION OF PHOTOGRAPHS IN-GLOBO -- I'LL JUST READ IT FOR THE RECORD -- NO. 1, 2, 3, 4, 5, 7, 10,

11, 12, 14, 15, 16, 17, 18, 19, EXHIBIT 13 AND 22.

**THE COURTROOM DEPUTY:** JUDGE, THAT'S WHAT THEY SHOWED, BUT I THINK YOU AGREED TO JUST ADMIT IT ALL.

**THE COURT:** IS THAT RIGHT?

**MS. PIERCE:** YES, SIR. WE AGREED TO THE ADMISSION OF ALL THOSE.

**MR. MCLAUGHLIN:** YES, YOUR HONOR. THOSE WERE THE FAMILY PHOTOS THAT --

**THE COURT:** AND FINALLY WE HAVE PLAINTIFFS' EXHIBIT 109, WHICH IS THE -- WHICH IS THE PHOTOGRAPH. IS THAT CORRECT?

**MS. PIERCE:** YES, SIR.

**THE COURT:** THAT CONCLUDES ALL OF THE PLAINTIFFS' EXHIBITS. CORRECT?

NOW, ON THE DEFENSE SIDE WE HAVE EXHIBIT 13, WE HAVE EXHIBIT 15, EXHIBIT 16. IS THAT CORRECT?

**MR. MCLAUGHLIN:** YES, YOUR HONOR.

**THE COURT:** MS. PIERCE, DO YOU AGREE WITH THAT?

**MS. PIERCE:** ON DEFENDANTS' EXHIBIT NO. -- ON DEFENDANTS' EXHIBIT NO. 13, THERE ARE SOME --

**THE COURT:** MS. LEGER, YOU'RE A PRETTY GOOD COURTROOM DEPUTY THERE. IF THIS LAW THING DOESN'T WORK OUT, LET ME KNOW, WE HAVE A JOB FOR YOU.

**MS. LEGER:** I'M JUST BOSSY, YOUR HONOR. THAT'S ALL.

**THE COURT:** I'M SORRY, MS. PIERCE.

**MS. PIERCE:** WE ARE TAKING SOME PAGES OUT OF DEFENDANTS' 136 THAT CONTAIN MEDICAL INFORMATION.

**THE COURT:** OKAY.

**MS. PIERCE:** I MEAN DEFENDANT 13. I'M SORRY.

**THE COURT:** DEFENDANT 13.

**MS. PIERCE:** SO WE ARE PULLING PAGES 93 THROUGH 96, BY AGREEMENT.

**MR. MCLAUGHLIN:** YES, YOUR HONOR.

**MS. PIERCE:** WE ARE PULLING PAGE 22, BY AGREEMENT; PAGE 53 AND 54, BY AGREEMENT.

**MR. MCLAUGHLIN:** YES, YOUR HONOR.

**MS. PIERCE:** AND I BELIEVE THAT'S IT. BUT I WAS JUST FINISHING THAT ONE.

**THE COURT:** IS THAT CORRECT, MR. MCLAUGHLIN?

**MR. MCLAUGHLIN:** YES, YOUR HONOR.

**THE COURT:** THANK YOU. OKAY. SO AGAIN, WE'RE GOOD WITH NO. 13 WITH THOSE CAVEATS, AS WELL AS 15 AND 16.

ALSO DEFENSE EXHIBIT 21, WHICH IS THE PHOTOGRAPH. IS THAT CORRECT?

**MR. MCLAUGHLIN:** I THINK, YOUR HONOR, SHE --

MS. PIERCE IS LOOKING AT DEFENDANTS' 15, WHICH IS THE EMPLOYEE HANDBOOK.

**MS. PIERCE:** I'M GOOD WITH IT, JUDGE.

**THE COURT:** AND 16? YEAH, 16?

**MS. PIERCE:** WE'RE GOOD WITH THAT.

**MR. MCLAUGHLIN:** YES, YOUR HONOR.

**THE COURT:** 21?

**MS. PIERCE:** WE'RE GOOD WITH THAT.

**THE COURT:** WE HAVE DEFENSE EXHIBIT 37.

**MS. PIERCE:** YES, SIR, GOOD WITH THAT.

**THE COURT:** AND DEFENDANT EXHIBIT 38.

**MS. PIERCE:** YES, SIR.

**MR. MCLAUGHLIN:** YES, YOUR HONOR.

**THE COURT:** THAT PRETTY MUCH SUMS IT UP FOR ME. DID I OMIT ANYTHING?

**MS. PIERCE:** NO, SIR.

**MR. MCLAUGHLIN:** NO, YOUR HONOR.

**THE COURT:** VERY GOOD. THANK YOU.

MS. HARTER, DO WE HAVE EVERYTHING WE NEED?

**THE COURTROOM DEPUTY:** I DO NOT HAVE ANY OF THOSE EXHIBITS, JUDGE.

**THE COURT:** SO IF Y'ALL HAVE COPIES -- DO YOU HAVE HARD COPIES?

**MS. PIERCE:** YES, SIR.

**THE COURT:** SEE, WE WOULD OTHERWISE --

**THE COURTROOM DEPUTY:** I HAVE THE ONLY --

**THE COURT:** THERE IS NO JERS SYSTEM IN THIS -- RIGHT?

**THE COURTROOM DEPUTY:** NO, SIR.

**THE COURT:** I APPRECIATE Y'ALL SUBMITTING THESE ELECTRONICALLY. THE PROBLEM IS THIS COURTROOM DOESN'T HAVE THE JERS SYSTEM, SO WE HAVE TO --

**THE COURTROOM DEPUTY:** WE HAVE TO DO BOTH HERE.

**THE COURT:** WE HAVE TO PROVIDE THE JURY HARD COPIES.

**MS. PIERCE:** 24, 6. OKAY. WE NEED 24, 6 AND EXHIBIT 24, 8.

**THE COURT:** NOW, COUNSEL -- LET ME HAVE ORDER IN THE COURT, PLEASE. IN ADDITION TO THE EXHIBITS, THE JURY WILL OF COURSE RECEIVE THE VERDICT FORM, BUT THEY WILL ALSO RECEIVE -- AS I INFORMED COUNSEL YESTERDAY, THEY WILL RECEIVE A COPY OF THE JURY INSTRUCTIONS THAT WERE READ TO THEM A FEW MINUTES AGO.

ALL RIGHT. IS THERE ANYTHING ELSE THAT WE SHOULD TAKE UP BEFORE WE PROVIDE ALL OF THE EXHIBITS AND THE VERDICT FORM AND THE INSTRUCTIONS TO THE JURY? ANYTHING ON THE PLAINTIFFS' SIDE?

**MS. PIERCE:** YOUR HONOR, WE'RE -- I THINK

THERE WAS A -- I'M JUST TRYING TO GET THESE RIGHT. PLAINTIFFS 24, PAGE 6. WE STILL NEED TO PRINT THAT OUT REAL QUICK, JUDGE. WE GAVE PAGE 8 INSTEAD OF PAGE 6. WE NEED 24, PAGE 8 PRINTED.

**THE COURTROOM DEPUTY:** 6.

**MS. PIERCE:** I MEAN PAGE 6. GOOD LORD. PLAINTIFFS' 24, PAGE 6 IN COLOR. AND THEN WE'LL BE DONE.

**THE COURT:** ALL RIGHT. AND SO THE FINAL THING THAT I WILL TAKE UP AND THEN I WILL EXCUSE MYSELF: MS. LEGER AND MR. SILVERSTEIN, I UNDERSTAND THAT BOTH OF YOU, FOR VARIOUS REASONS, HAVE REQUESTED TO BE EXCUSED FOR THE BALANCE OF THE TRIAL, AND OF COURSE YOU ARE EXCUSED. LET ME THANK YOU ALL FOR YOUR PARTICIPATION IN THE TRIAL. BOTH OF YOU DID A SUPERB JOB.

**MR. SILVERSTEIN:** THANK YOU, JUDGE.

**THE COURT:** I'M SURE YOUR CO-COUNSEL WILL BE AVAILABLE TO YOU. I WOULD ONLY ASK THAT YOU BE SURE YOU KEEP YOUR CELL PHONES ON IN THE EVENT OF A QUESTION. IN CASE IF YOUR CO-COUNSEL ATTEMPT TO REACH YOU, WE DON'T WANT TO HAVE, OF COURSE, A WHOLE LOT OF UNNECESSARY DELAY.

**MR. SILVERSTEIN:** I APPRECIATE THE COURT ALLOWING -- IF MR. MCLAUGHLIN GETS SOMETHING THAT

HE'S NOT COMFORTABLE HANDLING, HE WILL BE ABLE TO REACH ME AND --

**THE COURT:** I THINK -- NOW THAT THE MATTER IS IN MR. MCLAUGHLIN'S VERY CAPABLE HANDS, I THINK WE'LL MAKE A LOT OF PROGRESS NOW.

**MR. SILVERSTEIN:** THE CASE WILL CERTAINLY BE A LOT BETTER TRIED.

**THE COURT:** I'M JUST KIDDING YOU, MR. SILVERSTEIN. I'M KIDDING, YOU KNOW.

**MR. SILVERSTEIN:** JUDGE, I'VE BEEN CALLED A LOT WORSE, I CAN PROMISE YOU.

**MS. LEGER:** THANK YOU, YOUR HONOR.

**MR. SILVERSTEIN:** JUDGE, COULD I QUICKLY APPROACH ABOUT A NON-MATTER?

**THE COURT:** UNRELATED MATTER? SURE. COME FORWARD.

**(WHEREUPON, THERE WAS AN OFF-THE-RECORD DISCUSSION.)**

**THE COURT:** MS. LEGER, GOOD LUCK TO YOU, MA'AM. I THINK WE HAVE EVERYTHING WE NEED FOR THE JURY. CORRECT?

**MS. PIERCE:** YES, SIR.

**THE COURT:** VERY GOOD. COURT IS IN RECESS. AND NEEDLESS TO SAY, COUNSEL, PLEASE MAKE SURE THAT MS. HARTER HAS YOUR CELL PHONE NUMBERS IN CASE YOU

ROAM OFF FOR A FEW MINUTES, IF WE HAVE A QUESTION, WE CAN GET AHOLD OF YOU. OKAY? THANK YOU ALL.

COURT IS IN RECESS.

**(WHEREUPON, A RECESS WAS TAKEN.)**

**THE COURT:** BE SEATED. WE ARE BACK ON THE RECORD IN THE CASE OF MAYS VERSUS CHEVRON PIPE LINE COMPANY. LET THE RECORD REFLECT THAT COUNSEL FOR BOTH THE PLAINTIFF AND THE DEFENDANT ARE PRESENT AT THIS TIME.

THE COURT HAS RECEIVED A QUESTION FROM THE JURY, AND IT READS AS FOLLOWS: "QUESTION NO. 3:

"CAN WE HAVE A FURTHER EXPLANATION OF QUESTION NO. 3 ON THE JURY VERDICT FORM? MOST SPECIFICALLY IN REGARDS TO THE SECOND LINE 'THAT JAMES MAYS WAS HIMSELF NEGLIGENT.'

"DOES THIS MEAN:

"1, WAS JAMES MAYS," PAREN, "SOLELY AND BY HIMSELF -- "WAS JAMES MAYS (SOLELY AND BY HIMSELF NEGLIGENT);

"2, OR DOES IT MEAN THAT JAMES MAYS HAD SOME PERCENTAGE OF NEGLIGENCE AND/OR FAULT BUT THAT OTHER PARTIES ARE ALSO NEGLIGENT?" SO -- AND IT IS SIGNED AND DATED BY THE FOREPERSON.

I WILL GIVE BOTH SIDES, IF YOU WISH, AN OPPORTUNITY TO READ IT YOURSELVES. I KNOW IT'S A

LITTLE COMPLICATED. IT'S NOT A ONE-LINER. SO PAM AND JORDAN, WHY DON'T YOU SHOW THIS TO BOTH SIDES, AND THEN I'M GOING TO TELL YOU WHAT MY PROPOSED RESPONSE IS.

**MS. PIERCE:** VERY INTERESTING QUESTION.

**THE COURT:** YES. OKAY. SO --

**MS. PIERCE:** VERY PRECISE.

**THE COURT:** WHY DON'T WE GO ON AND RETURN THE -- THIS IS -- MY RESPONSE WILL BE AS FOLLOWS -- AND IT WILL BE ENTITLED: "RESPONSE TO JURY QUESTION NO. 1." THE RESPONSE IS: "IF YOU FIND THAT JAMES MAYS, SOLELY AND BY HIMSELF, WAS NEGLIGENT AND THAT HIS NEGLIGENCE CAUSED HIS DEATH, OR IF YOU FIND THAT JAMES MAYS AND OTHERS WERE NEGLIGENT AND THAT THE NEGLIGENCE OF JAMES MAYS AND OTHERS CAUSED MR. JAMES MAYS'S DEATH, YOUR ANSWER TO QUESTION 3 SHOULD BE YES."

ANY OBJECTION TO THAT BY THE PLAINTIFF?

**MS. PIERCE:** DO YOU MIND READING THAT ONE MORE TIME, YOUR HONOR?

**THE COURT:** SURE. "IF YOU FIND THAT JAMES MAYS, SOLELY AND BY HIMSELF, WAS NEGLIGENT AND THAT HIS NEGLIGENCE CAUSED HIS DEATH, OR IF YOU FIND THAT JAMES MAYS AND OTHERS WERE NEGLIGENT AND THAT THE NEGLIGENCE OF JAMES MAYS AND OTHERS CAUSED JAMES

MAYS'S DEATH, YOUR ANSWER TO QUESTION 3 SHOULD BE YES."

ANY OBJECTION BY THE PLAINTIFF?

**MS. PIERCE:** NO OBJECTION, YOUR HONOR.

**THE COURT:** ANY OBJECTION BY THE DEFENDANT?

**MR. MCLAUGHLIN:** NO OBJECTION.

**THE COURT:** VERY WELL. I WILL SIGN IT AT THIS TIME AND DATE IT. AND THE TIME NOW IS 1:09 P.M. AND I AM PLACING -- I'LL ORDER THAT THE QUESTION BE PLACED INTO THE RECORD AS JURY QUESTION NO. 1.

OKAY. MR. MARSHAL, IF YOU WOULD BE KIND ENOUGH TO RETURN THAT TO THE JURY, SIR, I WOULD APPRECIATE THAT.

ALL RIGHT. PAM, WE'LL ENTER THAT INTO THE RECORD, PLEASE.

**THE COURTROOM DEPUTY:** YES, SIR.

**THE COURT:** ALL RIGHT. OKAY. THANK YOU ALL FOR BEING CLOSE BY. I WOULD ASK YOU TO EXCUSE YOURSELVES AT THIS TIME, AND WE WILL NOTIFY YOU IF THE JURY HAS ANY ADDITIONAL QUESTIONS OR WHEN THE VERDICT IS REACHED. THANK YOU ALL.

COURT IS IN RECESS.

**(WHEREUPON, A RECESS WAS TAKEN.)**

**THE COURT:** BE SEATED. LET THE RECORD REFLECT THAT WE'RE BACK ON THE RECORD IN THE CASE OF

MAYS VERSUS CHEVRON PIPE LINE COMPANY. PRESENT AT THIS TIME ARE COUNSEL FOR BOTH PARTIES.

THE COURT HAS RECEIVED A SECOND QUESTION FROM THE JURY. AND THE QUESTION READS AS FOLLOWS. IT SAYS: "JURY QUESTION NO. 2.

"IN REGARDS TO QUESTION NO. 7, IS THE PERCENTAGE OF FAULT IN QUESTION NO. 6 GIVEN ANY WEIGHT OR CONSIDERATION WITH RESPECT TO THE TOTAL DOLLAR AMOUNT OF ANY DAMAGES AWARDED TO THE PLAINTIFF (IF ANY)? OR IS 100 PERCENT OF THE TOTAL AWARDED IN QUESTION 7 CONSIDERED REGARDLESS OF ANY PERCENTAGE OF FAULT SPECIFIED IN QUESTION 6?"

NOW, I'LL GIVE Y'ALL AN OPPORTUNITY TO READ IT BEFORE I INFORM YOU OF WHAT MY RESPONSE TO THE JURY WILL BE.

OKAY. THE RESPONSE WILL BE BASED UPON INFORMATION AND AUTHORITY FOUND AT THE LOUISIANA LAW TREATISE AND SPECIFICALLY THE CHAPTER 5, WHICH IS THE CHAPTER IN DEALING WITH DEFENSES IN NEGLIGENCE CASES AND THE AWARDING OF A PORTION OF FAULT.

THE COURT'S RESPONSE WILL READ AS FOLLOWS: "RESPONSE TO JUROR QUESTION NO. 2. AFTER YOU DETERMINE THE PERCENTAGES OF FAULT, IF ANY, ATTRIBUTED TO DEFENDANT CHEVRON PIPE LINE COMPANY, JAMES MAYS, FURMANITE AMERICA, INC., AND ACADIAN

CONTRACTORS (AS REQUIRED IN QUESTION 6), QUESTION 7 REQUIRES YOU TO CALCULATE THE TOTAL AMOUNT OF DAMAGES PLAINTIFFS HAVE PROVED BY A PREPONDERANCE OF THE EVIDENCE WITHOUT MAKING ANY REDUCTIONS, ENHANCEMENTS, OR OTHER CALCULATIONS BASED UPON YOUR ASSIGNMENT OF FAULT."

I'LL READ IT AGAIN. "AFTER YOU DETERMINE THE PERCENTAGES OF FAULT, IF ANY, ATTRIBUTED TO DEFENDANT CHEVRON PIPE LINE COMPANY, JAMES MAYS, FURMANITE AMERICA, INC., AND ACADIAN CONTRACTORS, INC. (AS REQUIRED IN QUESTION 6), QUESTION 7 REQUIRES YOU TO CALCULATE THE TOTAL AMOUNT OF DAMAGES PLAINTIFFS HAVE PROVED BY A PREPONDERANCE OF THE EVIDENCE WITHOUT MAKING ANY REDUCTIONS, ENHANCEMENTS, OR OTHER CALCULATIONS BASED ON YOUR ASSIGNMENT OF FAULT."

AND THAT IS THE RESPONSE THAT IS, IN MY JUDGMENT, REQUIRED BY THE LOUISIANA LAW. AS YOU ALL KNOW, THE COURT WILL THEN MAKE THE FINAL DETERMINATION OF DAMAGES BASED UPON THE JURY'S ATTRIBUTION OR ASSIGNMENT OF FAULT TO ANY RELEVANT PARTIES.

ALL RIGHT. ANY OBJECTION BY THE PLAINTIFF?

**MS. PIERCE:** NO, SIR.

**THE COURT:** ANY OBJECTION BY THE DEFENDANT?

**MR. MCLAUGHLIN:** NO, SIR.

**THE COURT:** VERY WELL. AND LET THE RECORD REFLECT THAT AT THIS TIME, MR. MARSHAL, IF YOU WILL -- OH. I GUESS I SHOULD SIGN IT AND DATE IT AND -- JUST A MOMENT.

OKAY. LET ME THANK YOU ALL FOR BEING CLOSE BY. I'M GOING TO ASK YOU OF COURSE TO REMAIN CLOSE BY IN CASE THERE IS ANOTHER QUESTION FROM THE JURY.

COURT IS IN RECESS.

**(WHEREUPON, A RECESS WAS TAKEN.)**

**THE COURT:** BE SEATED. LET THE RECORD REFLECT THAT WE ARE OF COURSE BACK ON THE RECORD IN THE CASE OF MAYS VERSUS CHEVRON PIPE LINE COMPANY. ALSO LET THE RECORD REFLECT THAT COUNSEL FOR BOTH THE PLAINTIFF AND THE DEFENDANTS ARE PRESENT IN COURT AT THIS TIME.

I'VE BEEN INFORMED THAT THE JURY HAS REACHED A VERDICT IN THE CASE. AND AT THIS POINT WE WILL HAVE THE JURY RETURN TO THE COURTROOM AND THE VERDICT WILL BE READ ALOUD.

LET'S ALL RISE FOR THE JURY.

**REPORTER'S NOTE: (WHEREUPON, THE JURY IS IN THE COURTROOM.)**

**THE COURT:** BE SEATED. MS. FITZGERALD, I'VE BEEN INFORMED THAT YOU HAVE BEEN SELECTED TO SERVE AS

THE FOREPERSON OF THIS JURY.

**JUROR FITZGERALD:** YES, SIR.

**THE COURT:** HAS THE JURY REACHED A VERDICT IN THE CASE, MA'AM?

JUROR FITZGERALD: YES, WE HAVE.

**THE COURT:** WOULD YOU BE KIND ENOUGH TO PASS YOUR VERDICT FORM TO THE MARSHAL AT THIS TIME.

CALCULATOR STILL IN THE COURTROOM? LET ME JUST MAKE SURE THE NUMBERS ARE RIGHT, LADIES AND GENTLEMEN. I DON'T WANT TO HAVE TO SEND YOU ALL BACK. THERE IS ONE VERY MINOR ERROR IN THE CALCULATION BY -- MS. FITZGERALD, LET ME JUST SEE YOU.

AND I'M GOING TO ASK YOU TO JUST MAKE -- AND I'LL EXPLAIN LATER. THANK YOU SO MUCH. I APPRECIATE IT.

I FIND THAT THE VERDICT FORM IS PROPERLY COMPLETED BY THE JURY AND SIGNED BY THE FOREPERSON. AT THIS TIME, LADIES AND GENTLEMEN, YOUR VERDICT WILL BE READ ALOUD. IT WILL BE, AS WE CALL IT, PUBLISHED TO THE JURY BY MY COURTROOM DEPUTY.

**THE COURTROOM DEPUTY:** CIVIL ACTION 14-3098-BAJ, PEGGY MAYS, ET AL, VERSUS CHEVRON PIPE LINE COMPANY, ET AL.

"VERDICT

"HAVE PLAINTIFFS PROVED, BY A PREPONDERANCE OF THE EVIDENCE, THAT THERE IS A SUBSTANTIAL NEXUS -- THAT IS, A SIGNIFICANT CAUSAL LINK -- BETWEEN JAMES MAYS'S DEATH AND DEFENDANT CHEVRON PIPE LINE COMPANY'S OPERATIONS CONDUCTED ON THE OUTER CONTINENTAL SHELF FOR THE PURPOSE OF EXTRACTING OR TRANSPORTING NATURAL RESOURCES BY PIPELINE FROM THE OUTER CONTINENTAL SHELF?

"YES.

"HAVE PLAINTIFFS PROVED, BY A PREPONDERANCE OF THE EVIDENCE, THAT DEFENDANT CHEVRON PIPE LINE COMPANY WAS NEGLIGENT AND THAT DEFENDANT CHEVRON PIPE LINE COMPANY'S NEGLIGENCE CAUSED JAMES MAYS'S DEATH?

"YES.

"HAS DEFENDANT CHEVRON PIPE LINE COMPANY PROVED, BY A PREPONDERANCE OF THE EVIDENCE, THAT JAMES MAYS WAS HIMSELF NEGLIGENT AND THAT JAMES MAYS'S NEGLIGENCE CAUSED JAMES MAYS'S DEATH?

"YES.

"HAS DEFENDANT CHEVRON PIPE LINE COMPANY PROVED, BY A PREPONDERANCE OF THE EVIDENCE, THAT FURMANITE AMERICA, INC. WAS NEGLIGENT AND THAT FURMANITE AMERICA, INC.'S NEGLIGENCE CAUSED JAMES MAYS'S DEATH?

"NO.

"HAS DEFENDANT CHEVRON PIPE LINE COMPANY PROVED, BY A PREPONDERANCE OF THE EVIDENCE, THAT ACADIAN CONTRACTORS, INC. WAS NEGLIGENT AND THAT ACADIAN CONTRACTORS, INC.'S NEGLIGENCE CAUSED JAMES MAYS'S DEATH?

"NO.

"INDICATE IN THE SPACES BELOW THE PERCENTAGE FAULT FOR JAMES MAYS'S DEATH THAT YOU ASSIGN TO THE FOLLOWING:

"DEFENDANT CHEVRON PIPE LINE COMPANY 70 PERCENT.

"JAMES MAYS 30 PERCENT;

"FURMANITE AMERICA ZERO;

"ACADIAN CONTRACTORS ZERO;

"INDICATE THE DOLLAR AMOUNTS IN THE SPACES BELOW WHAT DAMAGES, IF ANY, PLAINTIFFS HAVE PROVED BY A PREPONDERANCE OF THE EVIDENCE.

"FUNERAL EXPENSE $12,549.79;

"LOSS OF SUPPORT OF PEGGY MAYS $630,000;

"LOSS OF LOVE, AFFECTION, AND CONSORTIUM OF PEGGY MAYS $2 MILLION;

"LOSS OF LOVE AND AFFECTION OF DAPHNE LANCLOS $100,000;

"LOSS OF LOVE AND AFFECTION OF BRENT MAYS $100,000;

"LOSS OF LOVE AND AFFECTION OF JARED MAYS $100,000;

"TOTAL: $2,942,549.79."

SIGNED THIS DATE BY THE FOREPERSON.

**THE COURT:** THANK YOU, MADAME CLERK.

WOULD EITHER PARTY LIKE THE JURY TO BE POLLED IN CONNECTION WITH THIS VERDICT AT THIS TIME? ANY POLLING BY THE PLAINTIFF?

**MS. PIERCE:** NO, YOUR HONOR.

**THE COURT:** BY THE DEFENSE?

**MR. MCLAUGHLIN:** YES, YOUR HONOR.

**THE COURT:** VERY WELL. LADIES AND GENTLEMEN, AT THIS TIME WE WILL, WHAT IS CALLED, POLL YOU. THAT EACH OF YOUR -- EACH OF YOU WILL BE ASKED INDIVIDUALLY WHETHER THIS IS, IN FACT, YOUR VERDICT. AND WE WILL BEGIN WITH YOU, MR. HAWKINS.

MADAME CLERK?

**THE COURTROOM DEPUTY:** MR. HAWKINS, IS THIS YOUR VERDICT?

**JUROR HAWKINS:** I'M SORRY?

THE COURTROOM DEPUTY: IS THAT YOUR VERDICT?

**JUROR HAWKINS:** YES.

**THE COURTROOM DEPUTY:** MS. BOREL, IS THIS YOUR VERDICT?

**JUROR BOREL:** YES.

**THE COURTROOM DEPUTY:** MR. METZ, IS THIS YOUR VERDICT?

**JUROR METZ:** YES.

**THE COURTROOM DEPUTY:** MR. ANDRUS, IS THIS YOUR VERDICT?

**JUROR ANDRUS:** YES.

**THE COURTROOM DEPUTY:** MS. GUIDRY, IS THIS YOUR VERDICT?

**JUROR GUIDRY:** YES.

**THE COURTROOM DEPUTY:** MR. KOCH, IS THIS YOUR VERDICT?

**JUROR KOCH:** YES.

**THE COURTROOM DEPUTY:** MS. WALL, IS THIS YOUR VERDICT?

**JUROR WALL:** YES.

**THE COURTROOM DEPUTY:** MS. FITZGERALD, IS THIS YOUR VERDICT?

**JUROR FITZGERALD:** YES.

**THE COURTROOM DEPUTY:** MS. NAQUIN, IS THIS YOUR VERDICT?

**JUROR NAQUIN:** YES.

**THE COURT:** THANK YOU, LADIES AND GENTLEMEN. LET THE RECORD REFLECT THAT THE POLLING VERIFIES THE VERDICT -- THE JURY'S UNANIMOUS VERDICT. I SHALL DIRECT THE CLERK TO FILE AND RECORD THE VERDICT INTO

THE RECORD AT THIS TIME.

LADIES AND GENTLEMEN, THIS HAS BEEN A LONG WEEK. IT'S BEEN A TOUGHER WEEK THAN I THINK A LOT OF US ANTICIPATED. BUT LET ME JUST TELL YOU, ONCE AGAIN, HOW VITALLY IMPORTANT YOUR SERVICE IS TODAY. ALL OF YOU HERE -- AND I KNOW I SPEAK FOR EVERYONE ASSOCIATED WITH THIS CASE. ALL OF YOU HERE WERE VERY ATTENTIVE THROUGHOUT THIS WEEK. ONE OF MY JOBS IS TO MAKE SURE THAT THE JURY IS ATTENTIVE AND FOCUSED ON THE EVIDENCE. AND CLEARLY EACH OF YOU AT ALL TIMES WERE FOCUSED. AND IT'S CLEAR FROM THE AMOUNT OF TIME YOU TOOK TO DELIBERATE, AS WELL AS OTHER FACTORS, THAT YOU ALL TOOK YOUR JOBS VERY, VERY SERIOUSLY. AND SO AGAIN, ON BEHALF OF EVERYONE ASSOCIATED WITH THIS TRIAL, I WANT TO THANK YOU FOR THAT.

I ALSO TOLD YOU EARLIER THAT IT IS GOOD CITIZENS LIKE YOU ALL WHO ARE THE PEOPLE THAT OUR FOUNDING FATHERS REALLY HAD IN MIND AS REALLY PROTECTING OUR DEMOCRACY AND, MORE SPECIFICALLY, PROTECTING OUR SYSTEM OF CIVIL JUSTICE AND CRIMINAL JUSTICE BY DOING WHAT YOU DID AND SACRIFICING YOUR TIME TO BE HERE TODAY, SO I CAN'T THINK YOU ENOUGH FOR THAT.

I WILL OFFICIALLY EXCUSE YOU AT THIS TIME, BUT I WILL ASK YOU TO RETURN TO THE JURY ROOM FOR

JUST ABOUT FIVE MINUTES. AND I PROMISE YOU IT WILL ONLY BE FIVE MINUTES THIS TIME. I HAVE JUST A VERY SHORT MATTER TO ATTEND TO WITH THE LAWYERS, BUT I'D LIKE TO VISIT WITH YOU PRIVATELY BEFORE YOU LEAVE HERE TODAY. THANK YOU AGAIN.

LET'S ALL RISE FOR THE JURY.

**REPORTER'S NOTE: (WHEREUPON, THE JURY IS OUT OF THE COURTROOM.)**

**THE COURT:** BE SEATED. ALL RIGHT. WELL, IF THERE ARE ANY POST-TRIAL MATTERS TO BE TAKEN UP, I WOULD SIMPLY ASK FOR ALL THE LAWYERS TO ABIDE BY THE RELEVANT RULES AND THE FEDERAL RULES OF CIVIL PROCEDURE AND THE DEADLINE SET FORTH THEREIN. I'M NOT ENCOURAGING ANY POST-TRIAL FOLLOW-UP TO ANYTHING WE HAD TODAY.

BUT LET ME, BEFORE WE ADJOURN COURT, THANK THE LAWYERS ONCE AGAIN. ALL OF YOU WERE VERY, VERY PREPARED, AND THAT ALWAYS HELPS THE CASE TO FLOW. I KNOW THAT THE JURY APPRECIATES YOU ALL BEING PREPARED AND READY TO GO. AND AGAIN, I COMMEND YOU FOR ALL YOUR HARD WORK ON BOTH SIDES OF THIS VERY, VERY DIFFICULT CASE.

AND FINALLY, MRS. MAYS, TO YOU AND YOUR FAMILY, ONCE AGAIN, LET ME EXPRESS MY SYMPATHY TO YOU. THIS WAS A HORRIBLE, HORRIBLE INCIDENT THAT NO

FAMILY SHOULD HAVE TO GO THROUGH.

**MS. MAYS:** MAY I SAY SOMETHING?

**THE COURT:** YES, MA'AM, YOU MAY.

**MS. MAYS:** I WOULD LIKE TO SAY TO THE JURY WHEN THEY COME BACK IN --

**THE COURT:** THEY'RE NOT GOING TO COME BACK IN.

**MS. MAYS:** OKAY.

**THE COURT:** BUT I WILL CONVEY TO THEM YOUR --

**MS. MAYS:** PLEASE DO. AND I WOULD LIKE TO THANK YOU FOR EVERYTHING YOU DID.

**THE COURT:** YOU'RE QUITE WELCOME, MA'AM. AND GOOD LUCK TO YOU AND TO ALL OF YOUR FAMILY IN THE FUTURE. OKAY?

**MS. MAYS:** THANK YOU.

**THE COURT:** ALL RIGHT. IS THERE ANYTHING FURTHER FROM EITHER SIDE AT THIS TIME?

**MS. PIERCE:** NOT FROM THE PLAINTIFF, YOUR HONOR.

**MR. MCLAUGHLIN:** NOT FROM THE DEFENSE, YOUR HONOR.

**THE COURT:** WELL, THANK YOU ALL VERY MUCH, AND GOOD LUCK TO EVERYONE.

COURT IS NOW ADJOURNED.

(WHEREUPON, THE TRIAL BY JURY WAS CONCLUDED.)

C E R T I F I C A T E

I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF THE PROCEEDINGS IN THE ABOVE-ENTITLED NUMBERED MATTER.

S:/NATALIE W. BREAUX

NATALIE W. BREAUX, RPR, CRR

OFFICIAL COURT REPORTER